1  LAURENCE F. PULGRAM (CSB NO. 115163)
   *lpulgram@fenwick.com*
2  JEDEDIAH WAKEFIELD (CSB NO. 178058)
   *jwakefield@fenwick.com*
3  ALBERT L. SIEBER (CSB NO. 233482)
   *asieber@fenwick.com*
4  LIWEN A. MAH (CSB NO. 239033)
   *lmah@fenwick.com*
5  FENWICK & WEST LLP
   555 California Street, Suite 1200
6  San Francisco, CA  94104
   Telephone: (415) 875-2300
7  Facsimile:  (415) 281-1350

8  Attorneys for Defendants
   STORAGE TECHNOLOGY CORPORATION,
9  SUN MICROSYSTEMS, INC., EMC CORPORATION
   VERITAS SOFTWARE CORPORATION, and
10 DARDEN RESTAURANTS, INC.

11              UNITED STATES DISTRICT COURT

12            NORTHERN DISTRICT OF CALIFORNIA

13               SAN FRANCISCO DIVISION

14

15 NETBULA, LLC, a Delaware limited        Case No.  C-06-07391-MJJ
   liability company,
16                                         **DEFENDANTS' NOTICE OF MOTION AND**
                 Plaintiff,                **MOTION FOR SUMMARY JUDGMENT OR**
17                                         **SUMMARY ADJUDICATION OF ISSUES**
          v.                               **RELATING TO LICENSE DEFENSE**
18
   STORAGE TECHNOLOGY                      Date:     November 27, 2007
19 CORPORATION, a Delaware corporation;    Time:     9:30 A.M.
   SUN MICROSYSTEMS, INC., a Delaware      Dept:     Courtroom 11
20 corporation; INTERNATIONAL             Judge:    The Honorable Martin J. Jenkins
   BUSINESS MACHINES
21 CORPORATION, a New York
   corporation; EMC CORPORATION, a
22 Massachusetts corporation; VERITAS
   SOFTWARE CORPORATION, a
23 Delaware corporation; DARDEN
   RESTAURANTS, INC., a Florida
24 corporation; and DOES 1-100, inclusive,

25               Defendants.

26

27  / / /

28  / / /

DEFENDANTS' MOTION FOR SUMMARY                          CASE NO.  C-06-07391-MJJ
JUDGMENT

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ................................................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................ 2

INTRODUCTION ................................................................................................................. 2

ISSUES PRESENTED .......................................................................................................... 4

FACTUAL BACKGROUND ................................................................................................. 5

    A.    StorageTek's Business and Use of Netbula RPC Software .................................... 5

    B.    Netbula's Business and Products .......................................................................... 5

    C.    The Governing Agreements ................................................................................. 6

        1.    The SDK Licenses ................................................................................. 7

        2.    The Distribution Licenses Are Not Limited In Quantity and Do Not
            Require Prepayment ............................................................................... 7

        3.    The Distribution Licenses Are Not Restricted by Operating System ......... 8

    D.    Overview of the Dispute ...................................................................................... 9

    E.    Plaintiff's Purported Termination of the Netbula License ................................... 10

ARGUMENT ...................................................................................................................... 10

I.    LEGAL STANDARDS ................................................................................................ 10

II.    PLAINTIFF CANNOT MEET ITS BURDEN OF PROVING THAT
    STORAGETEK'S USE OR DISTRIBUTION OF SOFTWARE WAS OUTSIDE
    THE SCOPE OF ITS LICENSES ................................................................................ 11

    A.    Since The Existence Of The License Is Not In Dispute, Plaintiff Bears The
        Burden Of Proving Use Outside The Scope Of Its License ................................. 11

    B.    The Court Must Look To The Written Integrated Agreements To
        Determine Their Scope ...................................................................................... 12

    C.    Plaintiff Cannot Prevail On A Claim That StorageTek Exceeded The Scope
        Of The Distribution Licenses by Failing to Pay in Advance For Each Unit
        Distributed ........................................................................................................ 14

        1.    The Distribution Licenses Do Not Require Prepayment .......................... 14

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**TABLE OF CONTENTS**
(continued)

Page

2.    Miscounting Distributions and Failing to Pay Royalties Does Not Convert a Contract Dispute Into an Infringement Case ........................... 16

3.    StorageTek's Grant of "Site Licenses" to Customers Was Not Outside the Scope of the Distribution Licenses ....................................... 18

D.    Plaintiff's Effort to Import a Platform Restriction Into the Distribution Licenses Does Not Create a Claim for Copyright Infringement .......................... 19

1.    There is No Platform Restriction on the Distribution Licenses ............... 19

2.    Any Purported Platform Requirement Is Not A Condition Of The Distribution Licenses ............................................................................. 21

E.    Alleged Breaches of the SDK License Do Not Create Claims Under Copyright ....................................................................................................... 22

1.    Netbula Fails to Meet Its Burden Of Proving Use Outside The Scope Of The SDK Licenses ...................................................................... 22

2.    Even if Netbula Could Show That StorageTek Violated the SDK License, The Otherwise Licensed Distribution of Software Is Not An Infringement, And Is Subject To Summary Adjudication ................. 23

III.    PLAINTIFF'S PURPORTED TERMINATION OF STORAGETEK'S AGREEMENT DOES NOT CREATE A COPYRIGHT INFRINGEMENT CLAIM ...................................................................................................................... 23

IV.    STORAGETEK CUSTOMERS, INCLUDING DEFENDANTS EMC, IBM AND DARDEN, ARE WITHIN THE SCOPE OF STORAGETEK'S PERPETUAL AND IRREVOCABLE DISTRIBUTION LICENSES .................................................. 24

V.    CONCLUSION ........................................................................................................... 25

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

4      **CASES**

5      *Anderson v. Liberty Lobby, Inc.*,
          477 U.S. 242 (1986) ............................................................................. 10, 11

6      *Beck v. American Health Group Int'l, Inc.*,
          211 Cal. App. 3d 1555 (Cal. Ct. App. 1989) ......................................... 13

7

8      *Bionghi v. Metropolitan Water Dist.*,
          70 Cal. App. 4th 1358 (Cal. Ct. App. 1999) .................................... 13, 21

9      *Bourne v. Walt Disney Co.*,
          68 F.3d 621 (2nd Cir. 1995) ................................................................... 12

10     *Brawthen v. H & R Block, Inc.*,
          28 Cal. App. 3d 131 (Cal. Ct. App. 1972) ............................................ 13

11     *Brinderson-Newberg Joint Venture v. Pac. Erectors*,
          971 F.2d 272 (9th Cir. 1992) ................................................................. 15

12

13     *Celotex Corp. v. Catrett*,
          477 U.S. 317 (1986) ............................................................................... 11

14     *Effects Assoc., Inc. v. Cohen*,
          908 F.2d 555 (9th Cir. 1990) ................................................ 14, 16, 17, 18

15     *Fosson v. Palace (Waterland), Ltd.*,
          78 F.3d 1448 (9th Cir. 1996) ................................................................. 24

16

17     *Goodman v. Citizens Life & Casualty Ins. Co.*,
          253 Cal. App. 2d 807 (Cal. Ct. App. 1967) .......................................... 13

18     *Goodwest Rubber Corp. v. Munoz*,
          170 Cal. App. 3d 919 (1985) ................................................................. 11

19     *Graham v. James*,
          144 F.3d 229 (2d Cir. 1998) ............................................................ 11, 17

20     *I.A.E., Inc. v. Shaver*,
          74 F.3d 768 (7th Cir. 1996) ............................................................. 16, 17

21     *Irwin v. Am. Interactive Media, Inc.*,
          Civ. No. CV 93-1403, 1994 U.S. Dist. LEXIS 16223
          (C.D. Cal. April 14, 1994) ..................................................................... 17

22

23     *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*,
          175 F.3d 985 (Fed. Cir. 1999) ............................................................... 10

24     *Larsen v. Johannes*,
          7 Cal. App. 3d 491 (1970) ..................................................................... 13

25

26     *Leyse v. Leyse*,
          251 Cal. App. 2d 629 (Cal. Ct. App. 1967) .......................................... 13

27     *Madison River Mgmt. Co. v. Bus. Mgmt. Software Corp.*,
          387 F. Supp. 2d 521 (M.D.N.C. 2005).................................................. 17

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) .................................................................................................. 11

*Netbula, LLC v. BindView Dev. Corp.*,
    Case No. C-06-0711, 2007 U.S. Dist. LEXIS 74416
    (N.D. Cal. Sept. 10, 2007) ....................................................................................... 12

*Peer Int'l Corp. v. Pausa Records, Inc.*,
    909 F.2d 1332 (9th Cir. 1990) ........................................................................... 11, 24

