Dr. DONGXIAO YUE
2777 ALVARADO ST., SUITE C
SAN LEANDRO, CA 94577
Telephone:     (510) 396-0012
Facsimile:      (510) 291-2237
E-Mail:         ydx@netbula.com

*Pro Se*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NETBULA, LLC., a Delaware limited liability company,<br><br>                    Plaintiff,<br><br>        v.<br><br>STORAGE TECHNOLOGY<br>CORPORATION, et al.,<br><br>                    Defendants. | Case No. Case No. C06-07391-MJJ<br><br>**DONGXIAO YUE'S NOTICE AND MOTION (1) TO INTERVENE AND JOIN AS PLAINTIFF; (2) FOR INJUNCTIVE RELIEF; (3) FOR COPYRIGHT IMPOUNDMENT**<br><br>Date: November 27, 2007<br>Time: 9:30 a.m.<br>Dept: Courtroom 11<br>Judge: The Honorable Martin J. Jenkins |

-1-

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION ............................................................................ 4

I.    INTRODUCTION ................................................................................................. 4

II.   FACTS AND PROCEDURAL BACKGROUND ................................................. 5

    A. Facts leading to the instant dispute .............................................................. 5

    B.  Procedural background ................................................................................. 8

III.  LEGAL STANDARD .......................................................................................... 10

    A.    Legal Standard for Intervention of Right .................................................. 10

    B.    Legal Standard for Preliminary Injunction under Copyright Law .......... 11

        1.    A plaintiff demonstrates a prima facie case of copyright
            infringement is entitled to preliminary injunctive relief ............ 11

        2.    Elements of a prima facie case of copyright infringement .......... 12

        3.    Copyright license and contract interpretation ........................... 13

        4.    Copyright license transferability and reverse triangular merger ............... 15

    C.    Copyright impoundment .............................................................................. 16

IV.   ARGUMENT ........................................................................................................ 16

    A.    Dr. Yue has the right to intervene .............................................................. 16

    B.    Dr. Yue is very likely to succeed on his copyright infringement claim .............. 17

        1.    Dr. Yue has ownership of the copyrights in Netbula RPC Programs ......... 17

        2.    Defendants Violated the Copyrights of Netbula RPC Programs ............... 19

    C.    The Public's Interest in Upholding the Integrity of Copyright Law ...................... 22

V. BOND    ................................................................................................................. 23

VI. RELIEF SOUGHT ................................................................................................. 24

VII. CONCLUSION...................................................................................................... 25

MOTION TO INTERVENE
MOTION FOR PRELIMINARY INJUNCTION

1

**TABLE OF AUTHORITIES**

2

Cases

3

A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1013 (9th Cir. 2001) ................................... 11

4

Apple Computer, Inc. v. Formula Int'l, Inc., 725 F.2d 521, 524-25 (9th Cir. 1984) ..................... 18

5

Apple Computer, Inc. v. Franklin Computer Corp., 714 F.2d 1240, 1247–49 (3d Cir. 1983) ....... 18

6

Caligav v. Inter Ocean Newspaper Company., 30 S. Ct. 38, 215 U.S. 182 (U.S. 11/29/1909) ...... 12

7

Federal Rule of Civil Procedure 24(a) ................................................................................... 10, 17

8

Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991) ........................................... 17

9

First Technology Safety Systems Inc. v. Depinet, 11 F.3d 641 (6th Cir. 1993) ............................ 24

10

Harris v. Emus Records Corp., 734 F.2d 1329 (9th Cir. 1984) .................................................... 15

In re Napster, Inc, 191 F. Supp. 2d 2087 (N.D. Cal. 2002) ......................................................... 19

11

Johnson Controls, Inc. v. Phoenix Control Sys., Inc., 886 F.2d 1173, 1174 (9th Cir. 1989) ......... 12

12

LGS Architects, Inc. v. Concordia Homes of Nevada, 434 F.3d 1150, 1153 (9th Cir. 2006) ........ 11

13

Micro Star v. Formgen Inc., 154 F.3d 1107, 1109 (9th Cir. 1998) ............................................... 22

14

Microsoft Corp. v. Grey Computer, 910 F.Supp. 1077, 1084 ....................................................... 12

15

Novelty Textile Mills, Inc. v. Joan Fabrics Corp., 558 F.2d 1090, 1094 (2d Cir. 1977) ............... 22

Perfect 10, Inc. v. Amazon.com, Inc., No. 06-55405 (9th Cir. 05/16/2007) .................................. 19

16

Silvers v. Sony Pictures Entertainment, Inc., 402 F.3d 881, 884 (9th Cir. 2005) .......................... 12

17

SQL Solutions, Inc. v. Oracle Corp., 1991 WL 626458 (N.D.Cal. 1991) .................................... 15

18

Sun Microsystems, Inc. v. Microsoft Corp., 188 F.3d 1115, 1119 (9th Cir. 1999) ....................... 11

19

Sun Microsystems, Inc. v. Microsoft Corp., 81 F. Supp.2d 1026 (N.D.Cal. 2000) ....................... 14

20

Triad Systems Corp. v. Southeastern Express Co. ....................................................................... 24

21

U.S. v. Alisal Water Corp., 370 F.3d 915, 921 (9th Cir. 2004) .................................................... 17

22

Wall Data v. Los Angeles Cty. Sheriff's Dept., 447 F.3d 769 (9th Cir. 2006) .............................. 14

Williams Electronics, Inc. v. Artic International, Inc., 685 F.2d 870, 878 (3d Cir. 1982) ............. 23

23

Yurman Design, Inc. v. PAJ, Inc., 262 F.3d 101 (2d Cir. 2001) .................................................. 18

24

25

26

27

28

MOTION TO INTERVENE
                                                        MOTION FOR PRELIMINARY INJUNCTION

**NOTICE OF MOTION AND MOTION**

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on November 27, 2007 at 9:30 a.m., or as soon as the matter may be heard, in the United States District Court for the Northern District of California located at 450 Golden Gate Avenue, San Francisco, California, in the Courtroom of The Honorable Martin J. Jenkins, Dr. Dongxiao Yue ("Dr. Yue", "Yue" or "Intervenor"), acting *pro se*, hereby moves for a Court Order to  (1) grant Yue's application to intervene and join as plaintiff, (2) preliminarily or permanently enjoin defendant Storage Technology Corporation ('StorageTek") and Sun Microsystems, Inc. ("SUN") from making unauthorized copies of Netbula software, (3) impound all unauthorized copies of Netbula software made by StorageTek and SUN.

