VONNAH M. BRILLET (SBN 226545)
**LAW OFFICES OF VONNAH M. BRILLET**
2777 ALVARADO ST., SUITE E
SAN LEANDRO, CA 94577
Telephone:     (510) 351-5345
Facsimile:     (510) 351-5348
E-Mail:         BrilletLaw@yahoo.com

Attorneys for Plaintiff
NETBULA, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NETBULA, LLC., a Delaware limited liability company,<br><br>               Plaintiff,<br><br>    v.<br><br>STORAGE TECHNOLOGY CORPORATION, et al.,<br><br>               Defendants. | Case No. C06-07391-MJJ<br><br>**[PROPOSED] ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION OF ISSUES RELATING TO LICENSE DEFENSE**<br><br>Date:  December 13, 2007<br>Time:  3:00 p.m.<br>Dept.:  Courtroom 11<br>Judge:  Honorable Martin J. Jenkins |

Before the Court is Defendants SUN Microsystems, Inc. ("SUN"), Storage Technology Corporation ("StorageTek"), EMC Corporation ("EMC"), Darden Restaurants, Inc. ("DARDEN") and IBM Corporation ("IBM") [collectively "Defendants"]'s Motion for Summary Judgment or Summary Adjudication of Issues Relating to License Defense ("MSJ").

For the reasons below, the Court **DENIES** Defendants' Motion.

## I.    BACKGROUND

1.    Plaintiff's RPC software products were used by other software developers to develop new computer software applications. A software developer must purchase SDK licenses for developing new programs using Netbula RPC software, and must also purchase distribution licenses for distributing copies of Netbula RPC "Supporting Programs" (the "runtime software", including the "pwrpc32.dll" module), which were necessary to run the RPC applications developed with the Netbula SDK. Yue Decl., at ¶¶ 6-13.

2.    On February 7, 2000, Michael Melnick of StorageTek emailed Netbula, inquiring about "the purchase of 8 developer licenses" and "a limited application distribution agreement." Yue Decl., at ¶19, Ex. 4.

3.    Netbula's sales records show that from January 2000 to December 2006, Netbula sold RPC distribution licenses in "paks" of different sizes, each pak granted a customer the right to make or distribute certain number of copies of the Netbula runtime software. Yue Decl., at ¶20.

4.    In February 2000, the 20-pak, which granted a customer the right to make 20 copies of the runtime software, was priced at $1000. Yue Decl., at ¶21, Ex.5.

5.    In February 2000, the "limited application distribution license", which granted the right to make 1000 copies of the runtime software, was priced at $5995. Netbula's web page in February 2000 had a detailed description of the licensing terms. Yue Decl., at ¶22, Ex.6.

6.    In February 2000, Netbula gave StorageTek the following quote for licenses: "ONC RPC Win32 developer license: $895 per developer per machine", "ONC RPC Win32 limited distribution license: $5995", and "The limited distribution license is for distributing the DLLs and support programs to 1,000 machines." Yue Decl., at ¶23, Ex.7.

7.      Per Mr. Melnick's request, Netbula provided a license agreement template to StorageTek. The license agreement reflected Netbula's license purchase terms described above. Mr. Melnick then made changes to the agreement and sent the modified version back to Netbula. Yue Decl., at ¶24, Ex.8; Yue Decl., Ex 43 (Melnick Depo.), pp. 44-50.

8.      Netbula accepted the proposed changes to the agreement drafted by Mr. Melnick. The parties signed the agreement on March 1, 2000 (the "2000 Agreement"). The 2000 Agreement was governed by the laws of California and "may not be assigned by either party or amended without the written consent of both parties…" Yue Decl., at ¶25, Ex.9.

9.      The 2000 Agreement granted StorageTek the right to develop products under Windows NT and 98/95 only. Yue Decl., at ¶¶ 26-30.

10.     The "Pmapsvc.exe" program in the limited distribution license was explicitly limited to Windows NT in the 2000 Agreement. Yue Decl., at ¶ 26.

11.     Pursuant to the 2000 Agreement, StorageTek issued a purchase order to Netbula for the purchase of eight (8) developer licenses and a 1000-copy limited distribution license. Netbula sent StorageTek the software on a CD with a label which had the following information: name of the software, name of licensee ("StorageTek"), invoice number ("1605"), license type and license quantity ("8 Developers 1000 runtime").  The CD was described in an email written by a StorageTek manager named Lisa Rady:

> I have a CD in my hand called "Netbula ONC RPC for Win32 Development Toolkit", licensed to StorageTek (1605) 8 Developers 1000 runtime. Inside the CD was the Receipt that included the PO number CCOL122576...

Yue Decl., ¶35, Ex. 10.

12.     On May 1, 2000, Scott Painter, a StorageTek engineer, emailed Netbula about customizing Netbula's "PowerRPC Portmapper" software, the email was copied to Michael Abramovitz. Yue Decl., ¶37, Exhibit 11.

13.     On June 11, 2001, a StorageTek developer in Australia named Anton Vatcky requested a copy for Netbula's RPC for Windows 2000. Yue Decl., ¶38, Ex. 12.

14.     On June 13, 2001, Netbula emailed Mr. Vatcky a copy of the evaluation version of Netbula

PowerRPC for Win2K (Microsoft Windows 2000). But, StorageTek did not respond to Netbula to sign any agreement for Windows 2000. Yue Decl., ¶39.

15.    According to StorageTek's release notes, LibAttach 1.1, LibAttach 1.2 and LibAttach 1.3 used Netbula RPC software and were developed for Windows 2000. Yue Decl., ¶40.

16.    In May 2001, Netbula sent a license usage audit request to StorageTek.  Yue Decl., ¶42.

17.    On June 22, 2001, Michael Melnick responded to Netbula's audit request via email, stating,

> The license agreements requires [*sic*] us to provide the number of licenses distributed… The license count you request is 107, this leaves us the rights to distribute 893…

Yue Decl., ¶44, Ex. 15.

18.    On September 9, 2002, responding to another audit request, Michael Melnick sent an email to Netbula, stating that StorageTek ceased distributing Netbula RPC. Yue Decl., ¶45, Ex. 16.