*S.O.S., Inc. v. Payday, Inc.*,
    886 F.2d 1081 (9th Cir.1989) ................................................................................... 12

*Scholastic, Inc. v. Stouffer*,
    221 F. Supp. 2d 425 (S.D.N.Y. 2002),
    *aff'd*, 81 Fed Appx. 396 (2d Cir. 2003) ................................................................... 11

*Sulmeyer v. United States*,
    684 F.2d 1259 (9th Cir. 1982) .................................................................................. 17

*Sun Microsystems, Inc. v. Microsoft Corp.*,
    188 F.3d 1115 (9th Cir. 1999) .............................................................................. 2, 12

*Sun Microsystems, Inc. v. Microsoft Corp.*,
    Case No. 97-20884, 2000 U.S. Dist. LEXIS 20222
    (N.D. Cal. May 8, 2000) ..................................................................................... 16, 22

*Wm. E. Doud & Co. v. Smith*,
    256 Cal. App. 2d 552 (Cal. Ct. App. 1967) ....................................................... 20, 21

**STATUTES**

Cal. Civil Code § 1639 ................................................................................................... 13

Cal. Code of Civil Procedure § 1856(d) ........................................................................ 13

**RULES**

Federal Rule of Civil Procedure 56 ........................................................................... 1, 10

**OTHER AUTHORITIES**

3-27 Roger R. Milgrim, *Milgrim on Licensing*
    § 27.08, at 27-50 (rev. 2005) .................................................................................... 24

Software Council of Southern California, Understanding and Using Key Licensing
    Terminology, at http://www.scsc.org/resources/licensingterminology.html. ......................... 24

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE, that on November 27, 2007, at 9:30 A.M., or as soon thereafter as the matter may be heard, in Courtroom 11 of the above-entitled Court, located at 450 Golden Gate Avenue, San Francisco, California, Defendants Storage Technology Corporation ("StorageTek"), Sun Microsystems, Inc. ("Sun"), EMC Corporation ("EMC"), Darden Restaurants, Inc. ("Darden") (collectively "Defendants")[1], will and hereby do move pursuant to Fed. R. Civ. P. 56 for summary judgment that they are not liable to Plaintiff Netbula, LLC ("Netbula" of "Plaintiff") for copyright infringement and that Netbula is not entitled to an accounting by Defendants IBM, EMC, Veritas, or Darden.

Alternatively, Defendants seek summary adjudication of the following issues, and that each of them cannot give rise to a claim for copyright infringement: (1) StorageTek's distribution of products containing Netbula "Supporting Programs" without prepaying for each copy distributed was not outside the scope of StorageTek's Distribution Licenses with Plaintiff; (2) StorageTek's distribution of products containing Netbula "Supporting Programs" without pre-stated quantity limits was not outside the scope of StorageTek's Distribution Licenses with Plaintiff; (3) StorageTek's distribution of products containing Netbula "Supporting Programs" for use by customers on Windows 2000 Computers was not outside the scope of StorageTek's Distribution Licenses with Plaintiff; (4) Use by StorageTek customers Defendants EMC, Darden and IBM was not outside the scope of Netbula's Distribution Licenses to StorageTek; (5) StorageTek's use of Plaintiff's RPC Software Developer's Kit ("SDK") was not outside the scope of StorageTek's SDK Licenses with Plaintiff; and (6) Plaintiff's attempt to terminate StorageTek's perpetual, irrevocable license was ineffective and does not invalidate the rights of StorageTek customers to copy and use StorageTek software containing Plaintiff's code. The motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities in Support of Motion for Summary Judgment, the Declaration of Jedediah Wakefield ("Wakefield

---

[1] This action was dismissed as to Defendant Veritas Software Corporation on October 13, 2007. Docket No. 62. Although Storage Technology Corporation was dissolved after the merger with Sun, StorageTek was the named licensee, so in this brief we refer to StorageTek rather than to Sun to avoid confusion.

1   Decl."), the Declaration of Michael Melnick ("Melnick Decl."), the Declaration of Michael

2   Abramovitz ("Abramovitz Decl."), the papers, records, and pleadings on file herein, and on such

3   argument of counsel as the Court may allow.

4                   **MEMORANDUM OF POINTS AND AUTHORITIES**

5   **INTRODUCTION**

6           This motion presents a straightforward question: whether Defendant StorageTek's use and

7   distribution of Plaintiff's software was within the scope of StorageTek's licenses, thus providing

8   a complete defense to Plaintiff's claims of copyright infringement, and leaving Plaintiff with

9   remedies for alleged breach of contract rather than infringement.  In 2000 and again in 2004,

10  Plaintiff granted StorageTek licenses to develop software using Plaintiff's software developer's

11  kit, or "SDK" (the "SDK Licenses"), and separate licensees to distribute certain Netbula's code

12  within StorageTek products (the "Distribution Licenses").  Under the Distribution Licenses,

13  StorageTek could distribute any number of products containing the Netbula code – it merely had

14  to keep reasonable records and pay for the copies distributed.  StorageTek prepaid $5,995 for the

15  first 1000 copies to be distributed, and the Distribution Licenses provided for discounted prices

16  for each 1000 copies, or portion thereof, distributed thereafter.

17          In 2001 and 2002, StorageTek mistakenly underreported the number of copies it had

18  made.  In 2005, it updated its earlier reports and offered to pay the amount owed under the

19  licenses.  Unsatisfied with its contractual rights, Netbula refused payment, and instead filed a

20  sweeping lawsuit not only for breach of contract, but for "willful" copyright infringement and

21  fraud, and naming not only its customer StorageTek, but a number of StorageTek's customers as

22  well, and seeking infringement damages more than 100 times more than the contract price.

23          It is axiomatic that a copyright holder who grants a license to use his copyrighted material

24  waives his right to sue the licensee for copyright infringement and can sue only for breach of

25  contract.  *Sun Microsystems, Inc. v. Microsoft Corp.,* 188 F.3d 1115, 1121-22 (9th Cir. 1999).

26  Nevertheless, Netbula points to three equally baseless theories to attempt to revive its copyright

27  claims.  First, Netbula argues that its licenses did not allow StorageTek to distribute any copies

28  beyond the first 1000 for which it had prepaid.  Yet even a cursory review of the Agreement

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   makes clear that StorageTek had rights to continue distributing the products.  As Magistrate Judge

2   Zimmerman commented during Netbula's unsuccessful TRO attempt, "I don't quite understand

3   you.  This agreement says that they can go up *to any number of copies* as long as they're willing

4   to pay."  Wakefield Decl. ¶ 6, Ex. 7 at 25:6-8 (emphasis added)); *see also* Docket 18.  As a matter

5   of law, even if StorageTek is found to have fallen behind in royalty payments, such a contract

6   breach does not give rise to a claim of copyright infringement.

7         Second, Netbula argues – contrary to the plain language of the integrated Agreements –

8   that StorageTek's distribution rights were limited to particular computer operating systems.  Yet

9   while the *SDK License* in the 2000 Agreement was for use under Windows NT, 95 and 98, the

10  *Distribution Licenses* contained *no platform restriction,* nor even a mention of the operating

11  systems for which the code could be distributed.  Thus, under its unambiguous license grant,

12  StorageTek was permitted to distribute Netbula software along with StorageTek products for use

13  on any Windows computer.

14        Third, Netbula argues that StorageTek's internal use of the *SDK* violated the *SDK*

15  *Licenses*, by using it on the wrong version of Microsoft Windows and allowing use by too many

16  developers.  Yet Netbula can come forward with no evidence to support these allegations.

17  Moreover, even if Netbula could raise a factual issue as to inappropriate internal use of the SDK,

18  that could not undo the separate Distribution Licenses, nor convert StorageTek's otherwise

19  licensed distributions of the Supporting Programs into an infringement.  The Distribution and

20  Development Licenses are separate license grants.  The alleged use of the SDK by too many

21  programmers or on the wrong platform internally at StorageTek does not mean that distribution of

22  the Supporting Programs was unlicensed, and would not preclude summary judgment on the

23  license defense to distribution-based claims.

24        Netbula's desire to ignore its contracts is understandable.  After all, Netbula's contractual

25  prices – and the limitation of liability provisions to which it agreed – are small fraction of the

26  more than $10 million it now hopes to extract from StorageTek and its customers.  First Amended

27  Complaint ("FAC") ¶ 91.  But having licensed the right to develop and distribute software to

28  StorageTek for a fixed royalty, Netbula must live with its bargain.  On the undisputed facts of

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  record, Netbula cannot meet its burden of proving that StorageTek's use of the SDK or

2  distribution of Netbula code was outside the scope of its licenses.  Accordingly, Netbula's

3  copyright claims fail as a matter of law, not only as to StorageTek and its successor Sun, but as to

4  StorageTek's customers, whose perpetual, irrevocable licenses survive any purported termination

5  of the Agreements.  Plaintiff's copyright claims should be disposed of by summary judgment, and

6  StorageTek customers IBM, EMC, and Darden, who have been joined only in the copyright and

7  related accounting claims, should be dismissed.