This motion is based upon this Notice, the following Points and Authorities, the Declaration of Dongxiao Yue ("Yue Decl."), the Proposed Order, the papers on file in this matter, and such further evidence and argument as may be presented to the Court at or before the hearing.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

On December 4, 2006, Plaintiff Netbula, LLC ("Netbula") initiated the instant copyright infringement action. Along the complaint, Netbula filed an application for a Temporary Restraining Order ("TRO") and a Motion for Preliminary Injunction. Netbula was unsuccessful in obtaining the TRO, partly due to evidentiary concerns raised by the Court. Recently, discovery in the instant case revealed that defendant StorageTek and SUN knowingly infringed the copyrights in the Netbula RPC software, which are now owned by Dr. Yue by assignment.

Plaintiff Netbula's counsel is withdrawing from the case, leaving Netbula without adequate representation. On the other hand, defendants SUN and StorageTek are planning to move for

summary judgment on the copyright infringement claim. Under these situations, Dr. Yue seeks to intervene and join as plaintiff, and to move for a preliminary or permanent injunction and impoundment order under the Copyright Act.

## II.    FACTS AND PROCEDURAL BACKGROUND

### A. Facts leading to the instant dispute

In July 1996, Dr. Yue founded Netbula, LLC, a Delaware Limited Liability Company, to market the PowerRPC software that he was developing. PowerRPC is a technology that enables a program on a computer to execute a command on a remote computer over a network and get results back. PowerRPC is available for both UNIX and Microsoft Windows platforms. Netbula also developed a product called Netbula ONC RPC. The Netbula RPC software is used by other software developers to develop new computer software applications. Yue Decl., ¶2.

A Netbula RPC product purchaser must buy one developer license (an "SDK" license) for each computer programmer who will use Netbula Software Development Kit ("SDK") to develop RPC applications. Each SDK license is only granted for a single computer for a single user and only for use in specific operating system environment, such as Windows NT.

The Netbula SDK software includes many program files or modules such as "rpcgen.exe", "pwrpc32.dll", "pwrpc32.lib", "pmapsvc.exe" and computer source code files such as "powerrpc.h". The pwrpc32.dll file contains the essential code for RPC functionality and is a necessary component for a program based on RPC technology.

To distribute the program based on Netbula RPC, the Netbula customer must buy a separate license for the right to copy the distributable version of "pwrpc32.dll" file[1]. The license for the right to copy the pwrpc32.dll to a single computer is called a "runtime license". See First Amended Complaint ("FAC") at ¶¶ 16-22.

---

[1] The distributable version of the pwrpc32.dll is different from the developer version.

MOTION TO INTERVENE
MOTION FOR PRELIMINARY INJUNCTION

In March 2000, StorageTek and Netbula signed a license agreement for PowerRPC (the "2000 Agreement"). Pursuant to this agreement, StorageTek purchased development licenses for eight (8) developers and one block of 1,000-copy runtime licenses. Yue Decl., at ¶¶6-7, Exhibits B-C.

In June 2001, Netbula requested a license usage report from StorageTek. Mike Melnick, on behalf of StorageTek, reported that "[t]he license count you request is 107, this leaves us the rights to distribute 893." FAC at ¶35.

In September 2002, Netbula requested another license usage report from StorageTek. Mr. Melnick, on behalf of StorageTek, stated that the product was being terminated and license usage stayed at 107. Yue Decl., ¶10, Exhibit F. Netbula re-confirmed with StorageTek that PowerRPC was no longer used by StorageTek. As a result, Netbula deleted StorageTek from its list of active licensees and stopped requesting license usage reports from StorageTek. FAC at ¶36.

Unknown to Netbula, StorageTek had been distributing Netbula RPC with a StorageTek product called LibAttach for Windows 2000 (Yue Decl., ¶9, Ex. E) and had exceeded the 1000-copy limit. StorageTek knew that it exceeded the limit and had an internal discussion. Lisa Rady, a program manager at StorageTek wrote in an email dated March 2, 2004:

> As you can see, we have exceeded the 1,000 distributions that we had right to with Netbula…. I think it is obvious that engineering has not and did not monitor the distributions on this product.

Yue Decl., ¶12, Exhibit G. Responding to Ms. Rady's messages, Mr. Melnick wrote:

> The agreement is specific to platform (Win NT and 95/98 platforms) types of Netbula software (PowerRPC SDK). This concerns me greatly as we have already told them we are no longer shipping it with our product.

On the same day, March 2, 2004, Mr. Melnick sent an email to Netbula, stating: "Could you provide me with the StorageTek sales representative or if possible give me a quote on distributing an additional 1000 units of RPC? The platform used will need to be Windows 2003."

-6-

Mr. Melnick did not inform Netbula that StorageTek had been distributing Netbula RPC from 2000 to 2004 and had in fact exceeded the license limit. *Id.*

Since StorageTek previously represented that it had ceased to use Netbula RPC and since the new request was for a new operating system, Netbula assumed it was for a new project. FAC at ¶38. In March 2004, Netbula and StorageTek signed a new agreement (the "2004 Agreement"). Like the 2000 Agreement, the 2004 Agreement was also not transferable without written authorization from Netbula. Pursuant to the 2004 Agreement, StorageTek issued a purchased order and purchased one developer license and another 1000-copy runtime license. Yue Decl., ¶¶14-15, Exhibits I-J.

In a document attached to a March 12, 2004 email, Ms. Lisa Rady wrote the following about LibAttach: "There is no license key in the product, and it is apparent that the software has been copied, uncontrolled, for several years." Yue Decl., ¶17, Ex. K.

On October 25, 2004, a StorageTek employee named Michael Abrmovitz sent an email to Netbula, stating: "We bundle your PowerRPC into several of our products." On the same day, Netbula emailed StorageTek requesting a license usage report, but StorageTek did not provide a report for this request. Yue Decl., at ¶18.