19.    Since 2003, Netbula's pricing for the 1000-pak license was about $18,000. An agreement signed between Netbula and a customer in October 2003 had the following pricing terms,

> [Customer] has paid NETBULA a one-time fee of $895.00 per developer license for all rights granted under this Agreement with respect to the NETBULA ONC RPC SDK Product and a one-time fee of $7995.00 for the right to distribute up to 1000 units of ONC RPC client runtime license. Client runtime License pricing has been defined as $680 for 20 licenses or $17,850 for 1000 license[*sic*]. Server runtime license pricing has been defined as $800 per unit…

The Customer in the above agreement purchased 1000 Netbula ONC RPC runtime licenses in May 2002 for $7,995.00. In 2003, the Customer and Netbula re-negotiated the above license agreement with the new price. Yue Decl., ¶47, Ex. 17.

20.    On March 2, 2004 at 10:06 AM, Lisa Rady, the program manager in charge of LibAttach development at StorageTek, sent an email to Michael Melnick, stating that StorageTek had "exceeded the 1000 distributions that we had right to, with Netbula". Yue Decl., ¶48, Ex. 18.

21.    On March 2, 2004 at 10:52AM, Lisa Rady emailed Michael Melnick again:

> I have a CD in my hand called "Netbula ONC RPC for Win32 Development Toolkit", licensed to StorageTek (1605) 8 Developers 1000 runtime…
>
> Engineering will need to provide what specific platform they require.

Responding to Ms. Rady's email message, Mr. Michael Melnick wrote at 11:21AM:

> The agreement is specific to platform (Win NT and 95/98 platforms) types of Netbula software (PowerRPC SDK). This concerns me greatly as we have already told them we are no longer shipping it with our product.

Yue Decl., ¶49, Exhibit 14.

22.    Lisa Rady wrote in another email on March 2, 2004,

> As you can see we have exceeded our 1000 distributions of NetBula, so that is one issue…
> We need to work on this, and make sure there is a better process in place for managing the number of distributions and making sure we are compliant with our contract with Netbula…
>
> Is there any freeware that is comparable?

In the same string of emails, Michael P. Abramovitz responded,

> Some kind of port mapper must always be present for LibAttach to function. NetBula was chosen because it was one of only a handful of port mappers that ran natively on windows. All other port mappers require a UNIX emulation layer (like NuTCracker or some such)…

Lisa Rady then emailed Janet L. Rooney and Michael Melnick:

> Can you respond to Mike Melnick regarding what platform you need, for Netbula? … The CD you gave me was for Windows NT/95/98. Do we need to request a more current windows version?

Yue Decl., ¶50, Exhibit 19.

23.    After the above internal discussion, Mr. Melnick sent an email to Netbula on March 2, 2004 at 3:29 PM, stating:

> Could you provide me with the StorageTek sales representative or if possible give me a quote on distributing an additional 1000 units of RPC? The platform used will need to be Windows 2003.

Yue Decl., ¶51, Ex. 20. On March 3, 2004, Netbula replied by email, stating: "The original agreement covers Windows NT/98/95 only". *Id.*

24.    In a document titled "LibAttach 1.2.1" attached to a March 12, 2004 internal StorageTek email, Lisa Rady wrote the following:

> 3/11/04 …Terry is testing LibAttach with two firewalls, ACSLS and ACSLS GA. Michael Abramovitz is available to help on as needed basis.
> 3/4/04 It has been determined that we need to purchase a new SDK and 1000 more distributions of Netbula…
> …
> 3/4/04 Terry has received one copy of Visual C++. He is still waiting to have another copy installed on the stand alone machine…
> …
>
> There is no license key in the product, and it is apparent that the software has been copied, uncontrolled, for several years.

This email was sent to Thomas J. Murray (whose email signature identified him as "Manager, RD&E Software Engineering") and others. Mr. Murray wrote on March 15, 2004:

> We either need to increase the Netbula license or put a stop-ship on the LibAttach product, because we have shipped LibAttach copies up to the limit of the current Netbula license (Netbula is embedded in our LibAttach product)

Yue Decl., ¶52, Ex. 21.

25.    In March 2004, Netbula and StorageTek negotiated for a second agreement. Netbula provided the then-current license agreement template with the price of $18,000 for 1000 client runtime licenses, and $800 for one server runtime license. Michael Melnick then modified the template and emailed the word document with drafted changes to Netbula. Yue Decl., ¶53, Ex. 22.

26.    Because StorageTek previously represented that it only used 107 licenses out of the 1000 licenses purchased (thus with 893 licenses wasted) and ceased distributing the product, and because Mr. Melnick did not inform Netbula that StorageTek had in fact been distributing Netbula RPC from 2000 to 2004 and had in fact exceeded the purchased license count, Netbula gave StorageTek a price much lower than the standard pricing at the time. Yue Decl., ¶54.

27.    Mr. Michael Melnick, on behalf of StorageTek, signed the second license agreement (the "2004 Agreement") on March 17, 2004. Yue Decl., ¶¶55-56, Ex. 23.

28.    Pursuant to the 2004 Agreement, StorageTek ordered one (1) developer license and one limited distribution license (1000-copy license). Pursuant to the 2004 Agreement and the 2004 Purchase Order, Netbula delivered the 2004 version of the RPC software on a CD to StorageTek and invoiced StorageTek for the amount on the purchase order. Like the CD delivered in 2000, the

CD delivered in 2004 was also labeled with license type and quantity information. The software

StorageTek received from Netbula would display the following information:

        Licensee: StorageTek, 1000 machine runtime license (s10302)

Yue Decl., ¶¶56-58, Ex. 23.

29.    The 2000 Purchase Order and the 2004 Purchase Order were the only two license

purchases StorageTek made for Netbula software licenses. Yue Decl., ¶59.

30.    On October 25, 2004, Michael Abramovitz sent an email to Netbula, stating: "We bundle

your PowerRPC into several of our products." On the same day, Netbula requested an audit from

StorageTek, but StorageTek did not provide any report in response to this request. Yue Decl., ¶60.