8  **ISSUES PRESENTED**

9       (1)     Whether Plaintiff can meet its burden of proving that StorageTek's distribution of

10  products containing Netbula "Supporting Programs" without prepaying for each copy distributed

11  was outside the scope of StorageTek's Distribution Licenses.

12      (2)     Whether Plaintiff can meet its burden of proving that StorageTek's distribution of

13  products containing Netbula "Supporting Programs" without preset quantity limits was outside

14  the scope of StorageTek's Distribution Licenses.

15      (3)     Whether Plaintiff can meet its burden of proving that StorageTek's distribution of

16  products containing Netbula "Supporting Programs" for use by customers on Windows 2000

17  computers was outside the scope of StorageTek's Distribution Licenses, which say nothing about

18  limitation to any particular operating systems.

19      (4)     Whether Plaintiff's copyright claims fail as to StorageTek customers, including

20  Defendants EMC, Darden and IBM, where StorageTek's Distribution Licenses expressly

21  provided for distribution to StorageTek customers.

22      (5)     Whether Plaintiff can meet its burden of proving that StorageTek's use of

23  Plaintiff's "SDK" was outside the scope of StorageTek's SDK Licenses, and if so, whether such

24  use would invalidate StorageTek's separate Distribution Licenses.

25      (6)     Whether Plaintiff's attempt to terminate StorageTek's perpetual, irrevocable

26  Distribution Licenses long after product sales had ceased was effective, and if so, whether it can

27  retroactively invalidate the continuing rights of StorageTek customers to use StorageTek

28  software, where those Licenses expressly provide that customer licenses survive termination.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT        -4-        CASE NO.  C-06-07391-MJJ

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

**FACTUAL BACKGROUND**

2

    **A.**    **StorageTek's Business and Use of Netbula RPC Software**

3

    StorageTek, which Sun Microsystems, Inc. ("Sun") acquired in 2005, designs,

4

manufactures, and sells hardware, software, and services related to data storage, primarily based

5

on tape-cartridge technology. *See* Declaration of Michael Abramovitz ("Abramovitz Decl.") ¶ 2.

6

StorageTek's Automated Cartridge System Library Software ("ACSLS") manages tape cartridge

7

libraries, allowing the retrieval of tapes when needed. *Id.* StorageTek also provides software that

8

allows servers running various operating systems to interact with ACSLS. LibAttach is a

9

StorageTek software product that, among other things, allows Windows computers to

10

communicate with servers running ACSLS. *Id.* Until 2001, StorageTek also sold storage

11

management software known as REEL. *Id.* ¶ 3. StorageTek used Netbula's software developer's

12

kit, or "SDK" in connection with development of REEL and LibAttach. *Id.* ¶ 4. As permitted by

13

its Distribution Licenses, StorageTek then distributed to its customers component software parts

14

supplied by Netbula, called the "Supporting Programs," within certain versions of REEL and

15

LibAttach (including a LibAttach Integrators' Kit, used by StorageTek customers to create

16

applications that are compatible with LibAttach).[2] *Id.*

17

    In November 2005, StorageTek replaced the Netbula code with free software it found on

18

the Internet. *Id.* ¶ 9. That software, like Netbula's, was based on the code that Sun originally

19

created and made available free of charge to the developer community in the 1980s. *Id.* The

20

replacement was accomplished in a single day. *Id.*.

21

    **B.**    **Netbula's Business and Products**

22

    Netbula LLC was formed in July 1996. *See* Wakefield Decl. ¶ 5, Ex. 6 (Netbula-

23

BindView Joint Statement of Undisputed Facts) ("BVJS") ¶ 1. Dr. Dongxiao Yue is the owner

24

and only employee of Netbula. *Id.* Depending on the circumstances, Dr. Yue uses various titles:

25

President, Chief Officer of Sales and Marketing, and Vice President of Sales. *Id.* He also

26

---

27

[2] To ensure that the ACSLS server receives data in a consistent format, StorageTek used a standard protocol based on industry standard Remote Procedure Call ("RPC") technology. Sun, not Netbula, originally created the RPC technology known as ONC RPC. Other companies, such as Netbula, have adapted ONC RPC to support various operating systems. Abramowitz Decl. ¶ 2.

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  assumes false identities, using the aliases "John Young" and "David King" when communicating

2  with his customers.  Wakefield Decl. ¶ 4, Ex. 5 (52:2-54:20).  Although its PowerRPC copyright

3  registration lists Netbula as the author, Netbula's ONC RPC and Power RPC software were

4  developed beginning in 1994 – years before Netbula was formed.  BVJS ¶ 1.

5        Netbula's ONC RPC and PowerRPC software facilitates use of "Remote Procedure Call"

6  or "RPC" technology. *Id. ¶* 2. Netbula admits that its allegedly copyrighted code is based on

7  Sun's original ONC RPC code developed in the 1980s. *Id. ¶* 3.  Netbula offers separate licenses

8  for development and distribution of its RPC software: (1) SDK Licenses for computer

9  programmers who will use the SDK to develop applications, and (2) Distribution Licenses (also

10  sometimes called "Runtime Licenses") that give the licensee the right to distribute Netbula RPC

11  Supporting Programs.  FAC ¶ 22; BVSJ ¶ 4.

12        **C.    The Governing Agreements**

13        StorageTek and Netbula signed two written agreements, first on March 1, 2000 (the "2000

14  Agreement"), and again on March 17, 2004 (the "2004 Agreement") (collectively "the

15  Agreements").[3] Melnick Decl. ¶ 2, Ex. 1 (2000 Agreement at p. 1); Ex. 2 (2004 Agreement at

16  p. 1). Both Agreements include the identical integration clause:

17        This Agreement is the final, complete and exclusive agreement between the
       parties relating to the subject matter hereof, and supersedes all prior or
18        contemporaneous understandings and agreements relating to such subject matter,
       whether oral or written.
19

20  *Id.* ¶ 2, Ex. 1 (2000 Agreement at p. 4); Ex. 2 (2004 Agreement at p. 4).  The Agreements are

21  both governed by California law. *Id.*

22        Each Agreement is a single document, but contains two separate and distinct licenses:

23  (1) the "NETBULA ONC RPC SDK AND POWER SDK PRODUCT LICENSE" (the "SDK

24  License"), which provides for use of Plaintiff's Software Developer's Kit, or "SDK"; and (2) the

---

[3] When Sun approached Netbula in 2004 to pay for additional copies, Netbula suggested
25  *amending* the existing 2000 Agreement, and proposed using its updated form license agreement
26  to do so.  Melnick Decl. ¶ 3, Exs. 3-4.  Now, Netbula claims that the 2004 Agreement is not an
   amendment, but rather is a new Agreement.  Since the outcome of this Motion does not turn on
27  whether the 2004 Agreement was a stand-alone contract or an amendment, for ease of reference
   Sun refers to two signed documents as the "2000 Agreement" and the "2004 Agreement," but Sun
28  reserves its rights to assert that the 2004 Agreement was an amendment to the 2000 Agreement.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

"NETBULA ONC RPC AND POWERRPC DISTRIBUTION LICENSE" (the "Distribution

License"), which provides for StorageTek's distribution to customers of software containing

certain Netbula "Supporting Programs."

### 1. The SDK Licenses

The SDK Licenses govern StorageTek's internal use of Netbula's SDK product.  In

contrast to the Distribution Licenses, the SDK Licenses limit the operating systems on which

StorageTek could use the SDK to develop software.  The 2000 SDK License provides for up to

one StorageTek user for each SDK License purchased (and StorageTek purchased eight Licenses)

to use Plaintiff's SDK under "Windows NT and 95/98." *Id.* ¶ 2, Ex. 1 (2000 Agreement at p. 1).

The 2004 SDK License is nearly identical, but allows the one StorageTek user to use computers

running additional operating systems—"Windows Server 2003, NT/2K/XP and 95/98/ME." *Id.*

¶ 2, Ex. 2 (2004 Agreement at p. 1).  As discussed below, contrary to Plaintiff's speculation, the

only evidence is that StorageTek used Plaintiff's SDK to develop software on computers running

operating systems within these license grants.  Abramovitz Decl. ¶¶ 4-8.

The restrictions of the SDK License, by their own terms, do not apply to the separate and

distinct Distribution Licenses, which govern distribution of "Supporting Programs," not use of the

SDK.  Each SDK License is for "one user" who must be an employee, consultant or subsidiary of

StorageTek.  In contrast, the Distribution License necessarily provides for distributions outside of

StorageTek, to StorageTek customers, resellers and business partners.