On June 15, 2005, Netbula emailed StorageTek again for an audit of license usage and inquired about the impending SUN- StorageTek merger. Mr. Melnick responded:

> As for Sun, it should be completed by the end of summer…
> The only thing that you and I may have to do is for you to
> allow assignment of the agreement to Sun. The agreements
> calls [sic] for your approval. I assume you would sallow [sic]
> this as if you did not the agreement would be terminated.

Yue Decl., at ¶19, Ex. L.

On June 20, 2005, Holly Wagner, a Software Product Planner at StorageTek emailed Mr. Michael Melnick, Ms. Lisa Rady, Mr. Michael Abramovitz and others, stating:

MOTION TO INTERVENE
MOTION FOR PRELIMINARY INJUNCTION

> The SAP query I ran this morning shows 2,386 models shipped. This number is low due to the fact that the query does not have the capability of pulling the client feature quantities that were released in November of last year.

Responding to this email, Mr. Melnick wrote on June 28, 2005:

> The number that Holly has provided and thought it may be low causes quite a problem for you. We have only made 2 purchases for the rights to distribute a total of 2000 licenses.

Yue Decl., at ¶20, Ex. M.

In August 2005, after numerous requests by Netbula, StorageTek finally provided a license usage report showing 7455 licenses. However, Netbula found what it believed to be inconsistencies in the report. Yue Decl., at ¶21, Ex. N; FAC at ¶¶47-50.

On August 31, 2005, SUN acquired StorageTek via a reverse triangular merger. Yue Decl., ¶24, Ex. Q.

After StorageTek became a subsidiary of SUN, it continued to distribute LibAttach products that contained Netbula RPC software. Yue Decl., ¶¶22-23,25-26, Exhibits O, P, R.

**B.  Procedural background**

On December 4, 2006, Netbula filed a lawsuit against Storage Technology Corporation ("StorageTek") and SUN Microsystems, Inc. ("SUN"), et al., alleging, *inter alia*, copyright infringement on the 2000 and 2004 versions of Netbula RPC SDK and runtime software by (1) developing infringing derivative work, (2) distributing infringing derivative work and (3) copying/distributing Netbula SDK and runtime software without license. Netbula applied for a temporary restraining order. Docket No. 2. A SUN engineer made a declaration stating that SUN had found a "free, open" alternative to replace Netbula RPC. Declaration of Michael Abramovitz, Docket No. 13.

On December 6, 2006, a hearing for Netbula's TRO application was held before Magistrate Judge Bernard Zimmerman, who expressed questions about the evidence Netbula had.

-8-

Netbula's counsel withdrew the application for the TRO and reserved the right to re-file the motion for preliminary injunction.

On January 8, 2007, SUN counterclaimed against Dongxiao Yue and Netbula, alleging, *inter alia*, trademark infringement on SUN RPC marks, cyber-squatting, common law and statutory unfair competition. Docket No. 17.

On February 21, 2007, the case was reassigned to the Honorable Judge Jeremy Fogel.

On March 2, 2007, the case was reassigned to the Honorable Judge Martin J. Jenkins, upon Netbula's administrative motion to relate cases.

On April 26, 2007, Netbula served StorageTek the "FIRST SET OF REQUEST FOR DOCUMENTS AND THINGS FOR STORAGETEK CORPORATION (NOS. 1-16)".

On May 8, 2007, the Court ordered that "[t]he parties are to initially focus on the License Issues/Contract claims. The Parties are directed to exchange letters confirming their stay of responses to pending discovery requests." Docket No. 50, Minute Entry for Initial Case Management Conference held on 5/8/2007 before Judge Martin J. Jenkins.

On May 15, 2007, the Court entered a Pretrial Order which set August 31, 2007 as the non-expert discovery cutoff date, and November 27, 2007 as the last day of hearing dispositive motions.

Subsequently, the Netbula and SUN/StorageTek served each other amended discovery requests limiting to the license issues and contract claims.

On and after August 31, 2007, SUN and StorageTek produced about 1000 pages of documents responsive to Netbula's requests.

On September 10, 2007, the Court entered an Order granting summary judgment for the defendants in the related Netbula, LLC v. BindView Development Corp case (Case No. C06-0711-MJJ, N.D. Cal) on the copyright infringement, fraud and breach of contract claims. Docket

No. 288 of the *BindView* case. The *BindView* defendants were represented by the same defense counsel in the instant action.

On September 12, 2007, SUN deposed Dr. Yue as a designated FRCP 30(b)(6) witness for plaintiff Netbula, LLC.

On September 19, 2007, Netbula deposed Mr. Melnick, who was designated by SUN as a FRCP 30(b)(6) witness.

On September 26, 2007, Netbula executed a copyright assignment, transferring all exclusive copyrights in Netbula PowerRPC and ONC RPC created before January 1, 2007 to Dr. Dongxiao Yue, along with all related claims.

On October 1, 2007, Netbula filed a motion to repalce Netbula, LLC with Dongxiao Yue as the plaintiff for the copyright claim, scheduled to be heard on November 20, 2007. Docket No. 56. On the same day, Netbula's counsel, Vonnah M. Brillet, noticed the parties that she will be unavailable on November 19-20, 26, 27 and 29. Yue Decl., ¶29.

On October 3, 2007, Mr. Jededish Wakefield, defense counsel, sent a letter to Ms. Brillet regarding the schedule for defendants' summary judgment motions concerning the license defense.

On October 11, 2007, Netbula's counsel, Vonnah M. Brillet, filed a motion to withdraw. Docket No. 59.

## III.    LEGAL STANDARD

### A.  Legal Standard for Intervention of Right

Federal Rule of Civil Procedure 24(a) affords an applicant who has an interest in the subject matter the right to intervene in an action. In the Ninth Circuit, an applicant for intervention as of right must demonstrate that "(1) it has a significant protectable interest relating to the property or transaction that is the subject of the action; (2) the disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect its interest; (3) the application

-10-

MOTION TO INTERVENE
MOTION FOR PRELIMINARY INJUNCTION

1    is timely; and (4) the existing parties may not adequately represent the applicant's interest." *United*

2    *States v. City of Los Angeles,* 288 F.3d 391, 397 (9th Cir. 2002) (quoting *Donnelly v. Glickman*,

3    159 F.3d 405, 409 (internal quotation marks omitted)). The four tests are conjunctive, and the

4    applicant must satisfy each of the tests.