31.    In June 2005, Netbula noticed a news story about SUN's planned acquisition of

StorageTek. On June 15, 2005, Netbula emailed StorageTek again for an audit of license usage

and inquired about the impending SUN- StorageTek merger. Mr. Melnick responded:

> As for Sun, it should be completed by the end of summer… The only thing
> that you and I may have to do is for you to allow assignment of the agreement
> to Sun. The agreements calls [sic] for your approval. I assume you would
> sallow [sic] this as if you did not the agreement would be terminated.

Yue Decl., ¶61, Ex. 24.

32.    On June 16, 2005, Mr. Melnick wrote to Thomas Murray:

> Can you give ne an update of how many Netbula RPC licenses we have
> distributed? We need to make sure we have not exceeded what we have been
> licensed for.

On June 16, 2005, Michael P. Abramovitz wrote: "To the best of my memory, we have a license

to redistribute 2000 copies."

On June 20, 2005, Holly Wagner, a Software Product Planner at StorageTek, emailed Mr. Michael

Melnick, Ms. Lisa Rady, Mr. Michael Abramovitz and others, stating:

> The SAP query I ran this morning shows 2,386 models shipped. This number
> is low due to the fact that the query does not have the capability of pulling the
> client feature quantities that were released in November of last year.

Responding to this email, Mr. Melnick wrote on June 28, 2005:

> The number that Holly has provided and thought it may be low causes quite a problem for you. We have only made 2 purchases for the rights to distribute a total of 2000 licenses.

Yue Decl., ¶62, Ex. 25.

33.    Michael Melnick then emailed Netbula inquiring about an unlimited license:

> We would like to get a quote on having an unlimited distribution model. Is this available? Tracking usage is becoming burdensome and we want to ensure we continue to be in compliance.

Yue Decl., ¶63, Ex. 26.

34.    On July 8, 2005, in response to StorageTek's particular request and based on StorageTek's purported usage history, Netbula emailed a price quote for an unlimited license with one year of upgrades and fixes. Mr. Melnick immediately rejected the offer and the parties did not proceed further on license negotiations. *Id.* at p.2. A0114.

35.    On July 8, 2005, Netbula emailed StorageTek again for an audit of the license usage count. Michael Melnick responded:

> There is nothing in the agreement that allows any kind of audit, nor was there one in the previous agreement. We would love to pay you on a royalty "as we use basis" but when this was requested we were reminded that this was not your model and we must prepay.

Yue Decl., ¶65, Ex. 26.

36.    In an email dated July 27, 2005, Netbula requested a detailed report with product names and platform information, and raised issues on "Supported platforms". In Michael Melnick's response, he wrote: "No disagreement with the [sic] that the original agreement was for (Windows NT/98/95 only)." Yue Decl., ¶¶66-67, Ex. 27, A0128.

37.    On July 28, 2005, Michael Abramovitz wrote in an email titled "RE: Netbula":

████████████████████████████████

Yue Decl., ¶68, Ex. 28.

38.    According to a press release issued by SUN, it completed its acquisition of StorageTek on

-8-

1    August 31, 2005. Yue Decl., ¶¶69-70, Exhibits 29-30.

2    39.    StorageTek finally provided Netbula a detailed license report in August 2005, showing that

3    StorageTek distributed 7455 copies. The report also showed that StorageTek copied and

4    distributed PowerRPC on Windows 2000 before it purchased a license for that operating system.

5    Yue Decl., ¶71, Ex. 31.

6    40.    Netbula performed an analysis of the license usage and found what it believed to be

7    inconsistencies. StorageTek then had Maria Woods, its Corporate Counsel, take over the dispute

8    between Netbula and StorageTek. According to her email signatures, no later than October 3,

9    2005, Maria Woods became "Corporate Counsel" for "Sun Microsystems, Inc." with the email

10   address maria.woods@sun.com. Yue Decl., ¶72, Ex. 32.

11   41.    On or about December 16, 2005, Carmel Gill at "Sun StorageTek Legal Department"

12   emailed Don Yue several electronic documents, including "Letter to Don Yue 12-16-05.doc" and

13   "FinalCount-RoyaltyItemsOnly.xls". Yue Decl., ¶73, Ex. 33.

14   42.    The file "FinalCount-RoyaltyItemsOnly.xls" was a report of StorageTek's license sales. It

15   showed StorageTek continued to sell LibAttach software which included Netbula RPC

16   components after it became a subsidiary of Sun Microsystems. Yue Decl., ¶74, Ex. 34.

17   43.    In the letter to Don Yue, Carmel Gill stated:

18           Also, as Mike Melnick informed Netbula back in 2000, StorageTek systems
             are set up to track royalties on a going-forward basis, not on a pre-paid basis.
19           Mike Melnick suggested that the parties enter into a straight royalty-type
             agreement, but Netbula declined to do so…
20

21   44.    Sun StorageTek also admitted that it had sold unlimited licenses for LibAttach software

22   containing Netbula code to multiple customers. Yue Decl., ¶75, Ex. 35.

23   45.    StorageTek's pricing list showed that it offered product LibAttach on its website for

24   "**UNLIMITED CLIENTS**". Yue Decl., ¶¶77-78, Exhibits 36-37.

25   46.    Documents found online in October 2007 indicate SUN is still offering infringing software

26   to existing StorageTek customers. Yue Decl., ¶80, Ex. 38.

27                                    II. **LEGAL STANDARD**

28           **A.**        **Summary Judgment Standard**

Summary judgment is proper only when there is no genuine issue of material fact and, when viewing the evidence in the light most favorable to the nonmoving party, the movant is clearly entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c); *Cleary v. News Corp.*, 30 F.3d 1255, 1259 (9th Cir. 1994).

In judging evidence at the summary judgment stage,

> [T]he judge does not weigh conflicting evidence with respect to a disputed material fact…Nor does the judge make credibility determinations with respect to statements made in affidavits, answers to interrogatories, admissions, or depositions…These determinations are within the province of the factfinder at trial. Therefore, ***at summary judgment, the judge must view the evidence in the light most favorable to the nonmoving party***: if direct evidence produced by the moving party conflicts with direct evidence produced by the nonmoving party, ***the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact***.