### 2. The Distribution Licenses Are Not Limited In Quantity and Do Not Require Prepayment

Each Distribution License expressly allows StorageTek to distribute the Supporting

Programs without any limitation on quantity.  The 2000 Distribution License provides:

> NETBULA grants to STORAGETEK, a non-exclusive, perpetual, irrevocable
> license to copy, sublicense, transfer and distribute the NETBULA RPC
> Supporting Programs and components set forth on Exhibit B (the "Supporting
> Programs") along with STORAGETEK's product to STORAGETEK's resellers
> and customers.

Melnick Decl. ¶ 2, Ex. 1 (2000 Agreement at p. 1).  The 2004 Distribution License states

> NETBULA grants to STORAGETEK, a non-exclusive, perpetual, worldwide,

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> irrevocable license to copy, sublicense, transfer, demonstrate and distribute the NETBULA RPC Supporting Programs and components set forth on Exhibit B (the "Supporting Programs") along with STORAGETEK's product to STORAGETEK's resellers, business partners and customers.

*Id.* ¶ 2, Ex. 2 (2004 Agreement at p. 2).

Neither the 2000 nor the 2004 Distribution Licenses require prepayment. On the contrary, each specifically envisions payment for copies that have been "distribut*ed*" – that is, where the distribution has already occurred:

> You agree to maintain reasonable records of the number of copies of the Supporting Programs distributed hereunder and to pay NETBULA as set forth in Exhibit C for such copies."

*Id.* ¶ 2, Ex. 1 (2000 Agreement at p. 2); Ex. 2 (2004 Agreement at p. 2). Exhibit C of each Distribution License lists not one price, but rather a schedule of quantities in 1000-unit increments with accompanying prices (e.g., the list price of $5995 for the first thousand, and discounted prices for quantities beyond that). *Id.* ¶ 2, Ex. 1 (2000 Agreement at p. 7); Ex. 2 (2004 Agreement at p. 8). Exhibit C makes clear that additional units may be distributed at these specified pricing terms, as part of the "limited distribution license." Exhibit C of the 2000 Agreement states, "NETBULA agrees to offer STORAGETEK additional units of Supporting Program licenses for the limited distribution license" as specified in the schedule. *Id.* ¶ 2, Ex. 1 (2000 Agreement at p. 7). The 2004 version omits that sentence but instead introduces the schedule of prices with "Limited distribution licenses *will* be priced as follows." *Id.* ¶ 2, Ex. 2 (2004 Agreement at p. 8 (emphasis added)). For both 2000 and 2004, Exhibit C of the Distribution License makes clear that future distributions are governed by the same terms: "Additional license purchased are subject to the terms and conditions of this Agreement." *Id.*

### 3.    The Distribution Licenses Are Not Restricted by Operating System

The Distribution Licenses say nothing about platform. They simply grant broad rights to distribute Netbula Supporting Programs with StorageTek's products. While a software supplier theoretically could restrict distributions to particular operating systems, Netbula did not do so.[4]

---

[4] Nor would it have made sense Netbula to restrict the type of computer that *StorageTek's* customers could use. After all, the more StorageTek customers who use the software, the more royalties Netbula can make.

1    The original draft of the 2000 Distribution License proposed by Plaintiff did include a

2    restriction on the types of software products in which StorageTek could distribute the Supporting

3    Programs, restricting the license to products that did not compete with Netbula.  Melnick Decl.

4    ¶ 3, Ex. 3.  However, in negotiations StorageTek rejected that restriction, explaining, "We can't

5    be constrained in what we ship." *Id.*

6    Likewise, Exhibits B and C to the Agreements do not impose any restriction on licensees

7    or sub-licensees regarding the type of use or operating system for Plaintiff's Supporting

8    Programs.  *See id.* ¶ 2, Ex. 1 (2000 Agreement at pp. 6-7); Ex. 2 (2004 Agreement at pp. 7-8).

9    Exhibit B to both Agreements simply states that "[o]ne or more of the following components are

10   distributed along with Netbula ONC RPC applications," and includes a list of the Supporting

11   Programs for Netbula ONC RPC.  It does not specify that StorageTek may only distribute them

12   under certain conditions.  *Id.*

13   **D.    Overview of the Dispute**

14   In 2001, Netbula requested a report of the number of copies distributed pursuant to the

15   distribution license. *Id.* ¶ 4.  Based on an understanding that the Netbula Supporting Programs

16   were only being used in REEL, Michael Melnick of StorageTek reported that the number of

17   copies distributed was 107. *Id.* When Netbula requested another report in 2002, Mr. Melnick

18   responded that StorageTek no longer distributed the runtimes with its products, and that the

19   count remained the same as provided in 2001. *Id.*

20   Unbeknownst to Mr. Melnick at the time, the Netbula Supporting Programs were also

21   being distributed with StorageTek's LibAttach product. *Id.* After learning of this in 2004, Mr.

22   Melnick contacted Netbula to pay for another 1,000 copies. *Id.* ¶ 5. On March 12, 2004,

23   StorageTek executed the 2004 Agreement, pursuant to which StorageTek obtained a new version

24   of the SDK for the platforms described above (i.e., all Windows platforms in existence to that

25   time), and paid $5,096 for another 1,000 distribution copies of the Supporting Programs. *Id.*

26   Later in 2004, Dr. Yue (under the assumed name "John Young") sent Mr. Melnick a

27   request for an additional report of the number of copies of Supporting Programs distributed. *Id.*

28   ¶ 6. After some discussions, StorageTek reported over 1000 copies distributed before the 2004

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    Agreement, and over 1000 thereafter; it also proposed paying for 3,000 copies beyond the 2000

2    for which it had already paid. *Id.*  In December 2005, Sun provided a further report of the

3    number of copies distributed, and again offered payment. *Id.* However, after learning of

4    StorageTek's planned acquisition by Sun, Dr. Yue, acting as "John Young," refused to honor the

5    prices listed in the Distribution Licenses, and threatened to terminate the 2004 licenses unless

6    StorageTek agreed to a much higher per copy price. *Id.*  Sun refused Netbula's inflated demands

7    and replaced the Netbula Supporting Programs with free publicly available alternatives. *Id.*;

8    Abramovitz Decl. ¶ 9.

9              **E.      Plaintiff's Purported Termination of the Netbula License.**

10            A year later, and a week before filing this action, Plaintiff sent a letter purporting to

11   terminate retroactively its licenses with StorageTek.  Yet all of StorageTek's licenses are

12   perpetual and irrevocable by their terms.  *See* Melnick Decl. ¶ 2, Ex. 1 at pp. 1-2; Ex. 2 at p. 2.

13   And if this were not enough, both the 2000 and 2004 licenses state that, even if Netbula could

14   terminate the Agreements, it cannot revoke the licenses granted to StorageTek customers: "Any

15   termination of this Agreement will not affect any sublicenses granted by STORAGETEK to their

16   customers, *such licenses will remain in full force and effect*."  *Id.* ¶ 2, Ex. 1 at p. 4; Ex. 2 at p. 4

17   (emphasis added).

18   **ARGUMENT**

19   **I.      LEGAL STANDARDS**

20            Summary judgment is appropriate where there is "no genuine issue as to any material fact

21   and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see*

22   *also, Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 988 (Fed. Cir. 1999).  An

23   issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable fact finder

24   could find for the nonmoving party, and a dispute is "material" only if it could affect the outcome

25   of the suit under governing law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49

26   (1986).

27            A motion for summary judgment "pierces" the pleadings and tests whether the non-

28   movant can produce sufficient evidence for its claims or defenses to create a genuine issue for

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Once the movant has met its

2   initial burden of showing there is no genuine issue of any material fact, the non-movant has the

3   burden of producing competent evidentiary materials and cannot rely merely on mere allegations

4   or denials in the pleadings.  *Id.* at 322-23; *Anderson*, 477 U.S. at 247-48, 256-57; *Matsushita*

5   *Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  "Where the record

6   taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

7   'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587.  Interpretation of the meaning of

8   contracts is a matter of law suitable for summary judgment.  *See Goodwest Rubber Corp. v.*

9   *Munoz*, 170 Cal. App. 3d 919, 920-21 (1985).  Summary judgment may appropriately resolve

10  claims of copyright infringement.  *See, e.g.*, *Scholastic, Inc. v. Stouffer*, 221 F. Supp. 2d 425,

11  433, 438-39 (S.D.N.Y. 2002), *aff'd*, 81 Fed Appx. 396, 397-98 (2d Cir. 2003).