5

### B.    Legal Standard for Preliminary Injunction under Copyright Law

6

7    "Preliminary injunctive relief is available to a party who demonstrates either: (1) a

8    combination of probable success on the merits and the possibility of irreparable harm; or (2) that

9    serious questions are raised and the balance of hardships tips in its favor. " *A&M Records, Inc. v.*

10   *Napster, Inc.,* 239 F.3d 1004, 1013 (9th Cir. 2001).  "Voluntary cessation of challenged conduct

11   moots a case . . .only if it is ***absolutely clear*** that the allegedly wrongful behavior could not

12   reasonably be expected to recur." *LGS Architects, Inc. v. Concordia Homes of Nevada*, 434 F.3d

13   1150, 1153 (9th Cir. 2006) [quoting *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 222, 120

14   S.Ct. 722, 145 L.Ed.2d 650 (2000) (per curiam)].

15

16   ### 1.    A plaintiff demonstrates a prima facie case of copyright infringement is entitled to preliminary injunctive relief

17

18   "Under federal copyright law, . . . a plaintiff that demonstrates a likelihood of success on

19   the merits of a copyright infringement claim is entitled to a presumption of irreparable harm." *Sun*

20   *Microsystems, Inc. v. Microsoft Corp.*, 188 F.3d 1115, 1119 (9th Cir. 1999). A copyright holder

21   seeking a preliminary injunction is therefore not required to make an independent demonstration

22   of irreparable harm. See 4 M. *Nimmer & D. Nimmer, Nimmer on Copyright* § 14.06[A] (2004)

23   ("the plaintiff's burden for obtaining a preliminary injunction in copyright cases collapses to

24   showing likelihood of success on the merits, without a detailed showing of danger of irreparable

25   harm" (footnotes omitted)).

26

27   Therefore, a plaintiff "need only show a reasonable likelihood of success on its copyright

28   infringement claim" to obtain a preliminary injunction. *Johnson Controls, Inc. v. Phoenix Control*

-11-

1    *Sys., Inc.*, 886 F.2d 1173, 1174 (9th Cir. 1989). See also, *LGS Architects, Inc. v. Concordia Homes*

2    *of Nevada*, 434 F.3d 1150, 77 U.S.P.Q.2d 1560 (9th Cir. 2006) (reversing district court's denial of

3    preliminary injunction).

4        **2.        Elements of a prima facie case of copyright infringement**

5        A copyright plaintiff "must satisfy two requirements to present a prima facie case of direct

6    infringement: (1) they must show ownership of the allegedly infringed material and (2) they must

7

8    demonstrate that the alleged infringers violate at least one exclusive right granted to copyright

9    holders under 17 U.S.C. § 106." *A&M Records,* 239 F.3d at 1013.

10        Copyright is a statutory property right of the author granted by the Copyright Act (the

11    "Act"). Unlike contractual rights, which flow from mutual assent of the parties in a contract,

12
     copyright is vested with the author when the work is created. "The statute created a new property
13
     right, giving to the author… the exclusive right to multiply copies for a limited period." *Caligav v.*
14
     *Inter Ocean Newspaper Company.*, 30 S. Ct. 38, 215 U.S. 182 (U.S. 11/29/1909). "***Unlike***
15
16   ***contracts***, copyrights and the rights flowing therefrom are entirely creatures of statute. . . ." *Silvers*

17   *v. Sony Pictures Entertainment, Inc.*, 402 F.3d 881, 884 (9th Cir. 2005) (quoting *Microsoft Corp.*

18   *v. Grey Computer*, 910 F.Supp. 1077, 1084 (Md. 1995)) (emphasis added).

19        Section 106 of the 1976 Act defines several exclusive rights granted under copyright. The

20   relevant part of the 1976 Act is the following,
21

22        Subject to sections 107 through 122, the owner of
     copyright under this title has the exclusive rights to ***do*** and
23        to ***authorize*** any of the following:

24        (1) to reproduce the copyrighted work in copies or
     phonorecords;
25

26        (2) to prepare derivative works based upon the
     copyrighted work;

27        (3) to distribute copies or phonorecords of the copyrighted
28        work to the public by sale or other transfer of ownership,

-12-

or by rental, lease, or lending;

....

17 U.S.C. § 106, entitled "Exclusive rights in copyrighted works" (with exclusive rights to public display and performance omitted, emphasis added).

### 3.        Copyright license and contract interpretation

"When a licensee exceeds the scope of the license granted by the copyright holder, the licensee is liable for infringement." *LGS Architects, Inc.,* 434 F.3d at 1156.

In *LGS Architects,* LGS Architects, Inc. ("LGS") and Concordia Homes of Nevada ("Concordia") entered into a licensing agreement that authorized Concordia to use two of LGS's architectural plans to construct Arbor Glen I, a community of eighty houses in northwestern Las Vegas. The licensing agreement's Standard Rate Schedule establishes a "reuse fee" of "$3,600.00 plus $60.00/unit plotted" "for using plans developed under this contract in locations other than the original location."

About two years later, Concordia decided to use LGS's four Arbor Glen I plans to construct houses in the adjacent Arbor Glen II community. Relying on the reuse provisions of the original licensing agreement, Concordia remitted a reuse fee of $10,860 to LGS, which represented $60.00 for each of the 181 additional homes planned for Arbor Glen II. LGS refused to accept this payment because Concordia omitted the $3,600 "base reuse fee". Concordia proceeded to construct Arbor Glen II, which was scaled back to 68 houses. *Id*. at 1151-1152.