*T.W. Electrical Service Inc. v. Pacific Electrical Contractors Association*, 809 F.2d 626, 630-31 (9th Cir. 02/05/1987) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348 (1986); *First Nat'l Bank v. Cities Serv. Co.*,391 U.S. 253, 289 & n.19, 20 L. Ed. 2d 569, 88 S. Ct. 1575 (1968); *Anderson v. Liberty Lobby, Inc.*,477 U.S. 242, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986) ) (internal citations omitted, emphasis added). See also, *Ting v. United States*, 927 F.2d 1504, 1509 (9th Cir. 1991).

Because "[v]erdicts cannot rest on inadmissible evidence" and a grant of summary judgment is a determination on the merits of the case, the evidence presented by the moving party must be admissible. Fed.R.Civ.P. 56(e); *Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000). Hearsay statements found in affidavits are inadmissible. See, e.g., *Fong v. American Airlines, Inc.*, 626 F.2d 759, 762-63 (9th Cir. 1980). Thus, the moving party's affidavits must be free of hearsay.

For the nonmoving party, the evidence standard is lower. "We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment. . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  "Material in a form not admissible in evidence may be used to avoid, but not to obtain summary judgment . . . ."

1  *Tetra Techs. Inc. v. Harter*, 823 F. Supp. 1116, 1120 (S.D.N.Y. 1993). The Ninth Circuit has held

2  that "***to survive summary judgment***, a party does ***not*** necessarily have to produce evidence in a

3  form that would be admissible at trial, as long as the party satisfies the requirements of Federal

4  Rules of Civil Procedure 56." *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003) (citing

5  *Block v. City of L.A.*, 253 F.3d 410, 418-19 (9th Cir. 2001)) (emphasis added).

### B.    Exclusive Rights of a Copyright Owner

7  Copyright is a statutory property right of the author granted by the Copyright Act (the

8  "Act"). "Unlike contracts, copyrights and the rights flowing therefrom are entirely creatures of

9  statute. . . ." *Silvers v. Sony Pictures Entertainment, Inc.*, 402 F.3d 881, 884 (9th Cir. 2005)

10  (quoting *Microsoft Corp. v. Grey Computer*, 910 F.Supp. 1077, 1084 (Md. 1995)).

11  Section 106 of the 1976 Act defines several exclusive rights granted under copyright,

12  including the exclusive right to reproduce copies, to prepare derivative works and distribute

13  copies.

### C.    Copyright License and Contract Interpretation

15  A non-exclusive copyright license operates as an affirmative defense to copyright

16  infringement.  "Defendant bears the burden of proving . . . affirmative defenses." *A & M Records,*

17  *Inc. v. Napster, Inc.*, 114 F.Supp.2d 896, 912 (N.D.App. 2000).

18  "When a licensee exceeds the scope of the license granted by the copyright holder, the

19  licensee is liable for infringement." *LGS Architects, Inc. v. Concordia Homes of Nevada*, 434 F.3d

20  1150, 1156 (9th Cir. 2006).  Under federal law, "copyright licenses are assumed to prohibit any

21  use not authorized." *S.O.S., Inc. v. Payday, 886 F.2d* 1081, 1888 (9th Cir. 1989).

22  In *Sun Microsystems, Inc. v. Microsoft Corp.*, 81 F. Supp.2d 1026 (N.D.Cal. 2000), SUN

23  sued Microsoft under copyright and trademark for violating compatibility requirements in a

24  Technology License and Distribution Agreement ("TLDA"). Following rules of California law on

25  contract interpretation "to the extent that such rules are consistent with federal copyright law and

26  policy," the district court analyzed whether the terms in the TLDA were "independent covenants"

27  or "license conditions or restrictions". *Id*. at 1029-33. The approach taken by the *Sun*

28  *Microsystems* court was to examine whether a term was included in the license grant section of the

1  agreement or whether the term refers back to the license grant. The district court then found that

2  the compatibility requirements were conditions on the trademark license but not conditions on the

3  copyright license.

4      In *LGS Architects,* LGS Architects, Inc. ("LGS") and Concordia Homes of Nevada

5  ("Concordia") entered into a licensing agreement that authorized Concordia to use LGS's

6  architectural plans to construct eighty houses. The agreement had a standard rate schedule for a

7  "reuse fee". Later, Concordia decided to use LGS's plans to construct additional houses in an

8  adjacent community. Concordia remitted to LGS a reuse fee of $10,860. LGS refused the

9  payment. Concordia nevertheless proceeded to construct the new houses. *Id*. at 1151-1152.

10      LGS sued for copyright infringement and sought for a preliminary injunction. The district

11  court denied the preliminary injunction on the basis that it was a contract dispute. In 2006, after

12  finding that LGS was likely to succeed on the copyright infringement claim, the Ninth Circuit

13  directed the district court to enter a preliminary injunction against Concordia. *Id*. at 1158.

14      In *Wall Data v. Los Angeles Cty. Sheriff's Dept.*, 447 F.3d 769 (9th Cir. 2006), "[t]he Los

15  Angeles County Sheriff's Department purchased 3,663 licenses to Wall Data's computer software,

16  but installed the software onto 6,007 computers."  A jury found the defendant infringed Wall

17  Data's copyright. The district court entered final judgment against defendant. The Ninth Circuit

18  affirmed. See also, *Thoroughbred Software v. Dice, 488 F.3d 352 (6th Cir. 2007).*

19      **D.  Applicable Rules of Contract Interpretation under California Law**

20      Since both the 2000 and 2004 agreements between Netbula and StorageTek were

21  governed by the laws of California, California Civil Code sections 1636 to 1654 apply.

22      **E.  Copyright License Transferability and Reverse Triangular Merger**

23      *SQL Solutions, Inc. v. Oracle Corp.*, 1991 WL 626458 (N.D.Cal. 1991) addresses the

24  question of a license transfer under operation of law in a reverse triangular merger. In *SQL,* D&N

25  Systems Inc. ("D&N") licensed certain software from Oracle Corporation ("Oracle"). Later, D&N

26  merged with SybaseSub, Inc., a shell company created by Sybase, Inc. to facilitate a reverse

27  triangular merger. The surviving company, D&N, took the name SQL Solutions, Inc.