12  **II.     PLAINTIFF CANNOT MEET ITS BURDEN OF PROVING THAT
13         STORAGETEK'S USE OR DISTRIBUTION OF SOFTWARE WAS OUTSIDE
           THE SCOPE OF ITS LICENSES**

14       **A.     Since The Existence Of The License Is Not In Dispute, Plaintiff Bears The
15              Burden Of Proving Use Outside The Scope Of Its License**

16       As the Ninth Circuit has observed, "[g]enerally, a copyright owner who grants a

17  nonexclusive license to use his copyrighted material waives his right to sue the licensee for

18  copyright infringement and can sue only for breach of contract.  If, however, a license is limited

19  in scope and the licensee acts outside the scope, the licensor can bring an action for copyright

20  infringement."  *Sun Microsystems,* 188 F.3d at 1121-22 (internal quotations marks and citations

21  omitted) (vacating preliminary injunction, noting that before copyright holder can "gain the

22  benefits of copyright enforcement, it must definitively establish that the rights it claims were

23  violated are copyright, not contractual, rights").  "A copyright owner who grants a nonexclusive

24  license to use his copyrighted material waives his right to sue the licensee for copyright

25  infringement."  *Graham v. James*, 144 F.3d 229, 236 (2d Cir. 1998) (citing *Peer Int'l Corp. v.*

26  *Pausa Records, Inc.*, 909 F.2d 1332, 1338-39 (9th Cir. 1990).

27       Where a licensor violates a *condition* of the license, the licensor may sue for

28  infringement, but where the licensee breaches a *covenant* in the agreement, the licensor's remedy

1    is limited to an action on the contract. *Sun Microsystems,* 188 F.3d at 1121-22.  Applicable state

2    law (in this case, California law) is used to determine whether a contract term is a covenant or a

3    condition. *Id.*

4    　　　Where, as here, the *existence* of a license is not in dispute, and only the *scope* of the

5    license is at issue, the copyright owner bears the burden of proving that the defendant's copying

6    was outside the license's scope.  *Bourne v. Walt Disney Co*., 68 F.3d 621, 631 (2nd Cir. 1995)

7    ("Copyright disputes involving only the scope of the alleged infringer's license present the court

8    with a question that essentially is one of contract:  whether the parties' license agreement

9    encompasses the defendant's activities."); *see S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1085

10   (9th Cir. 1989) ("To prevail on its claim of copyright infringement, [the copyright owner] must

11   prove ... ' copying' of protectible expression by [the accused infringer] beyond the scope of [the]

12   license."); *Netbula, LLC v. BindView Dev. Corp.*, Case No. C-06-0711, 2007 U.S. Dist. LEXIS

13   74416 (N.D. Cal. Sept. 10, 2007).

14   　　　Here, there is no dispute that Plaintiff granted SDK Licenses in 2000 and 2004 for

15   StorageTek to use Plaintiff's SDK for developing software. *See* Wakefield Decl. ¶ 2, Ex. 1

16   [Plaintiff Response to Interrogatory No. 1].  Indeed, Plaintiff attached the 2000 Agreement to its

17   TRO papers, and has sued for the alleged breach of both Agreements.  *See* Docket No. 3

18   (Declaration of Don Yue in Support of Plaintiff's Application for Temporary Restraining Order

19   ¶ 4, Ex. A), FAC ¶¶ 102-107.  It is further undisputed that Plaintiff granted Distribution Licenses

20   in 2000 and 2004 to StorageTek for the distribution of Plaintiff's Supporting Programs with

21   StorageTek's own software. *See id*.  Accordingly, the burden falls squarely on Plaintiff to

22   "establish that the rights it claims were violated are copyright, not contractual, rights" by proving

23   that Defendants' allegedly infringing copying not only breached, but was outside the scope of,

24   the licenses. *See Sun Microsystems*, 188 F.3d at 1121-22.

25   　　　**B.　　The Court Must Look To The Written Integrated Agreements To Determine**
26   　　　　　　**Their Scope**

27   　　　When determining the scope of the licenses, "[t]he language of a contract is to govern its

28   interpretation, if the language is clear and explicit, and does not involve an absurdity." Cal. Civ.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    Code § 1638. Words of a contract "are generally to be understood in their ordinary and popular

2    sense." *Beck v. American Health Group Int'l, Inc.*, 211 Cal. App. 3d 1555, 1562 (Cal. Ct. App.

3    1989). For a written contract, "the intention of the parties is to be ascertained from the writing

4    alone." Cal. Civ. Code § 1639.

5         This is particularly true when the parties to a written instrument have agreed that it is the

6    exclusive and final embodiment of their contract, in which case the written contract is integrated

7    and parol evidence is inadmissible to alter or enlarge its terms. *Brawthen v. H & R Block, Inc.*, 28

8    Cal. App. 3d 131, 135 (Cal. Ct. App. 1972); *see also* Cal. Code Civ. Proc. § 1856(d); *Larsen v.*

9    *Johannes*, 7 Cal. App. 3d 491, 500 (1970) (noting that whether an instrument is integrated is a

10   question for the court). The most certain criterion of the completeness of an individual writing

11   will be found within the writing itself. *Goodman v. Citizens Life & Casualty Ins. Co.*, 253 Cal.

12   App. 2d 807, 814 (Cal. Ct. App. 1967).  If on its face a writing purports to be a complete and final

13   expression of the agreement, parol evidence is excluded.  *Leyse v. Leyse*, 251 Cal. App. 2d 629,

14   638 (Cal. Ct. App. 1967).  The rationale for such exclusion is that "[t]estimony of intention which

15   is contrary to a contract's express terms . . . does not give meaning to the contract: rather it seeks

16   to substitute a different meaning."  *Bionghi v. Metropolitan Water Dist.*, 70 Cal. App. 4th 1358,

17   1369 (Cal. Ct. App. 1999).

18        Here, the licenses are integrated: "This Agreement is the final, complete and exclusive

19   agreement between the parties relating to the subject matter here, and supersedes all prior or

20   contemporaneous understandings and agreements relating to such subject matter, whether oral or

21   written."  *See* Melnick Decl. ¶ 2, Ex. 1 (2000 Agreement at p. 4); Ex. 2 (2004 Agreement at p. 4).

22   The integration language is at least as clear as that in *Bionghi*.  *Bionghi*, 70 Cal. App. 4th at 1362

23   ("It is understood that no alteration or variation of the terms of this Agreement shall be valid

24   unless made in writing and signed by the parties hereto and that no oral understanding or

25   agreements not incorporated herein shall be binding on any of the parties hereto.") Extrinsic

26   evidence, such as unintegrated correspondence – or worse, Plaintiff's self-serving revisionist

27   "recollection" – cannot add or subtract contractual terms or substitute different meanings to the

28   express text of the 2000 and 2004 licenses. *Id.* at 1369.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

2

**C.** **Plaintiff Cannot Prevail On A Claim That StorageTek Exceeded The Scope Of The Distribution Licenses by Failing to Pay in Advance For Each Unit Distributed**

3

4

StorageTek acknowledges that it distributed more copies of Plaintiff's Supporting

5

Programs than StorageTek initially paid for at the time of the 2000 Distribution License and the

6

2004 Distribution License.  As a matter of law, however, this fact does not convert StorageTek's

7

licensed distribution into copyright infringement, for at least two reasons: First, the Distribution

8

Licenses do not condition StorageTek's license on prepayment.  Second, even if StorageTek's

9

failure to prepay were a breach of the payment schedule, as a matter of law such a "failure to

10

compensate" is a contractual matter, and does not create a claim of copyright infringement.

11

*Effects Assoc., Inc. v. Cohen*, 908 F.2d 555, 559 & n.7 (9th Cir. 1990).

12

**1.** **The Distribution Licenses Do Not Require Prepayment**

The express terms of the integrated Distribution Licenses state no requirement that

13

payment was required before StorageTek could distribute additional quantities of Supporting

14

Programs beyond what it initially paid for.  In both the 2000 and 2004 Distribution Licenses, the

15

license grants themselves say nothing about quantity or the amount or timing of payment.  They

16

simply grant StorageTek a "perpetual, irrevocable license to copy, sublicense, transfer and

17

distribute," and a "perpetual, worldwide, irrevocable license to copy, sublicense, transfer,

18

demonstrate and distribute" the supporting programs with StorageTek's products.  Melnick

19

Decl., Ex. 1, p. 1 and Ex. 2, p. 2.

20

Moreover, the language of the Distribution Licenses anticipates payment *after*

21

distributions that have already occurred, requiring payment not for copies that one wishes "to

22

distribute," but rather for copies "distributed."  In other words, as Magistrate Judge Zimmerman

23

observed, StorageTek "can go up to any number of copies as long as they're willing to pay." *See*

24

Wakefield Decl. ¶ 6, Ex. 7 [TRO transcript].