In May 2004, LGS sued for copyright infringement and sought for a preliminary injunction to prohibit Concordia from constructing and selling the houses, the district court denied LGS's preliminary injunction motion. LGS appealed. In August 2004, the construction of Arbor Glen II was completed. In 2006, the Ninth Circuit reversed the district court's denial of preliminary injunction and directed the district court to "enter a preliminary injunction prohibiting Concordia from reproducing, distributing, publicly displaying, or creating derivative works based upon LGS's

-13-

1    architectural plans." *Id.* at 1158.

2    In *Wall Data v. Los Angeles Cty. Sheriff's Dept.*, 447 F.3d 769 (9th Cir. 2006), "[t]he Los

3    Angeles County Sheriff's Department purchased 3,663 licenses to Wall Data's computer software,

4    but installed the software onto 6,007 computers."   A jury found the defendant infringed Wall

5    Data's copyright. The district court entered final judgment against defendant. The Ninth Circuit

6    affirmed.

7

8    In *Sun Microsystems, Inc. v. Microsoft Corp.*, 81 F. Supp.2d 1026 (N.D.Cal. 2000), SUN

9    sued Microsoft for copyright infringement for breaching the compatibility terms of a Technology

10   License and Distribution Agreement ("TLDA") on SUN's Java technology. The district court

11   initially granted SUN's motion for preliminary injunction. The Ninth Circuit vacated the

12   preliminary injunction order and remanded. *Sun Microsystems, Inc. v. Microsoft Corp.*, 188 F.3d

13   1115, 1121-1122 (9th Cir. 1999). Upon remand, the district court decided "whether the

14   compatibility provisions set forth in the TLDA limit the scope of Microsoft's license or stand only

15   as independent covenants." *Sun Microsystems, Inc.*, 81 F. Supp.2d at 1028. The district court

16

17   analyzed the language and structure of the TLDA, and reasoned,

18           The rules of contract construction embodied in California law
             control the interpretation of the TLDA to the extent that such rules
19           are consistent with federal copyright law and policy. *Sun*, 188 F.3d
             at 1122 (citing *S.O.S.*, 886 F.2d at 1088). Therefore, the court must
20           review the entire TLDA and effect the mutual intention of the
             parties "as gathered from the four corners of the instrument."
21           *Machado v. Southern Pacific Transportation Co.*, 233 Cal.App.3d
             347, 352, 284 Cal.Rptr. 560 (1991); *Brobeck v. Telex*, 602 F.2d 866,
22           871-72 (9th Cir. 1979); see also Cal. Civ. Code § 1641 ("the whole
             of a contract is to be taken together, so as to give effect to every
23           part, if reasonably practicable, each clause helping to interpret the
             other.").
24
25           The language and structure of the TLDA suggest that the
             compatibility obligations are separate covenants and ***not conditions
26           of, or restrictions on***, the license grants.[fn9] The license grants in
             sections 2.1 ("Source Code and Development License to
27           Technology") and 2.2 ("Distribution License to Technology") allow
28

-14-

MOTION TO INTERVENE
                                                                                    MOTION FOR PRELIMINARY INJUNCTION

> Microsoft to distribute the Technology and Derivative Works of the Technology as part of a Product but say nothing about the license grants being subject to, conditional on, or limited by compliance with the compatibility obligations set forth in Section 2.6 ("Compatibility").

*Id.* at 1031-1032 (emphasis added). The district court then went on analyze the other sections of the TLDA and found they are logically consistent with the interpretation that the compatibility terms were separate covenants.

### 4.    Copyright license transferability and reverse triangular merger

In *Harris v. Emus Records Corp.*, 734 F.2d 1329 (9th Cir. 1984), the Ninth Circuit held that a copyright license is not transferable unless expressly allowed by the copyright owner. See also *SQL Solutions, Inc. v. Oracle Corp.*, 1991 WL 626458 (N.D.Cal. 1991) ("Federal copyright law provides a bright line prohibition against transfer of copyright license rights.")

*SQL* is particularly important as it addresses the question of a license transfer under operation of law in a reverse triangular merger. In *SQL,* a company named D&N Systems Inc. ("D&N") licensed certain software from Oracle Corporation ("Oracle"). Later, D&N merged with SybaseSub, Inc., a shell company created by Sybase, Inc. to facilitate a reverse triangular merger. The surviving company, D&N, took the name SQL Solutions, Inc.

The *SQL* court (Patel, Judge) found that "when D&N became SQL Solutions, Inc., much more than a name change was involved. D&N went through a fundamental change in its form of ownership. It became a wholly-owned subsidiary of Sybase, Inc." *Id.* at *8. Under California law, "an assignment or transfer of rights does occur through a change in the legal form of ownership of a business." *Id.* Because federal copyright law prohibits the transfer of copyright licenses, "the court finds that an illegitimate transfer of copyright license rights occurred when D&N became SQL". *Id.* at *15.

-15-

MOTION TO INTERVENE
MOTION FOR PRELIMINARY INJUNCTION

It is important to note that D&N's change of name to SQL Solutions was not the deciding factor in finding that a transfer had occurred. The fundamental change was in the ownership of business.

### C.  Copyright impoundment

Federal copyright law expressly authorizes the Court to impound illegal copies of copyrighted material: "At any time while an action under this title is pending, the court may order the impounding, on such terms as it may deem reasonable, of all copies or phonorecords claimed to have been made or used in violation of the copyright owner's exclusive rights...." 17 U.S.C. § 503(a).

### IV.    ARGUMENT

#### A.    Dr. Yue has the right to intervene

As stated above, the Ninth Circuit requires an applicant for intervention as of right to demonstrate that "(1) it has a significant protectable interest relating to the property or transaction that is the subject of the action; (2) the disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect its interest; (3) the application is timely; and (4) the existing parties may not adequately represent the applicant's interest."

Because Dr. Yue now owns the copyrighted software and all claims against the defendants in the instant action, tests (1) and (2) are easily satisfied.  As a result of the copyright assignment and related claims, Netbula has filed a motion to substitute Dr. Yue as the plaintiff for the copyright claim pursuant to FRCP 25(c).