28

1   The *SQL* court found that "when D&N became SQL Solutions, Inc., much more than a

2   name change was involved. D&N went through a fundamental change in its form of ownership. It

3   became a wholly-owned subsidiary of Sybase, Inc." *Id.* at *8. Under California law, "an

4   assignment or transfer of rights does occur through a change in the legal form of ownership of a

5   business." *Id.* Because federal copyright law prohibits the transfer of copyright licenses, "the court

6   finds that an illegitimate transfer of copyright license rights occurred when D&N became SQL".

7   *Id.* at *15.

8                                  **III. ANALYSIS**

9   **A.     Intention of the parties as it existed at the time of contracting shows the Agreements
             were prepayment agreements** (applying Cal. Civ. Code §1636)

10

11   In 2000**,** Netbula's only way of marketing its software was via its website. Yue Decl., at

12   ¶20. The limited application distribution license at the time was described on Netbula's web order

13   form as follows:

14           **One development license is for one developer to use Netbula
             RPC (PowerRPC or ONC RPC) to develop client/server**

15           **applications on one machine running one operating system (each
             UNIX flavor is a different OS).**

16           **A Netbula ONC RPC limited application distribution license is
             for**

17

18           ●   installing applications developed using Netbula RPC tools and
                 supporting infrastructure (DLLs, portmapper, etc)

19           ●   for one operating system
             ●   on up to 1,000 (one thousand) machines for any number of

20               users.
             ***Netbula may request you to conduct an audit to account the***

21           ***number of runtimes installed.***

22   Yue Decl., at ¶22, Ex. 6 (bold face and italics original).

23   When Michael Melnick emailed Netbula on February 7, 2000, his request was:

24           I am looking to speak with someone on the purchase of 8 developer
             license for Power RPC, ONC RPC for Win 32, and a limited

25           application distribution agreement.

26

27

28

1   Yue Decl., at ¶19, Ex. 4, Melnick Depo., Ex. 4. StorageTek's initial intention was to purchase

2   specific quantity of licenses. According to Mr. Melnick's email message to Netbula:

3           We would love to pay you on a royalty "as we use basis" but when this was
            requested we were reminded that this was not your model and **we must**
4           **prepay**.

5   Yue Decl., at ¶65, Ex. 26, A0113 (Melnick, Ex. 54) (emphasis added).

6           The following is an exchange at Mr. Melnick's deposition,

7           Q   Okay. Were there any communications between StorageTek and Netbula
8           regarding prepaid versus royalty-type agreements?

9           A   There were some discussions, yes, originally. You're talking about from
10          the beginning of time?

11          Q   Yes.

12          A   (Nods head.)

13          Q   What was a prepaid agreement?

14          A   Prepaid agreement is one where I'm buying a block of licenses whether I
15          use them or not.  I still have the rights to distribute them, but I basically have
            to pay in advance.
16
            Q   Okay. And what is a straight royalty-type agreement?
17
            A   Pay as you go.  Pay as you use to distribute.
18
19  Yue Decl., Ex. 43 (Melnick Depo., p.63:4-20)

20          Q   Okay. The 2000 Netbula/StorageTek agreement, was that a prepaid or a
            straight royalty-type agreement?
21
22          MR. PULGRAM:  Object; vague.

23          THE WITNESS:  I was required to purchase in blocks of $1,000 units to be
            able to distribute per the agreement.
24
            BY MS. BRILLET:
25          Q   And who made that requirement?

26          A   Mr. Yue.

27
    Yue Decl., Ex. 43 (Melnick Depo., p.65:2-11).
28

-14-

Mr. Melnick's understanding of the Agreements were also confirmed by the December

16, 2005 letter from Sun StorageTek Legal Department, which stated, in part,

> [A]s Mike Melnick informed Netbula back in 2000, StorageTek systems are
> set up to track royalties on a going-forward basis, not on a pre-paid basis.
> Mike Melnick suggested that the parties enter into a straight royalty-type
> agreement, but Netbula declined to do so…

Yue Decl., at ¶75, Ex. 35 ("Letter to Don Yue 12-16-05.doc").

Based on the Mr. Melnick and SUN's admissions, the parties' intention at the time of

contracting was clear: the licenses must be pre-paid. Each copy made or distributed by StorageTek

must have a license. Each unauthorized act of copying is a separate claim. FAC at ¶¶87-88.

**B. The language of the Agreements shows they were  prepayment
purchase agreements** (applying Cal. Civ. Code §1639, §1641)

One must take the whole of a contract together, "so as to give effect to every part, if

reasonably practicable, each clause helping to interpret the other." Cal. Civ. Code §1641. See also,

*Sun Microsystems,* 81 F. Supp.2d at 1032 (citing Cal. Civ. Code §1641).

Among other things (such as provisions on copyright), the 2000 Agreement contained

the following terms regarding payment and licenses (with the portions drafted by Michael Melnick

underlined and italicized):

> NETBULA grants STORAGETEK, a non-exclusive, perpetual, irrevocable
> license for use by STORAGETEK's employees, consultants and subsidiaries
> for up to ONE user(s), *for each of the licenses purchased*, to use the
> PowerRPC SDK Product under Windows NT and 95/98 platforms; each user
> can only use the software on one computer….
>
> ….
> Limited Distribution. You agree to maintain reasonable records of the number
> of copies of the Supporting Programs distributed hereunder and to pay
> NETBULA as set forth in Exhibit C for such copies…
> …
>
> Payment. You agree to pay NETBULA the amounts set forth in Exhibit C in
> full payment for the rights and licenses granted herein, *thirty (30) days after
> receipt of an invoice referencing a valid purchase order number.*
>
> …..