25

Following the paragraph granting the Distribution Licenses, both Agreements contain a

26

numbered paragraph 1, which provides:

27

28

> You agree to maintain reasonable records of the number of copies of the
> Supporting Programs distributed hereunder and to pay Netbula as set forth

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

in schedule C for such copies.

Melnick Decl. ¶ 2, Ex. 1 (2000 Agreement at pp. 1-2); Ex. 2 (2004 Agreement at p. 2).  By requiring StorageTek to maintain records of copies that have already been *distributed*, and requiring payment for *such copies*, the Agreement specifically envisions payment after the fact. And Exhibit C of both "perpetual" Distribution Licenses then shows a schedule of quantities and prices far beyond what StorageTek initially paid for, allowing for any number of copies to be distributed in the future at the agreed-upon prices.  *Id.* ¶ 2, Ex. 1 (2000 Agreement at p. 7); Ex. 2 (2004 Agreement at p. 8).

Hoping to convert its case into more than the simple royalty dispute it really should be, Netbula contends that StorageTek never had a license for any distributions beyond that first 1000 copies for which it admittedly paid.  But if the Distribution License really required prepayment, there would be no need to agree to pay for distributed copies as the license text states, since pre-payment must have already occurred.  *See* Melnick Decl., Ex. 1 (2000 Agreement at p. 2); Ex. 2 (2004 Agreement at p. 2).  Thus, Netbula's proposed interpretation would render the payment language meaningless.  *Brinderson-Newberg Joint Venture v. Pac. Erectors*, 971 F.2d 272, 278-279 (9th Cir. 1992) ("Since an agreement is interpreted as a whole, it is assumed in the first instance that no part of it is superfluous." (internal quotation marks omitted)).

When confronted with this point, the absurdity of Netbula's position became apparent. Dr. Yue, as Netbula's 30(b)(6) witness, took the absurd position that this provision to pay for copies distributed is not for contractual royalties at all, but rather constitutes a licensee's contract to pay copyright infringement damages:

> Q.    In fact, under your reading of the agreement, they would never have to pay you any more; isn't that true?
>
> A.    Untrue.  When they – when they exceeded the limit, that's we – what we call copyright infringement.
>
> Q.    So they agree in the contract to pay you copyright infringement damages?
>
> A.    Oh, yeah.

Wakefield Decl. ¶ 4, Ex. 5 (6/27/07 Depo, 226:6-14).

The 2000 and 2004 Distribution Licenses are clear and cannot sensibly be construed to

1  require prepayment. But even if the Court were to consider parol evidence, Plaintiff can point to

2  no contemporaneous evidence that the parties considered prepayment to be a condition to

3  distribution of the Supporting Programs.  Plaintiff does not recall any conversations about the

4  supposed 1000-copy limit or prepayment requirement until after the present dispute arose.  *See*

5  Wakefield Decl. ¶ 3, Ex. 3 (Plaintiff Depo. at 200:7-201:1).  Thus Plaintiff's attempts to inject a

6  revisionist "prepayment" requirement was only articulated in 2005, long after the parties

7  executed the written, wholly integrated 2000 and 2004 Distribution Licenses.  *See I.A.E., Inc. v.*

8  *Shaver*, 74 F.3d 768, 778 (7th Cir. 1996) (affirming summary judgment, noting that copyright

9  owner "did not state that failure to pay would be viewed as copyright infringement" until after

10  dispute arose).

**2.      Miscounting Distributions and Failing to Pay Royalties Does Not
Convert a Contract Dispute Into an Infringement Case.**

13          In determining whether a contract term is a "condition" on the license or a "covenant,"

14  courts look to the affirmative grant language itself.  *See Sun Microsystems, Inc. v. Microsoft*

15  *Corp.*, Case No. 97-20884, 2000 U.S. Dist. LEXIS 20222, *13-17 (N.D. Cal. May 8, 2000)

16  (noting that license grants say nothing about being subject to, conditional on, or limited by

17  alleged violated term).

18          Even if StorageTek's mistaken distribution reports in 2001 and 2002, and its failure to pay

19  prior to distribution beyond the first payment, were considered violations of the Agreements, as a

20  matter of law such errors do not give rise to a copyright infringement claim.  As noted above, the

21  language of the affirmative license grants says nothing whatsoever about the amount or timing of

22  payment, or about maintaining records of distributions. The license grant here was simply not

23  conditioned on prepayment; the promise to pay for distributions was a covenant, and it may be

24  enforced as such.

25          The Ninth Circuit and other courts recognize that not paying in full before using a

26  licensed, copyrighted work may constitute a breach of contract, but the nonpayment is not a

27  failure of a condition precedent that causes the license to evaporate into thin air.  *See Effects*, 908

28  F.2d at 555, 559 & n.7 (noting "[w]hat we have here is a failure to compensate" and affirming

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

summary judgment against claim of copyright infringement).  Nonpayment of software royalties is a contractual issue, not a copyright issue. *See Graham*, 144 F.3d at 235-38 (vacating copyright infringement award because both bases of plaintiff's copyright claim – defendant's nonpayment of royalties and failure to credit the plaintiff's authorship of the licensed work – were breaches of covenants, not conditions on the license itself); *see also Madison River Mgmt. Co. v. Bus. Mgmt. Software Corp.*, 387 F. Supp. 2d 521, 533 (M.D.N.C. 2005) (holding that payment requirement was a covenant, not a condition of the license grant, where defendant failed to pay additional fees for licenses beyond the fifteen it had initially purchased).

In *Effects*, an accused infringer did not pay a copyright owner the full agreed-upon amount before using the copyrighted work, but neither the contract nor the communications between the parties showed a mutual understanding that nonpayment would expose the user to copyright infringement liability.  *Effects*, 908 F.2d at 559 n.7 (noting that "conditions precedent are disfavored and will not be read into a contract unless required by plain, unambiguous language," citing *Sulmeyer v. United States*, 684 F.2d 1259, 1264 (9th Cir. 1982)); *see also I.A.E., Inc. v. Shaver*, 74 F.3d 768, 778 (7th Cir. 1996) (payment was not a condition precedent).

Even when a licensee uses a licensor copyright owner's work with *no* payment having exchanged hands, the copying is still within the scope of the parties' agreement, notwithstanding the owner's contractual right to terminate the contract. *See Irwin v. Am. Interactive Media, Inc.*, Civ. No. CV 93-1403, 1994 U.S. Dist. LEXIS 16223, at *12-13, *19 (C.D. Cal. April 14, 1994) (finding that parties' agreement did not make payment in full a condition precedent).

Here, as in *Effects*, any delinquency or shortage in payment gives Plaintiff a remedy based on contract, not on copyright. *See Effects*, 908 F.2d at 559 & n.7. *Effects* reached that result even where the contractual writing was not full and complete, so that same result adheres more tightly here, where the written, wholly integrated license does not contain "plain, unambiguous language" establishing any prepayment condition. *See id.*

Indeed, nothing in the Distribution License indicates that the agreement to maintain records and pay is anything other than a covenant.  To hold otherwise would convert even the most innocuous record-keeping error into a claim for copyright infringement.  The Agreements

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    themselves recognized that errors routinely occur in accounting for software royalties, allowing

2    Netbula to request audits as often as once a year.  Melnick Decl., Ex. 1, p. 2, Ex. 2, p. 2.  Yet

3    under Netbula's interpretation of the Agreements, if such an audit uncovered even a handful of

4    miscounted distributions, it would give rise to federal copyright lawsuits to force StorageTek

5    customers to stop using their data storage software and to strip StorageTek and its customers of

6    their "direct and indirect profits or gains" attributable to use of the software.  *See* FAC, Prayer

7    for Relief ¶¶ 7, 11.  The parties never intended, and the Court should not entertain, such an

8    absurd – and draconian – result.

9        As the Ninth Circuit noted in *Effects*, in granting a nonexclusive license, the licensee

10   gives up the right to sue its licensee for infringement, but retains the right to sue in state court for

11   breach of contract.  *Effects*, 908 F.2d at 559.  Like any party to a contract that contends it has

12   been short changed, Netbula is free to pursue its contract remedies, but as a matter of law, it has

13   no claim for copyright infringement.