However, because of the timing in the case, Dr. Yue's property rights are in danger of being lost. Defendants are planning to have their summary judgment motions heard before November 27, 2007, but Netbula's motion to substitute Dr. Yue as the plaintiff as to the copyright claim won't be heard until November 20, 2007, which is the same day when Netbula's counsel's

MOTION TO INTERVENE
MOTION FOR PRELIMINARY INJUNCTION

motion to withdraw will be heard. Ms. Brillet's tight schedule makes it near impossible for her to give the needed attention for the expected summary judgment hearing. This situation leaves Dr. Yue's interest with little representation. Thus, test (4) is also satisfied.

The only question remaining is whether Dr. Yue's motion to intervene is timely. Although the instant action has been filed for eleven months, "the mere lapse of time, without more, is not necessarily a bar to intervention." *U.S. v. Alisal Water Corp.*, 370 F.3d 915, 921 (9th Cir. 2004). The parties are still engaged in discovery of the first phase of the case. There has been no dispositive motion filed. Therefore, Dr. Yue's application to intervene is timely. In fact, if Dr. Yue's motion to intervene is delayed to after defendants file their dispositive motions, it may be viewed as untimely. Moreover, there can be no prejudice to the defendants – Dr. Yue, a non-lawyer *pro se* litigant, can't possibly prejudice defendants who are represented parties. Given the situation that Netbula lacks adequate representation on the eve of defendants' summary judgment motions, justice requires that Dr. Yue be given the opportunity to protect his property rights.

For the above reasons, pursuant to Federal Rule of Civil Procedure 24(a), Dr. Yue has the right to intervene and join as plaintiff to oppose defendants' summary judgment motions and to seek a preliminary injunction and impoundment order against defendants.

**B.      Dr. Yue is very likely to succeed on his copyright infringement claim**

A plaintiff must meet two requirements to establish a prima facie case of copyright infringement: (1) ownership of the allegedly infringed material and (2) violation by the alleged infringer of at least one of the exclusive rights granted to copyright holder. See *Napster, Inc.*, 239 F.3d at 1013; see also 17 U.S.C. § 106. See also, *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).

**1.  Dr. Yue has ownership of the copyrights in Netbula RPC Programs**

Dr. Yue owns the exclusive copyright and related claims in the 2000 and 2004 versions of

Netbula RPC software that were delivered to StorageTek. The 2000 version was registered under the title "Netbula PowerRPC PWRPC32.DLL 00-SDK-STK" with U.S. Copyright Registration No. TX 6-437-847. The 2004 version was registered under the title "NETBULA POWERRPC 2K4" with U.S. Registration No. TX 6-491-697. Yue Decl., Exhibit A.

Section 2 of the license agreements between Netbula and StorageTek was dedicated to copyright. Yue Decl., Exhibits B and I. According to the agreements, StorageTek "must treat the software as copyrighted material. [StorageTek] may not copy and redistribute the software except as permitted under this Agreement." StorageTek signed the agreement and agreed to respect the copyrights in the Netbula PowerRPC software.

Computer programs may be entitled to copyright protection as "literary works" under 17 U.S.C. § 101 and may be protected from infringement under 17 U.S.C. § 106. Both human readable source code (such as source code generated by Netbula "rpcgen.exe" and incorporated into StorageTek's software) and the binary object code (such as Netbula's "pwrpc32.dll" file, which was included in StorageTek's LibAttach software) are copyrightable as "literary works". *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1247–49 (3d Cir. 1983) ("Thus a computer program, whether in object code or source code, is a 'literary work' and is protected from unauthorized copying, whether from its object or source code version."). See also, *Apple Computer, Inc. v. Formula Int'l, Inc.*, 725 F.2d 521, 524-25 (9th Cir. 1984).

Netbula has obtained federal copyright registrations for its Netbula "PowerRPC" software product (Registration No. TX 6-211-063 for the 1996 version, No. TX 6-437-847 for the 2000 version and No. TX 6-491-697 for the 2004 version). Because Netbula's PowerRPC software is registered in the United States Register of Copyrights, there is a statutory presumption that the copyright is valid. *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101 (2d Cir. 2001). "A copyright certificate establishes prima facie evidence of the validity of a copyright and of the facts in the

certificate." *In re Napster, Inc, 191 F. Supp. 2d 2087 (N.D. Cal. 2002)* (Patel, Judge). See also,

*S.O.S. Inc. v. Payday Inc.,* 886 F.2d 1081 (9th Cir. 1989)*; Data General Corp. v. Grumman*

*Systems Support Corp.,* 36 F.3d 1147 (1st Cir. 1994); *Hamil America, Inc. v. GFI, Inc., 193 F.3d*

*92,* 52 U.S.P.Q.2d 1225 (2d Cir. 1999); *Montgomery v. Noga,* 168 F.3d 1282, 49 U.S.P.Q.2d 1961

(11th Cir. 1999)*; Three Boys Music Corp. v. Bolton,* 212 F.3d 477 (9th Cir. 2000).

"Registration is generally a jurisdictional prerequisite to a suit for copyright infringement."

*Perfect 10, Inc. v. Amazon.com, Inc.*, No. 06-55405 (9th Cir. 05/16/2007), foot note 1. As long as

some of plaintiff's works are registered, a district court can "issue an [injunction] order that covers

unregistered works." *Id.*

2. **Defendants Violated the Copyrights of Netbula RPC Programs**

StorageTek and SUN directly infringed Dr. Yue's copyrights in the Netbula RPC software

by (1) creating unauthorized derivative works, (2) authorizing others to make infringing derivative

works, (3) making unauthorized copies, (4) authorizing others to make unauthorized copies, (5)

distributing infringing derivative works, (6) distributing Netbula software in excess of granted

license count, (7) authorizing its customers to make unlimited copies and other infringing acts.

We need not analyze every type of StorageTek's infringing acts. A few of such infringing

acts suffice to establish a case of infringement.

a.    **StorageTek exceeded the scope of the 2000 SDK license by creating derivative works for Windows 2000**

It is undisputed that the 2000 Agreement restricts the Netbula SDK license to Windows

NT, 95 and 98 platforms. In an internal StorageTek email dated March 2, 2004, Mr. Melnick

wrote: "The agreement is specific to platform (Win NT and 95/98 platforms) types of Netbula

software (PowerRPC SDK)." Yue Decl., ¶11, Exhibit G.