-15-

EXHIBIT C

PAYMENT

> *STORAGETEK* shall pay NETBULA a one-time fee of *$895 per license* for all rights granted under this Agreement with respect to the SDK Product, and one-time fee of *$5,995* for the right to distribute up to *1000* units of software containing the Supporting Programs, *thirty (30) days after receipt of an invoice referencing a valid purchase order number. NETBULA agrees that future SDK license purchases will be at a mutually agreed to price.* NETBULA agrees to offer *STORAGETEK* additional units of Supporting Program licenses for the limited distribution license, *at the cumulative license purchased prices as provided listed below… Additional licenses purchased are subject to the terms and conditions of this Agreement.*

Yue Decl., ¶26, Ex. 9. Dr. Yue testified to the following in his deposition,

> Q …The terms of those additional purchases were negotiated and are reflected in the year 2000 agreement identified as Exhibit 2, correct?
>
> A This is -- this was offered for StorageTek to purchase additional licenses at discounted prices. It doesn't mean that StorageTek had the license for those additional copies.

Yue Decl., Ex. 42, Yue Depo., pp.62:13-63:6. As Dr. Yue testified in his deposition, "This was [an] agreement to license. The – whether the license was purchased was a different issue." Yue Depo., p.57:21-23.

The plain language of the Agreement, when taken together, is not ambiguous. An SDK license was only granted "*for each of the licenses purchased*". The same applies to the "limited distribution license" which required a purchase order and payment. The Agreement merely offered Netbula SDK and runtime licenses for StorageTek to purchase with a pricing schedule and definitive terms. It is up to StorageTek to purchase the licenses with a purchase order and then pay an invoice referencing the purchase order. StorageTek had the right to distribute "up to 1000 units of software containing the Supporting Programs" only after it purchased the licenses with a purchase order.

**C.    Extrinsic evidence shows that StorageTek understood that it only had the right to distribute 1000 copies of the runtime under the 2000 Agreement and 1000 copies under the 2004 Agreement and it exceeded the licensed rights** (applying Cal. Civ. Code §1647-49).

The software CD Netbula sent to StorageTek in 2000 had the following information on the CD label: 8 Developers 1000 runtime. Yue Decl., at ¶¶31-35. When Michael Melnick (who drafted and signed the Agreement) responded to Netbula's audit request in June 2001, he wrote: "The license count you request is 107, this leaves us the rights to distribute 893." Yue Decl., at ¶44, Ex. 15.

On March 2, 2004 at 10:06 AM, Lisa Rady, a program manager in charge of LibAttach development at StorageTek, sent an email to Michael Melnick, she wrote:

> Hi, Mike, …As you can see, we have exceeded the 1000 distributions that we had right to, with Netbula… I think it is obvious that engineering has not and did not monitor the distribution on this product… Could you please contact Netbula and get a current quote for the rights to distribute another 1000 runtimes?

Yue Decl., at ¶48, Ex. 18.

After some internal discussion, Mr. Melnick sent an email to Netbula on March 2, 2004 at 3:29 PM, stating:

> Could you provide me with the StorageTek sales representative or if possible give me a quote on distributing an additional 1000 units of RPC? The platform used will need to be Windows 2003.

Yue Decl., at ¶51, Ex. 20.

On March 15, 2004, Thomas J. Murray (whose email signature identified him as "Manager, RD&E Software Engineering") wrote in an email:

> We either need to increase the Netbula license or put a stop-ship on the LibAttach product, because we have shipped LibAttach copies up to the limit of the current Netbula license (Netbula is embedded in our LibAttach product)

Yue Decl., at ¶52, Ex. 21. On June 16, 2005, Mr. Melnick wrote to Thomas Murray:

> Can you give ne an update of how many Netbula RPC licenses we have distributed? We need to make sure we have not exceeded what we have been licensed for.

Yue Decl., at ¶62, Ex. 25. On June 16, 2005, Michael P. Abramovitz wrote:

> To the best of my memory, we have a license to redistribute 2000 copies.

*Id*. On June 28, 2005, Mr. Melnick wrote:

1
2

> The number that Holly has provided and thought it may be low causes quite a
> problem for you. We have only made 2 purchases for the rights to distribute a
> total of 2000 licenses.

3

*Id.* On July 28, 2005, Michael Abramovitz wrote in an email titled "RE: Netbula":

4
5

██████████████████████████████████████████████████████

6

See Yue Decl., ¶68, Ex. 28. The evidence show StorageTek believed that it only had the right to

7

distribute 2000 copies.

8

### D.    The 2000 Agreement was restricted to Windows NT and 98/95 platforms

9
10

The 2000 Agreement had the following on the SDK license and distribution license (the

11

underlined portions were drafted by Michael Melnick):

12
13
14

> NETBULA grants STORAGETEK, a non-exclusive, perpetual, irrevocable
> license for use by STORAGETEK's employees, consultants and subsidiaries
> for up to ONE user(s), *for each of the licenses purchased*, to use the
> PowerRPC SDK Product under Windows NT and 95/98 platforms;….
> …

15
16

> Support is for *SDK Products and Supporting Programs* on the specific
> platforms only…

17
18

> NETBULA COMPONENTS PERMITTED TO BE DISTRIBUTED
> …
> * Pmapsvc.exeThe portmapper service for Windows NT

19

Yue Decl., Ex.9.

20

Before the instant lawsuit, both StorageTek and Netbula were in agreement about the

21

platform restrictions on both the SDK and limited distribution licenses. In June 2001, StorageTek

22

developer Anton Vatcky wrote:

23
24

> We at StorageTek currently use the NT version of PowerRPC in our product
> called REELs. We have a license agreement with Netbula for this specific
> version.

25
26

> Would it be possible to obtain a copy of the Win2K version of PowerRPC, to
> determine if our software will port OK to Win2K.
> …

27

> A separate licensing agreement would follow up if StorageTek determines that
> we will be able to sell our REEL software product for Win2K platforms.

28

1    Yue Decl., at ¶38, **Exhibit 12** (Melnick, Ex. 21). In March 2004, Mr. Michael Melnick in an

2    internal email,

3    > The agreement is specific to platform (Win NT and 95/98 platforms) types of
     > Netbula software (PowerRPC SDK). This concerns me greatly as we have
4    > already told them we are no longer shipping it with our product.

5
6    Yue Decl., at ¶49, Exhibit 14 (Melnick Depo., Ex. 25).