14          **3.      StorageTek's Grant of "Site Licenses" to Customers Was Not Outside**
                     **the Scope of the Distribution Licenses**
15

16       In support of its allegation that StorageTek acted outside the Distribution Licenses,

17   Netbula also points to a few instances in which StorageTek distributed LibAttach under "site

18   licenses" – agreements that did impose preset limits on the number of copies the customers could

19   make.  Wakefield Decl. ¶ 2, Ex. 1 [Plaintiff's Response to Interrogatory No. 4], at 8.  However,

20   StorageTek's Distribution Licenses did not prohibit such distributions. The affirmative license

21   grant to StorageTek contains no *condition* prohibiting site licenses.  Rather, StorageTek simply

22   agreed to maintain reasonable records of the number of distributed copies and "to pay NETBULA

23   as set forth in Exhibit C for such copies." At most, StorageTek's failure to impose a cap on the

24   number of copies made by a customer would run afoul of StorageTek's covenant to maintain

25   "reasonable records" of copies for royalty payment purposes.  Accepting Plaintiff's arguments as

26   true, the issuance of two site licenses could at most be a breach of a covenant, not a condition of

27   the license.  In other words, at most "[w]hat we have here is a failure to compensate," not an

28   infringement.  *See Effects*, 908 F.2d at 555, 559 & n.7.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

2

**D.      Plaintiff's Effort to Import a Platform Restriction Into the Distribution Licenses Does Not Create a Claim for Copyright Infringement**

3

4

5

6

7

Plaintiff next asserts – contrary to the plain language of the Distribution Licenses – that StorageTek was, under the 2000 License Agreement, prohibited from distributing products with the Nebula Supporting Programs for use on Windows 2000.  This interpretation finds no support in that Agreement.  There is simply no language even mentioning distribution for particular platforms, and certainly no such limitation on the *scope* of StorageTek's Distribution License.

8

**1.      There is No Platform Restriction on the Distribution Licenses.**

9

10

11

12

13

14

15

The complete and integrated Distribution Licenses simply have no term stating that the distributed Supporting Programs can be used on some operating systems but not others.  The license grants themselves impose no limits on the subject.  Melnick Decl. ¶ 2, Ex. 1 (2000 Agreement at pp. 1-2) (granting unconstrained license "to copy, sublicense, transfer and distribute the NETBULA RPC Supporting Programs and components"); Ex. 2 (2004 Agreement at p. 2) (granting license "to copy, sublicense, transfer, demonstrate and distribute the NETBULA RPC Supporting Programs and components").

16

17

18

19

20

This is in contrast with the SDK Licenses, which do expressly refer to operating systems for StorageTek's internal use.  *Id.* ¶ 2, Ex. 1 (2000 Agreement at p. 1) (referring to StorageTek's use of Plaintiff's SDK Product "under" specified platforms); Ex. 2 (2004 Agreement at p. 1) (same).  Plaintiff certainly knew how to draft platform restrictions, but the parties chose to omit them from the Distribution Licenses.[5]  Netbula's 30(b)(6) witness acknowledged as much:

21

22

Q. Could you point out for me where in Exhibit 2 the limitation on distribution to Windows 95, 98 and NT platforms can be found?

23

24

A. The – as I read this document, under the distribution license, it – it – it didn't specifically list those platforms.  But in the SDK license, it specifically limited the development of the application to those platforms.

25

26

27

28

[5] There is no reason to think that StorageTek would agree to bar its customers from using new versions of Windows as they came out in the future, and there is no language in the Agreements supporting the notion that it did.  As noted above, imposing a platform restriction on distribution copies would work to Netbula's detriment, by reducing the number of copies StorageTek could sell, and thus diminishing the potential royalties available to Netbula.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1 | Wakefield Decl. ¶ 3, Ex. 3 at pp .66:12-67:8.

2        The Distribution Licenses are both structurally and logically distinct from the SDK

3 Licenses.  There is thus no basis on which to import the restrictions of the latter to the former.

4 The SDK License text itself emphasizes that the Distribution License is distinct, not part of or

5 dependent on the SDK License.  *See* Melnick Decl. ¶ 2, Ex. 1 (2000 Agreement at p. 1) (SDK

6 notes distribution is *not* permitted, and that to distribute the Supporting Programs, purchase of a

7 *separate* Distribution License is required); Ex. 2 (2004 Agreement at p. 1) (same).  Plaintiff itself

8 describes its SDK license and Development licenses as separate.  FAC ¶ 22 ("A Netbula product

9 purchaser must also buy a *separate* license for the right to copy Netbula's Runtime Library . . . .")

10 (emphasis added); BVJS ¶ 4 ("Netbula offers software developer kit ('SDK') licenses for

11 computer programmers who will use the SDK to develop applications and distribution licenses

12 that give the licensee the right to distribute Netbula RPC supporting programs and components.").

13 The Distribution License does not refer to the SDK License at all.  The Distribution License has

14 an independent license grant, has clauses independently numbered from the SDK License, and

15 has independent provisions for topics such as payment and warranty.[6]  Whatever the restriction in

16 the SDK License may be, Plaintiff cannot use it to modify the Distribution License terms, which

17 are silent about operating systems. *See Wm. E. Doud & Co. v. Smith*, 256 Cal. App. 2d 552, 558

18 (Cal. Ct. App. 1967).

19        Moreover, imposing the restrictions of the SDK License on the Distribution License

20 would reduce it to gibberish.  The language limiting the SDK License to particular Windows

21 platforms is part of a series of restrictions limiting use "by STORAGETEK's employees,

22 consultants and subsidiaries" for only "one user" for each licensed purchased.  To apply these

23 SDK restrictions to the Distribution License would result in a self-contradicting and illusory

24 agreement:  The Distribution Licenses' authorization of distribution to customers would be

25 negated by the limitation of the SDK licenses to only StorageTek employees; the payment for

26

27 [6] Moreover, Plaintiff contends that the "Supporting Programs" provided under the Distribution Licenses are different software that what is licensed under the SDK Licenses.  Wakefield Decl. Ex. 5 at 147:20-148:15.  There is simply no basis on which to apply terms from a one license for

28 one software product to an admittedly *different* license governing allegedly *different* software.

Fenwick & West LLP
Attorneys At Law
San Francisco

1    thousands of runtime copies in the Distribution Licenses would be negated by the limitation to

2    one user on one computer in the SDK License.  It makes nonsense of the Distribution License to

3    even consider importing the SDK Licenses' independent restrictions.

4          Nor can Netbula escape the unambiguous language of the Distribution Licenses with

5    extrinsic evidence.  Under California law, a court may consider parol evidence to interpret an

6    ambiguous term that *exists* in a contract but may not use such evidence to add another item about

7    which the agreement is silent, particularly where the agreement "purports on its face to be the

8    complete expression."  *Wm. E. Doud*, 256 Cal. App. 2d 552, 558.  In addition, parol evidence is

9    inadmissible to enlarge or modify, vary or contradict the terms of an integrated written

10   instrument.  *Id.*; *Bionghi*, 70 Cal. App. 4th at 1364.  For example, a party cannot substitute a

11   different meaning for express terms simply because the party says it intended something other

12   than the express terms.  *Bionghi*, 70 Cal. App. 4th at 1369.

13         This is not an instance involving interpretation of an ambiguous license term, but rather

14   Plaintiff's attempt to add a wholly absent term.  Plaintiff cannot introduce extrinsic evidence to

15   prove the existence of a term that is nowhere written in the integrated Distribution License. *See*

16   *Wm. E. Doud*, 256 Cal. App. 2d at 558.  There is no ambiguous term about operating systems in

17   the Distribution Licenses.  There is therefore no basis to create a new term imposing a platform

18   restriction on StorageTek's broad distribution rights.[7]

19                  **2.      Any Purported Platform Requirement Is Not A Condition Of The**
                             **Distribution Licenses**
20

21         Even if Netbula could somehow show that the Agreements prohibited distribution for

22   certain platforms, as a matter of law it cannot show that such a requirement was a condition of the

23   Distribution Licenses giving rise to claims for copyright infringement instead of breach of

24   _____

25   [7] Plaintiff has suggested that the description of one of the supporting programs, called
     pmapsvc.exe "[t]he portmapper program for Win32," should be read to impose a platform
26   restriction on the Distribution Agreement.  Yet this argument also requires an absurd leap of
     logic.  Pmap.exe is described this way in the 2004 Agreement as well, which even Plaintiff admits
27   permits both development and distribution for all Windows platforms through Windows Server
     2003.  Thus, the reference to "Windows NT" in the description of one of the "Supporting
28   Programs" cannot rationally be viewed as any limitation on the license rights granted.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   contract.  The decision on remand in *Sun* is informative here.  As in this case, the license

2   agreement in *Sun* consisted of both a development license and a distribution license.  *Sun*, 2000

3   U.S. Dist. LEXIS 20222 at *4-5.  The distribution license granted Microsoft the non-exclusive

4   right to "make, use, import, reproduce, license, rent, lease, offer to sell, sell or otherwise

5   distribute to end users as part of a Product or an upgrade to a Product, the Technology and

6   Derivative Works thereof in binary form."  *Id.* at *5-7.  The agreement also contained provisions

7   setting forth terms requiring that any commercially distributed products meet certain

8   compatibility standards – terms that Sun alleged Microsoft had violated.  *Id.* at *12-13.  Noting

9   that there was no conditional language in the license grant itself, Judge Whyte determined that

10  these compatibility restrictions were covenants, not conditions or restrictions on the scope of the

11  license, and ultimately dismissed the copyright claim.  *Id.* at 13-14 (noting that license grants "say

12  nothing about the license grants being subject to, conditional on, or limited by compliance with"

13  the allegedly violated term).