-19-

1    It is also undisputed that StorageTek developed the LibAttach 1.1 software for Windows

2  2000, exceeding the scope of the license. Yue Decl., ¶9, Exhibit E.

3    **b.     StorageTek purchased 1000 licenses for distribution under the 2000 Agreement,**

4       **but exceeded the limit**

5    By its own admission, StorageTek exceeded the 2000 license grant by distributing more

6  than 1000 copies. A StorageTek manager wrote on March 2, 2004:

7       As you can see, we have exceeded the 1,000 distributions that we
8       had right to with Netbula…. I think it is obvious that engineering
       has not and did not monitor the distributions on this product.
9
10  Yue Decl., ¶12, Exhibit G.

11    Despite StorageTek's own admissions and the understanding between StorageTek and

12  Netbula on the 2000 Agreement, after StorageTek was acquired by with SUN, SUN attempted to

13  reinterpret the 2000 Agreement. Basically, SUN and StorageTek now claim that they can make as

14  many as copies they want and pay the bulk license price when they are caught.

15    In the 2000 Agreement, the relevant parts about the SDK license and distribution of

16  "Netbula RPC Supporting Programs and components" are the following:

17       NETBULA grants STORAGETEK, a non-exclusive, perpetual,
18       irrevocable license for use by STORAGETEK's employees,
       consultants and subsidiaries for up to ONE user(s), for each of
19       the licenses purchased, to use the PowerRPC SDK Product
       under Windows NT and 95/98 platforms; each user can only
20       use the software on one computer….

21
       Limited Distribution. You agree to maintain reasonable records
22       of the number of copies of the Supporting Programs distributed
       hereunder and to pay NETBULA as set forth in Exhibit C for
23       such copies….

24
       Payment. You agree to pay NETBULA the amounts set forth in
25       Exhibit C in full payment for the rights and licenses granted
       herein, thirty (30) days after receipt of an invoice referencing a
26       valid purchase order number.

27
       …..
28

-20-

MOTION TO INTERVENE
                                                       MOTION FOR PRELIMINARY INJUNCTION

EXHIBIT C

PAYMENT

STORAGETEK shall pay NETBULA a one-time fee of $895 per license for all rights granted under this Agreement with respect to the SDK Product, and one-time fee of $5,995 for the right to distribute up to 1000 units of software containing the Supporting Programs, thirty (30) days after receipt of an invoice referencing a valid purchase order number. NETBULA agrees that future SDK license purchases will be at a mutually agreed to price. NETBULA agrees to offer STORAGETEK additional units of Supporting Program licenses for the limited distribution license, at the cumulative license purchased prices as provided listed below. Pricing is based on cumulative purchases, not single purchase events. Additional licenses purchased are subject to the terms and conditions of this Agreement.

Under the license terms and conditions above, StorageTek must purchase the licenses by issuing a purchase order ("PO") with "a valid purchase order number" and make full payment thirty (30) days after receiving an invoice referencing the purchase order number. StorageTek issued one PO "for the right to distribute up to 1000 units of software containing the Supporting Programs." Netbula offered to sell additional licenses, but StorageTek did not purchase additional licenses under the 2000 Agreement.

Moreover, StorageTek failed to keep reasonable records for the copies it distributed – a condition in the license grant. The StorageTek manager wrote about LibAttach: "it is apparent that the software has been copied, uncontrolled, for several years."

**c. StorageTek purchased 1000 licenses for distribution under the 2004 Agreement, but exceeded the limit**

The 2004 Agreement was very similar to the 2000 Agreement. StorageTek issued a PO for 1000 runtime licenses. By its own admission, it exceeded the number of copies allowed. Yue Decl., ¶¶ 20-21.

MOTION TO INTERVENE
MOTION FOR PRELIMINARY INJUNCTION

1    In reckless disregard of Netbula's copyrights, StorageTek even sold unlimited licenses to

2    multiple customers. Yue Decl., ¶¶ 22-23, 25.

3    **d.  StorageTek had no licenses after it was acquired by SUN in August 2005**

4    Both the 2000 Agreement and 2004 Agreement are governed by California law, both

5    contained terms against assignment and transfer.

6

7    In August 2005, StorageTek went through a fundamental change in its form of ownership –

8    it became a wholly-owned subsidiary of Sun Microsystems, Inc. Based on Judge Patel's analysis

9    in *SQL Solutions*, 1991 WL 626458 (N.D.Cal. 1991), such change in ownership result in an

10    "illegitimate transfer of copyright license rights".

11    In fact, StorageTek fully understood the effect of the SUN-StorageTek merger. Mr.

12    Melnick wrote in his email that if Netbula did not approve the assignment of the agreement, the

13    "the agreement would be terminated." Yue Decl., ¶9. Netbula never give StorageTek written

14    authorization for the transfer of the license rights.

15

16    However, StorageTek continued to distribute Netbula software along with its products

17    after it was acquired by SUN in August 2005. Yue Decl., ¶¶ 22-26. Such distribution is

18    infringement.

19    **C.  The Public's Interest in Upholding the Integrity of Copyright Law**

20    The records clearly established StorageTek and SUN's infringement of Dr. Yue's

21    copyrights. In any case, StorageTek had no valid license rights after it was acquired by SUN in

22    August 2005. Dr. Yue's for preliminary injunction should therefore be granted. *Micro Star v.*

23    *Formgen Inc.*, 154 F.3d 1107, 1109 (9th Cir. 1998); *accord Novelty Textile Mills, Inc. v. Joan*

24    *Fabrics Corp.*, 558 F.2d 1090, 1094 (2d Cir. 1977) (reiterating that a court should issue a

25    preliminary injunction where the plaintiff makes a prima facie showing of copyright

26    infringement).

27

28

-22-

1    Injunctions should be issued even when infringement is innocent. See *Williams*

2 *Electronics, Inc. v. Artic International, Inc.*, 685 F.2d 870, 878 (3d Cir. 1982). But StorageTek and

3 SUN are not innocent infringers. Both companies are very sophisticated large corporations well

4 known in the information technology industry. Intellectual property is the basis of their businesses.