7        On July 27, 2005, Netbula emailed StorageTek with the following issue,

8    > Supported platforms – the original 2000 agreement does not cover the
     > Windows 2000 platform, however, we believe some of the licenses were used
9    > on the Win2K platform. Those were not covered by the license agreement…

10   Yue Decl., at ¶66, Exhibit 27 (Melnick Depo., Ex. 55). In response, Michael Melnick wrote:

11   > No disagreement with the [*sic*] that the original agreement was for
12   > (Windows NT/98/95 only).

13   Yue Decl., at ¶67.

14       In fact, Exhibit B (Netbula components permitted to be distributed) of the 2000 Agreement

15   explicitly limited the Portmapper service (Pmapsvc.exe) to **Windows NT**. Yue Decl., at ¶26, Ex.

16   9. "Pmapsvc.exe" was used in LibAttach 1.1 to 1.4.  Yue Decl., Ex.44, Abramovitz Depo.,

17   p.34:16-25.

18       SUN's current position that only the SDK license was restricted to the platform is not

19   supported by the evidence. Because StorageTek must use the SDK to develop a product, and

20   because the SDK software was restricted to the Windows NT/98/95 platforms, the product must be

21   automatically restricted to these specific platforms. A product developed for Windows 2000 using

22   the license for Windows NT would be an infringing product, violating the copyright owner's

23   exclusive rights in creating derivative works. Distribution of an infringing derivative work is also

24   infringement. Thus, distribution of products developed with the Windows NT SDK was also

25   automatically restricted to the Windows NT platforms.

26       The Support section of the 2000 Agreement is consistent with this platform restriction:

27   "Support is for SDK Products and Supporting Programs on the specific platforms only."

28

1  ("Supporting Programs" are the distributable components defined in the 2000 Agreement). The

2  words "SDK Products and Supporting Programs" were added by Mr. Melnick.

### E. StorageTek knew it did not have unlimited license (site license)

4  StorageTek's own admissions above show it only made two license purchases for a total of

5  2000 copies and only had the rights to distribute the 2000 copies, not unlimited copies. The

6  following request by Michael Melnick further prove that StorageTek knew it did not have the

7  rights to distribute unlimited licenses or site licenses,

> We would like to get a quote on having an unlimited distribution model. Is this available? Tracking usage is becoming burdensome and we want to ensure we continue to be in compliance.

10  Yue Decl., ¶63, Ex. 26, A0115. Netbula never granted StorageTek unlimited licenses.

### F. The 2004 Agreement was induced by fraud

13  Dr. Yue testified in his deposition:

> THE WITNESS: I think I have stated we believe that but for the fraud, that the license would not be formed under the terms of the 2004 agreement. Therefore, we should be allowed to rescind from that agreement. That would probably render the agreement void.

17  Yue Decl., Ex. 42, Yue Depo., pp.175:23-176:3. See also, Yue Decl., ¶66. Applying California

18  law on contracts, the fraud claim may render the 2004 Agreement void.

### G. Defendants made infringing copies of the SDK and created infringing derivative works

21  In 2000, StorageTek purchased eight (8) SDK licenses for Windows NT/98/95. Yue Decl.,

22  ¶35. The SDK license allowed "ONE user(s), for each of the licenses purchased, to use the

23  PowerRPC SDK Product under Windows NT and 95/98 platforms; each user can only use the

24  software on one computer." See 2000 Agreement.

25  According to the Declaration of Michael Abramovitz filed on October 23, 2007 (Docket

26  No. 65, "Abramovitz Decl."), six people worked on REEL Backup Netclient version 2.5 using the

27  Netbula SDK for Windows NT. Mr. Abramovitz also says that he is "informed" that LibAttach 1.2

28

1    was developed by two programmers in Australia in 2003 using Netbula SDK. Abramovitz Decl.,

2    ¶6. Up to this point, according to Mr. Abramovitz, StorageTek had already used up the eight

3    licenses – even assuming each developer had only one computer.

4        Mr. Abramovitz says that LibAttach 1.3 was developed by Terry Schmitt in February to

5    April 2004, using the "2000 SDK". Abramovitz Decl., ¶7. Terry Schmitt did not have a Netbula

6    SDK license, and he did not have the right to create derivative works of Netbula RPC.

7        For LibAttach 1.4, Mr. Abramovitz says he copied the information from the machine Terry

8    Schmitt used, and "installed the SDK obtained from Netbula in 2004 onto a different computer

9    with a Windows 2003 operating system,…" Abramovitz Decl., ¶8. He also says he used free

10   software found on the internet to replace Netbula in November 2005 and erased the Netbula

11   software from his computer. He then claims, "[t]hereafter, the LibAttach product distributed by

12   StorageTek did not include the Netbula components or code." Abramovitz Decl., ¶9.

13       Finally, Mr. Abramovitz, a software engineer, concludes, "at no time after StorageTek

14   stopped existing as a corporation was LibAttach (or REEL) software distributed that contained

15   Netbula code." Abramovitz Decl., ¶10.

16       But, Mr. Abramovitz's deposition transcript reveals a lot of inconsistencies. The following

17   are exchanges in Mr. Abramovitz's deposition.

18           Q   How was the Netbula SDK copied and distributed within StorageTek?

19           A   There was a CD that we received from Netbula and we loaded it onto our
20               work stations from that CD.

21           …

22           Q   What kind of -- well, was there any kind of control in terms of the inside
23               copying?  Was there some kind of a list that was maintained at StorageTek of
                 who actually made a copy of the program for their computer?

24           A   I don't know.

25           Q   Who would know that?

26           A   I don't know.

27   Abramovitz Depo., pp.18:15-19:3.

28

-21-

1

2       Scott Painter was the person who emailed Netbula about "PowerRPC portmapper" on May

3   1, 2000 with Mr. Abramovitz in the cc list. Yue Decl., ¶37, Ex. 11.

4       Q   Okay.  Scott Painter is an engineer at StorageTek; is that correct?
        A   Yes.
5       Q   And was he in any of your groups in May of 2000?
        A   He was not.
6

7   Abramovitz Depo., p.19:14-18.

8       Q   In May of 2000, on which product were you working?
        A   In May of 2000.  I had both REELs and LibAttach at that time.
9
    Abramovitz Depo., p.20:16-19.
10

11      In May 2000, Mr. Abramovitz was working on both REELs and LibAttach; Scott Painter

12  was working on "PowerRPC portmapper", Yue Decl., ¶37. Yet, Mr. Painter was not in any of Mr.