14          The same is true here.  There is no conditional language in the Distribution License grants

15  themselves.  Rather, even if Netbula could substantiate an operating system compatibility

16  requirement in the Agreement, it is undisputed that the license grant contains no platform

17  restriction, and thus such a purported term would at most be a covenant by StorageTek, not a

18  condition of its license.

19      **E.      Alleged Breaches of the SDK License Do Not Create Claims Under Copyright**

20          **1.      Netbula Fails to Meet Its Burden Of Proving Use Outside The Scope
                      Of The SDK Licenses**

21
            Netbula alleges two purported violations of the SDK License: First, Plaintiff contends that

22  StorageTek developed LibAttach and REEL products on the Windows 2000 operating system

23  before March 2004 (after which it is undisputed that the 2004 SDK License allowed use on

24  Windows 2000 machines).  Wakefield Decl. ¶ 2, Ex. 1 (Response to Interrogatory No. 4].  Yet

25  Plaintiff can come forward with nothing beyond conjecture to support this theory.  *Compare*

26  Abramovitz Decl. ¶¶ 3-4, 7 (describing use of SDK only on Windows NT, not Windows 2000).

27          Second, Netbula contends StorageTek allowed more than the authorized number of

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    developers to use the SDK.  However, there is no dispute that StorageTek purchased an SDK

2    License for eight users in 2000 and another for at least one user in 2004.  Plaintiff has produced

3    no evidence that StorageTek exceeded these numbers, and the unrebutted evidence is that

4    StorageTek never had more than 8 developers using the 2000 SDK nor more than 1 developer

5    using the 2004 SDK.  Abramovitz Decl. ¶¶ 4-8.

6            **2.      Even if Netbula Could Show That StorageTek Violated the SDK**
                **License, The Otherwise Licensed Distribution of Software Is Not An**
7               **Infringement, And Is Subject To Summary Adjudication**

8            Even assuming, *arguendo* that Plaintiff raised a question of fact as to StorageTek's

9    alleged violation of the SDK Licenses by its internal use, that would still not preclude summary

10   adjudication that no infringement occurred by StorageTek's distribution of the Supporting

11   Programs.  This is because alleged internal violations of the SDK License would not transform

12   the authorized distribution of Supporting Programs under the Distribution License into

13   unlicensed, infringing, copies.

14           If StorageTek loaded the SDK internally on the wrong platform, or let too many

15   programmers use the SDK, Plaintiff could pursue its claim for violation of the SDK License.  But

16   Plaintiff has no claim that, because StorageTek's internal use of the SDK exceeded the SDK

17   License, its distribution of the Supporting Programs – which were separately licensed for

18   distribution, not internal use – were somehow infringing.  The law recognizes no such

19   "infringement by association" theory.  To prevail to prove an infringing copy, Plaintiff must show

20   that the *particular distribution copies themselves* were distributed outside of the scope of the

21   Distribution Licenses.  Because the Distribution License categorically authorizes distribution of

22   the Supporting Programs, Plaintiff cannot meet this burden, and its infringement claims relating

23   to the distribution of the Supporting Programs fail as a matter of law.

24   **III.    PLAINTIFF'S PURPORTED TERMINATION OF STORAGETEK'S**
             **AGREEMENT DOES NOT CREATE A COPYRIGHT INFRINGEMENT CLAIM**
25

26           Since StorageTek's licenses are perpetual and irrevocable, Netbula's effort to terminate

27   them in its November 27, 2006 letter was ineffective.  But even if Netbula had effectively

28   terminated,  StorageTek's prior distributions would be licensed.  *See Peer Int'l*, 909 F.2d at

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1 1338-39 (copyright license agreement precluded possibility of licensee being liable for copyright

2 infringement for selling and distributing the copyrighted work prior to the licensor's termination

3 of the agreement). As StorageTek stopped distributing any products containing Netbula code a

4 year before the purported termination, *see* Abramowitz Decl. ¶ 7, Netbula cannot use its

5 November 2006 letter to concoct an infringement claim.[8]

6 **IV.    STORAGETEK CUSTOMERS, INCLUDING DEFENDANTS EMC, IBM AND**
**DARDEN, ARE WITHIN THE SCOPE OF STORAGETEK'S PERPETUAL AND**
7 **IRREVOCABLE DISTRIBUTION LICENSES**

8         Netbula has sued StorageTek customers IBM, EMC and Darden based only on their use of

9 StorageTek's LibAttach products. FAC ¶ 78, Wakefield Decl. ¶ 2, Ex. 1 (Response to Interrog.

10 No. 4). Thus, Netbula's copyright claims against StorageTek customers fail for the same reasons

11 they fail against StorageTek. Since distribution of the Supporting Programs with LibAttach to

12 StorageTek customers was entirely within the scope and purpose of StorageTek's Distribution

13 Licenses, the customers use of those products was not infringing. Netbula has presented no

14 evidence of any use by these customers beyond the license Netbula granted.

15         Moreover, Netbula's purported termination does not invalidate the rights of the IBM,

16 EMC or Darden to copy and use the Supporting Programs. Both the 2000 and 2004 Distribution

17 Licenses are *perpetual* and *irrevocable*. The software industry uses these terms in the commonly

18 understood way. *See, e.g.*, Software Council of Southern California, *Understanding and Using*

19 *Key Licensing Terminology* ("An irrevocable license is most often understood as a license that

20 cannot be terminated under any circumstances, including for breach of the license itself by the

21 licensee."), *at* http://www.scsc.org/resources/licensingterminology.html.

22         [I]n many instances a licensee will insist that the license be irrevocable and/or that
in the event of breach by the licensee, the licensor would be limited to remedies at
23         law but would have no right to terminate or rescind the license agreement. Such an
agreement would appear to be enforceable as against the licensor even if the
24         licensee utterly fails in such a fundamental and material performance as payment.

25 3-27 Roger R. Milgrim, *Milgrim on Licensing* § 27.08, at 27-50 (rev. 2005); *see also Fosson v.*

26 *Palace (Waterland), Ltd.*, 78 F.3d 1448, 1455 (9th Cir. 1996) (finding licensor agreed to

27 _____

28 [8] Likewise, because StorageTek stopped distributing Plaintiff's code prior to the completion of its merger into Sun, there is no claim against Sun for copyright infringement. Abramovitz Decl. ¶ 10.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  contractual language that waived any right to terminate the agreement).

2      Plaintiff could have negotiated a provision reserving its right to terminate customer

3  licenses, but did not. Quite the opposite: Plaintiff agreed in each Agreement that *"[a]ny*

4  *termination of this Agreement will not affect any sublicenses granted by STORAGETEK to their*

5  *customers, such licenses will remain in full force and effect."*  Melnick Decl. ¶ 2, Ex. 1 (2000

6  Agreement at p. 4); Ex. 2 (2004 Agreement at p. 4) (italics added). StorageTek required these

7  provisions to avoid the very situation confronting it now, where Plaintiff tries to revoke an

8  irrevocable license simply because it decides that contract claims are less lucrative than

9  copyright claims.  Notwithstanding Netbula's purported termination, the rights to StorageTek's

10  customers "remain in full force and effect."

11      Lastly, there was no distribution of the Supporting Programs to IBM, EMC or Darden on

12  or after the date of Plaintiff's purported November 27, 2006 termination. Abramovitz Decl. ¶ 9.

13  Accordingly, even if Netbula could have terminated StorageTek's right to continue distributions

14  after the November 27, 2006 letter, the customers received their licenses before then, and their

15  rights remain unaffected.

16  **V.    CONCLUSION**

17      For the foregoing reasons, Defendants are entitled to summary judgment of all copyright

18  infringement claims by Plaintiff.  In the alternative, Defendants seek summary adjudication of the

19  six issues identified in the Notice of Motion and Issues Presented.

20  Dated: October 23, 2007                    Respectfully,

21                                             FENWICK & WEST LLP

22                                             By: /S/
23                                                 Jedediah Wakefield

24                                             Attorneys for Defendants
25                                             STORAGE TECHNOLOGY
                                               CORPORATION, SUN MICROSYSTEMS,
                                               INC., EMC CORPORATION, and DARDEN
26                                             RESTAURANTS, INC.

27

28