5 However, after being caught infringing Dr. Yue's copyrights, both StorageTek and SUN showed

6 no intention to respect the intellectual property rights in the copyrighted software and federal

7 copyright law. Instead, they continued their infringing activity. Up against big corporations with

8 vast resources and no repentance for their wrongful and illegal conduct, Dr. Yue's last and only

9 recourse is to seek the protection of the law from the Court. Dr. Yue's motion for injunctive relief

10 should be granted, so as to uphold the integrity of the copyright law and deter other similarly

11 situated companies from taking advantage of their large size and conducting similar unlawful acts.

12    Defendants' infringement is very large in scale. A Court-ordered impoundment of all

13 pirated copies of the Netbula Software is the only way to give Dr. Yue the protection to which he

14 is entitled.

15

16

17    **V. BOND**

18    In order to obtain injunctive relief of the type requested, Dr. Yue must post a bond. Fed. R.

19 Civ. P. 65(c).   The infringement in the instant case is plain software piracy – direct identity

20 copying of software files. This is different from cases where the infringement was not so clear cut.

21 See, e.g., *Cybermedia, Inc. v. Symantec Corp.*, 19 F. Supp. 2d 1070 (N.D.Cal. 09/3/1998)

22 (infringement was theorized on similarity of small portions of source code); *Napster* (infringement

23 was theorized on vicarious or contributory liability).   Defendants StorageTek and SUN have no

24 right to pirate Netbula software in the first place (except the 1000 copies for Windows NT

25 purchased in 2000, and 1000 copies purchased in 2004, which they already distributed to

26 customers), nor do they have any **legal** right to continue to derive profits from the infringing

27

28

-23-

1    copies.  "[I]n motion for preliminary injunction, district court should not consider the devastating

2    effect of the injunction on the infringer's business".  See *Triad Systems Corp. v. Southeastern*

3    *Express Co.* , 64 F.3d 1330 (9th Cir. 08/31/1995).

4        The United States Supreme Court Copyright Practice Rules[2](1909) set the bond at a

5    minimum of "twice the reasonable value of such infringing copies". The key here is that the

6    "Copyright Rules are only relevant to the seizure of the infringing goods". *First Technology Safety*

7    *Systems Inc. v. Depinet*, 11 F.3d 641 (6th Cir. 1993) (The defendants estimated that impounded

8    articles worth $2.2 million, the plaintiff was required only to post $2,000 bond for impoundment

9    and seizure.) In the instant case, the value of illegal pirated copies of software should be zero. For

10   the impoundment of unlicensed, illegal copies and maintain the integrity of federal copyright laws,

11   a *de minimus* bond is appropriate.

12       Requiring Dr. Yue to post a high bond for impounding pirated copyrighted works would

13   pose a barrier for individuals to protect their intellectual production, and would be a major

14   protective shield for large companies to infringe with impunity. Dr. Yue submits that a bond of

15   $2,000 is sufficient for the injunction and impoundment against willful software pirates such as

16   StorageTek and SUN.

17                                  **VI. RELIEF SOUGHT**

18       Dr. Yue has demonstrated the likelihood of success on its copyright infringement claim

19   and is entitled to seek preliminary injunctive relief as a matter of law. Dr. Yue thus moves the

---

[2]     Although the U.S.  Supreme Court Copyright Rules was authorized by the 1909 Copyright Act,, "[t]he consensus of knowledgeable authorities is that the Supreme Court's Rules have not been repealed. See, e.g., 4 Wright, Federal Practice and Procedure, 2d ed. § 1018; 2 Moore's Federal Practice para. 1.03[3] (2d ed.); 3 Nimmer on Copyright, 14.07 (1988); 6A Federal Procedural Forms § 17:61-17:68 (1987); Owens, Impoundment Procedures Under the Copyright Act: The Constitutional Infirmities, 14 Hofstra L. Rev. 211, 213 (1985); Note, Pretrial Remedies in Infringement Actions: The Copyright Holder's Impound of Flesh? 17 Santa Clara L.Rev. 885, 897 (1977)." (quoted from *Warner Bros. v. Dae Rim Trading Inc.*, 877 F.2d 1120 (2nd Cir. 06/12/1989))

MOTION TO INTERVENE
                                                                      MOTION FOR PRELIMINARY INJUNCTION

Court for preliminary or permanent injunction ordering Defendants (and their directors, officers, employees, independent contractors, affiliates, agents and representatives) to:

1. Immediately stop pirating, using, copying, and distributing all unlicensed copies of Netbula software files, including, but not limited to, all versions and derivative works of Netbula "pwrpc32.dll", "rpcgen.exe", "powrrpc.h" and source code generated by Netbula "rpcgen.exe" (collectively and individually "The Netbula Software");

2. Immediately deliver to the Court for impoundment all illegal copies and all means[3] of making, selling, marketing such illegal copies of The Netbula Software in Defendants' possession, custody or control, together with an accounting, to be provided to Netbula, of:

(1) the number of all such copies in Defendants' possession, custody or control;

(2) where each infringing copy was found;

(3) a sworn statement on how each such copy was obtained, duplicated, used and/or disseminated, and identity of the persons who were involved in the acitivities;

(4) detailed explanation of the means of making, duplicating and disseminating such copies, including marketing, sales, promotion, web pages, internet download and any other materials used in aiding, supporting, encouraging, inducing and facilitating infringement.

3. File with the Court, and provide a copy to Dr. Yue, within twenty (20) days after service of the Court's Injunction Order, a report in writing and under oath setting forth, in detail, the manner and form in which Defendants have complied with the Court's Injunction Order.

### VII. CONCLUSION

For the foregoing reasons, Dr. Yue respectfully requests the Court to grant his application

---

[3] Rule 4 of the Supreme Court Copyright Rules not only requires impoundment of infringing copies, but also "plates, records, molds, matrices, etc., or other means of making such infringing copies".

1    to intervene and join as plaintiff, Dr. Yue respectfully requests the Court to grant his Motion for

2    Injunction and Impoundment.

3

4    Dated:    October 22, 2007

5

6                                                    By:    Dongxiao Yue, Ph. D.

7                                                           *Pro Se*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-26-