13  Abramovitz's groups. Thus, Scott Painter was working on something other than REELs or

14  LibAttach, of which Abramovitz was not aware. See Abramovitz Depo, p.47.

15      When Mr. Abramovitz was asked about an internal StorageTek email about "NetBula

16  License and Support Information" for the REEL software, he did not remember or did not know

17  most of the names in his own team. Abramovitz Depo., pp.21:3-24:13; Yue Decl., ¶87.

18
        In his declaration, Mr. Abramovitz says that he developed LibAttach 1.4 on Windows
19
    2003 in the year of 2005. But in his deposition, he says it was developed on Windows NT 4.0, a
20
    10-year old system.
21

22      Q   Was LibAttach -- well, the versions of LibAttach 1.1 through 4, developed
            on computers running Windows 2000?
23
        A   They were not developed on computers running Windows 2000.
24      Q   What were they developed on?
        A   Windows NT 4.0.
25

26  Abramovitz Depo., pp.40:24-41:3. Such inconsistencies raise serious questions on Defendants'

27  credibility. Mr. Abramovitz had no personal knowledge about the development work done in

28  Australia on LibAttach 1.2. Mr. Abramovitz was an engineer; he did not supervise the work done

by Terry Schmitt; he had no personal knowledge about how Terry Schmitt or others developed LibAttach 1.3. Mr. Abramovitz did not know how the inside copying of Netbula SDK was controlled. He did not know what Scott Painter was working on and he did not remember the people in his team. Moreover, defendants refused to produce documents for Plaintiff's Amended Requests for Documents and Things Nos. 1 and 2, which specifically asked for documents concerning StorageTek's development of its products on Windows NT, Windows 2000 and other operating systems by year. See Yue Decl., Ex. 40, pp.6-9.

The following shows that Mr. Abramovitz had no knowledge about licensing of the REELs and LibAtatch software.

> Q   Did StorageTek or its resellers sell any REELs licensed software after February 1st, 2001?
>
> A   I don't know.

Abramovitz Depo., pp.26:18-20.

> Q   Okay.  Although you're in the engineering group, did you deal with any kind of licensing issues with the programs?
>
> A   No.

Abramovitz Depo., p.30:22-25.

> Q   From 2000 to 2005, what were the different ways a customer could obtain a license for the LibAttach versions 1.1 to 1.4?
>
> A   Obtain a license?
>
> Q   Mm-hmm.
>
> A   I wouldn't know.
>
> …
>
> Q   Did ISVs have the right to further distribute the LibAttach programs to their customers?
>
> A   I don't know.
>
> …
>
> Q   Okay.  Who were the StorageTek people responsible for monitoring and accounting for LibAttach licenses?
>
> A   I don't know.

1   Abramovitz Depo., pp.41:17-42:19.

2        Mr. Abramovitz's assertion that SUN stopped shipping software containing Netbula RPC

3   components was unfounded. He has no knowledge on whether Sun StorageTek or its resellers are

4   distributing older versions of LibAttach **today**. His claim that he replaced Netbula software in

5   LibAttach 1.4.1 is also unsupported by evidence. Plaintiff requested the installable LibAttach

6   software and source code in discovery to determine the whether they contain Netbula code, types

7   of systems Defendants used and the number of developers, but defendants refused. See Yue Decl.,

8   Ex. 40, pp.13-14 for StorageTek's responses to Netbula's document requests Nos. 8 and 9.

9                **H. StorageTek had no license after it became a subsidiary of SUN**

10       Applying the *SQL* analysis to the instant case, when StorageTek became a wholly owned

11  subsidiary of SUN via a reverse triangular merger, an impermissible transfer of the Netbula

12  occurred by operation of law. Sun StorageTek continued to sell or offer to sell LibAttach software

13  which contained Netbula software. Yue Decl., ¶74, Ex. 34. That alone makes Sun StorageTek

14  subject to copyright infringement claims.

15   **I. Defendants' failure to respond to discovery requests requires the case continue to the**
16                                    **second phase**

17       Plaintiff's Interrogatory No. 7 asked why Michael Melnick attempted to change the

18  Netbula-StorageTek agreements from "pre-paid" to "royalty-type agreement". StorageTek's

19  response was that the words "pre-paid" to "royalty-type agreement" were vague and ambiguous,

20  even though these words were directly quoted from Sun StorageTek Legal Department's

21  December 16, 2005 letter to Don Yue.  See Yue Decl., Ex. 41, p.11 for StorageTek's answer.

22  Interrogatory No.4 asked StorageTek to identify and quantify all StorageTek software developers,

23  project managers and test engineers who copied or used NETBULA SOFTWARE. StorageTek

24  failed to provide a meaningful answer. See Yue Decl., Ex. 41, pp.8-9. Defendants also refused to

25  produce documents for Plaintiff's Amended Requests for Documents and Things Nos. 1 and 2.

26       Plaintiff's discovery requests were relevant to the first phase of the litigation, and

27  Defendants refused to respond. Due to the bifurcated nature of the case, Defendants' failure to

28  respond simply leaves genuine issues of material fact to be addressed by further discovery.

1

**J.   Evidentiary Issues**

Defendants used documents and transcripts from the Netbula v. BindView case as evidence; such documents and transcripts are hearsay and Defendants failed to establish exceptions to the hearsay rule. Many of the statements in Mr. Abramovitz's declaration are conclusory or hearsay. When Defendants filed their MSJ, the document stated that it was supported by a declaration of Michael Melnick.  However, Mr. Melnick had not yet made his declaration at the time of the filing of the MSJ.  Therefore, the MSJ could not have been supported by a document that did not yet exist.

**IV.     CONCLUSION**

The evidence Plaintiff presented above raises genuine issues of material fact on all aspects of the Defendants' license defense. Accordingly, the Court **DENIES** Defendants' Motion.

**IT IS SO ORDERED**.

Dated:

_____
United States District Judge