1  VONNAH M. BRILLET (SBN 226545)
   **LAW OFFICES OF VONNAH M. BRILLET**
2  2777 ALVARADO ST., SUITE E
   SAN LEANDRO, CA 94577
3  Telephone:      (510) 351-5345
   Facsimile:       (510) 351-5348
4  E-Mail:         BrilletLaw@yahoo.com
5
   Attorneys for Plaintiff
6  NETBULA, LLC

7

8                    UNITED STATES DISTRICT COURT

9                 NORTHERN DISTRICT OF CALIFORNIA

10 NETBULA, LLC., a Delaware limited liability         Case No. Case No. C06-07391-MJJ
11 company,
                                                       **DECLARATION OF DONGXIAO YUE IN**
12                 Plaintiff,                           **OPPOSITION TO DEFENDANTS'**
                                                       **MOTION FOR SUMMARY JUDGMENT**
13        v.                                            **OR SUMMARY ADJUDICATION OF**
                                                       **ISSUES RELATING TO LICENSE**
14                                                     **DEFENSE**
15 STORAGE TECHNOLOGY
   CORPORATION, et al.,                                Date: December 13, 2007
16                                                     Time: 3:00 p.m.
                                                       Dept: Courtroom 11
17                 Defendants.                          Judge: The Honorable Martin J. Jenkins
18

19                       # EXHIBITS 44-45

20

21         **EXHIBIT 44: 30 (b) (6) Deposition of Michael Abramovitz**

22         **EXHIBIT 45: transcript of the TRO hearing before Magistrate Judge Zimmerman**

23

24

25

26

27

28

---

# EXHIBIT 44

# EXHIBIT 44

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION


NETBULA, LLC, a Delaware limited
liability company,

            Plaintiff,

      vs.                          No.  C-06-07391-MJJ

STORAGE TECHNOLOGY CORPORATION, a
Delaware corporation; SUN MICROSYSTEMS, INC.,
a Delaware corporation; INTERNATIONAL BUSINESS
MACHINES CORPORATION, a New York corporation;
EMC CORPORATION, a Massachussetts corporation;
VERITAS SOFTWARE CORPORATION, a Delaware
corporation; DARDEN RESTAURANTS, INC., a Florida
corporation; and DOES 1-100, inclusive,

            Defendants.
_____
AND RELATED COUNTER-CLAIMS.
_____


30(b)(6) DEPOSITION OF MICHAEL ABRAMOVITZ

San Leandro, California

Tuesday, October 23, 2007


Reported by:
TRACY L. PERRY
CSR No. 9577

JOB No. 75688

MICHAEL ABRAMOVITZ                              10/23/07

Page 2

1                UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA
2                  SAN FRANCISCO DIVISION

3

4   NETBULA, LLC, a Delaware limited
    liability company,
5
                    Plaintiff,
6
                    vs.                    No.  C-06-07391-MJJ
7
    STORAGE TECHNOLOGY CORPORATION, a
8   Delaware corporation; SUN MICROSYSTEMS, INC.,
    a Delaware corporation; INTERNATIONAL BUSINESS
9   MACHINES CORPORATION, a New York corporation;
    EMC CORPORATION, a Massachussetts corporation;
10  VERITAS SOFTWARE CORPORATION, a Delaware
    corporation; DARDEN RESTAURANTS, INC., a Florida
11  corporation; and DOES 1-100, inclusive,

12                  Defendants.
    _____
13  AND RELATED COUNTER-CLAIMS.
    _____

14

15

16          30(b)(6) Deposition of MICHAEL ABRAMOVITZ, taken

17   on behalf of Plaintiff, at 2777 Alvarado Street, Suite E,

18   San Leandro, California, beginning at 11:10 a.m. and

19   ending at 12:40 p.m., on Tuesday, October 23, 2007,

20   before TRACY L. PERRY, Certified Shorthand Reporter

21   No. 9577.

22

23

24

25

MICHAEL ABRAMOVITZ                                          10/23/07

Page 3

```
 1            APPEARANCES: .

 2

 3    FOR PLAINTIFF:

 4         LAW OFFICES OF VONNAH M. BRILLET
           BY:  VONNAH M. BRILLET
 5         Attorney at Law
           2777 Alvarado Street, Suite E
 6         San Leandro, California  94577
           510-351-5345
 7         brilletlaw@yahoo.com

 8    FOR DEFENDANTS STORAGE TECHNOLOGY CORPORATION, SUN
      MICROSYSTEMS, INC., EMC CORPORATION, VERITAS SOFTWARE
 9    CORPORATION, DARDEN RESTAURANTS, INC., AND THE WITNESS:

10         FENWICK & WEST, LLP
           BY:  LAURENCE PULGRAM
11         Attorney at Law
           555 California Street, 12th Floor
12         San Francisco, California  94104
           415-875-2300
13         lpulgram@fenwick.com

14    For IBM CORPORATION:

15         QUINN, EMANUEL, URQUHART, OLIVER & HEDGES
           BY:  STACY M. MONAHAN
16         Attorney at Law
           50 California Street, 22nd Floor
17         San Francisco, California  94111
           415-875-6314
18         stacymonahan@quinnemanuel.com

19    Also present:

20         Dongxiao Yue

21

22

23

24

25
```

MICHAEL ABRAMOVITZ                          10/23/07

Page 4

1                            INDEX

2    WITNESS:                                EXAMINATION

3    MICHAEL ABRAMOVITZ

4

5                    BY MS. BRILLET                    5

6

7

8

9                           EXHIBITS

10    PLAINTIFF'S                                PAGE

11    62    E-mail dated 7/10/00 addressed to Anton Vatcky    6
            and others from Tracy Gagnon, with attachment;
12          3 pages

13    63    Document titled "License Agreement, StorageTek    6
            Library Attach for WindowsNT/2000"; 2 pages
14

15    64    Document titled "Sun Microsystems, Inc. Binary    6
            Code License Agreement"; 2 pages

16    65    Document titled "License Agreement, StorageTek    6
            Library Attach for Windows"; 2 pages
17

18    66    Document titled "License Agreement, StorageTek    6
            Library Attach for Windows NT/2000"; 2 pages

19    67    Document titled "StorageTek Master Terms and    6
            Conditions No. MTC XXXXXX"; 4 pages
20

21    68    Document titled "StorageTek Customer Purchase    6
            Agreement Business Page"; 5 pages

22    69    Document titled "StorageTek Customer Purchase    6
            agreement Business Page"; 5 pages
23

24    70    Spreadsheet titled "Final Count - Royalty    6
            Items Only.xls"; 57 pages

25

**MICHAEL ABRAMOVITZ**                                   10/23/07

Page 5

1    **INDEX (Continued):**

2                              **EXHIBITS**

3    **PLAINTIFF'S**                                         **PAGE**

4    **71    PowerRPC codes; 1 page                            6**

5    **72    Declaration of Michael Abramovitz in Support      43**
          **of Defendants' Opposition to Application for**
6        **Temporary Restraining Order and Impoundment;**
          **3 pages**

7

8

9

10

11          **QUESTIONS NOT ANSWERED PER INSTRUCTION OF COUNSEL**

12                        **PAGE        LINE**

13                         **7          24**

14                        **48          11**

15

16

17

18

19

20

21

22

23

24

25

MICHAEL ABRAMOVITZ                                    10/23/07

Page 6

1          San Leandro, California, Tuesday, October 23, 2007

2                    11:10 a.m. - 12:40 p.m.

3

4               (Prior to the proceedings, Plaintiff's

5               Exhibits 62 through 71 were marked.)

6

7                    MICHAEL ABRAMOVITZ,

8     having been administered an oath, was examined and

9     testified as follows:

10

11                      EXAMINATION

12    BY MS. BRILLET:

13        Q    Okay.  Would you please state your name.

14        A    Michael Abramovitz.

15        Q    Okay.  Mr. Abramowitz --

16        A    Abramovitz, please.

17        Q    Oh, I'm sorry.  Abramovitz?

18        A    Yes.

19        Q    Have you ever had your deposition taken before?

20        A    No, I haven't.

21        Q    Okay.  Do you understand the oath that you have

22    just taken is the same oath that you'd be given in a

23    court of law?

24        A    Yes, I do.

25        Q    Okay.  As you can see, the transcriber is taking

MICHAEL ABRAMOVITZ                                    10/23/07

Page 7

1    down every word that's spoken.  Please be sure to

2    enunciate each word and answer my questions with words

3    and not nods of the head or shakes.

4          A    Okay.

5          Q    Are you under the influence of any medications

6    today?

7          A    I'm not.

8          Q    Okay.  Is there any reason why you would not be

9    able to give truthful testimony today?

10          A    No reason.

11          Q    Okay.  Sun Microsystems produced some documents

12    responsive to the Plaintiff's request for production of

13    documents in this case.  Did you participate in the

14    preparation of any of those documents?

15          A    I did what the lawyers told me to do and

16    produced what they asked for.

17          Q    Okay.  Which documents did you produce in this

18    case?

19          MR. PULGRAM:  Objection; the materials that the

20    lawyers requested and that he provided to the lawyers, he

21    produced all the documents that are within the scope of

22    the production for this phase of the proceeding.

23    BY MS. BRILLET:

24          Q    Okay.  What types of documents were you able to

25    produce for the production?

MICHAEL ABRAMOVITZ                          10/23/07

Page 8

1        MR. PULGRAM:  Same objection.

2        MS. BRILLET:  Okay.  Is he instructed not to answer?

3        MR. PULGRAM:  Yes.

4    BY MS. BRILLET:

5        Q    Did you see the request for the documents for

6    this case?

7        A    I did not receive any written request.

8        Q    Okay.  What was your job function -- well, I'll

9    use StorageTek and Sun interchangeably, so I will use Sun

10    to refer to both companies.

11        A    Okay.

12        Q    Is that okay with you?

13        MR. PULGRAM:  I -- yeah, if -- I think if either of

14    you need to clarify at some point to distinguish between

15    the two, and as long as we understand that an answer

16    about Sun doesn't mean anything other than StorageTek --

17        MS. BRILLET:  As to his knowledge?

18        MR. PULGRAM:  -- did something.

19            Right.  May I make a suggestion on this?

20        MS. BRILLET:  Sure.

21        MR. PULGRAM:  I think we're probably better off

22    having the default be StorageTek.

23        MS. BRILLET:  Oh, okay.  Okay.

24        MR. PULGRAM:  Because that really is more the

25    company that was involved in the things here.  And if --

Page 9

1    if you want to use that terminology, I think that's going

2    to be more successful than Sun.

3            MS. BRILLET:  I have no problem with that.  Okay.

4    I'll use StorageTek.

5            MR. PULGRAM:  Good.

6    BY MS. BRILLET:

7        Q    What was your job function at StorageTek?

8        A    At what time?  I mean what period of time?

9        Q    Are you at StorageTek now?

10       A    Yes.

11       Q    And what is your title?

12       A    Currently, software engineer.

13       Q    How long have you been at StorageTek?

14       A    Since February of 1999.

15       Q    And what other titles have you held and when?

16       A    My first title was support engineer, which I

17   held for approximately six months.  Then I was promoted

18   to development engineer and have held the development

19   title ever since.

20       Q    And when did you become a software engineer?  Is

21   that under the development engineering title?

22       A    Yes.  I guess it's all software engineer, it's

23   just different -- different roles of engineer, support

24   versus development.

25       Q    Okay.  Are you aware of the topics that we will

Page 10

1    be discussing today?

2         A    Yes, I am.

3         Q    Okay.  And are you the designated 30(b)(6)

4    witness for these designated topics?

5         A    I don't understand what 30(b)(6) means.

6         Q    You are representing StorageTek in answering

7    these questions that I will be presenting you today?

8         A    Yes.

9         MR. PULGRAM:  And let me make that clear.

10        MS. BRILLET:  Sure.

11        MR. PULGRAM:  Mr. Abramovitz is produced as a

12   30(b)(6) witness with respect to Sun's use of the Netbula

13   SDK as relevant to the first phase of these proceedings.

14        MS. BRILLET:  Okay.

15        Q    Did you review Mr. Michael Melnick's deposition

16   transcript?

17        A    I did not.

18        Q    Did you review Dongxiao Yue's deposition for

19   this --

20        A    I did not.

21        Q    Okay.  Do you know when Sun acquired StorageTek?

22        MR. PULGRAM:  Vague, ambiguous.

23        THE WITNESS:  Acquired.  The acquisition was a

24   multi-stage process.  Can you be more specific?

25   BY MS. BRILLET:

MICHAEL ABRAMOVITZ                               10/23/07

Page 11

1       Q    Right now the two companies are one.

2       A    Yes.

3       Q    What was the process for that and do you know

4    when it occurred, when they became one company?

5       MR. PULGRAM:   I'm going to object to this question

6    as outside the scope of the 30(b)(6) deposition and

7    therefore is not appropriate for Mr. Abramovitz to be the

8    spokesman for the company.

9            But you can answer as to your personal

10   knowledge.

11      THE WITNESS:   Okay.  To the best of my recollection,

12   the announcement was made in June of '05.  The StorageTek

13   shareholders voted toward the end of August of '05, and

14   StorageTek was folded into Sun right at the beginning

15   of '06.

16   BY MS. BRILLET:

17      Q    Okay.  Are you familiar with the acronym SCH?

18      A    SCH.  Yes.  Took me a moment to recall, but yes,

19   SCH.

20      Q    What does it stand for?

21      A    Let's see.  SC is saber computing.

22      Q    Saber?

23      A    No.  Sorry.  I'm thinking of a different SCH.

24           An SCH relevant to this case would be the

25   software clearinghouse.

**MICHAEL ABRAMOVITZ**                                    10/23/07

Page 12

1      Q    Thank you.  Okay.

2           Do you know who Christine Tocalino is?

3      A    I do not.

4      Q    Do you know who Don Carrol is?

5      A    Yes, I do.

6      Q    And who is he?

7      A    He was a team lead on a team that I was on some

8   years ago.

9      Q    What type of team?

10     A    Software development team.

11     Q    Were they all engineers?

12     A    Yes.

13     Q    And how many engineers were in this group?

14     A    I believe there were six of us.

15     Q    Does that include Mr. Carrol?

16     A    No.

17     Q    Okay.

18     A    He was not an engineer.  He was a team lead.

19     Q    Okay.  Did StorageTek test a trial version of

20   the Netbula RPC in 2000?

21     A    I do not know.

22     Q    Who would know that?

23     A    The person who would know that was Keith Oliver,

24   and he's no longer with the company.

25     Q    To your knowledge, did StorageTek obtain any

Page 13

1    pricing information on the packs for Netbula?

2         A    I don't know anything about pricing information.

3         Q    Okay.  And is Mr. Carrol still with StorageTek?

4         A    He is not.

5         Q    Do you know when he ended his employment there?

6         A    I do not know exactly.  I think it was in 2001.

7         Q    Okay.  What does a backup and recovery engineer

8    do?

9         A    Well, I guess I would have fallen under that

10   category.  Backup and recovery was the division that I

11   was part of.  So all the engineers within that division

12   would have -- would have been classified as such.

13        Q    So every engineer was backup --

14        A    Yeah.

15        Q    -- and recovery?

16        A    Yes.

17        Q    Okay.

18        A    All of us in that division.

19        Q    How many engineering divisions were there?

20        A    I don't know.

21        Q    Were there more than two?

22        A    Oh, yeah.

23        Q    More than five?

24        A    That I don't know.  I'm not sure about the whole

25   organizational structure of StorageTek at the time.

1       Q    Okay.  Do you know who were the developers who

2   received the eight developer licenses purchased in 2000?

3       MR. PULGRAM:  Objection; vague.

4       THE WITNESS:  Who received the eight developer

5   licenses?

6   BY MS. BRILLET:

7       Q    Mm-hmm.

8       A    From the 2000 agreement?

9       Q    Yes, that were purchased in 2000.

10      MR. PULGRAM:  Assumes facts not in evidence.

11      THE WITNESS:  I don't know for sure who received the

12  eight.  I know I received one.

13  BY MS. BRILLET:

14      Q    And you don't know anyone else who received any?

15      A    I can't say for sure anyone other than myself

16  and Keith Oliver.

17      Q    Okay.  What were the groups that were using the

18  Netbula RPC SDK from 2000 to 2007?  Could you tell me the

19  groups for each year?

20      A    The first group was the REELs development team,

21  and after REELs ended, then it was just LibAttach.

22      Q    And what year did REELs end?

23      A    Mid-2001.

24      Q    And then it's been the LibAttach group from 2001

25  to 2007?

MICHAEL ABRAMOVITZ                          10/23/07

Page 15

1      A   Well, we stopped using the Netbula SDK in 2006,

2   so as for 2007, no one is using it at StorageTek.

3      Q   What were the products that were developed with

4   the Netbula RPC SDK from 2000 to 2006?

5      MR. PULGRAM:  Assumes facts not in evidence.

6   BY MS. BRILLET:

7      Q   Were there any products that were developed with

8   the Netbula RPC SDK from 2000 to 2006?

9      A   Yes.

10      Q   What were they?

11      A   REELs backup for Windows NT --

12      Q   Mm-hmm.

13      A   -- and LibAttach.

14      Q   Approximately when in 2006 did StorageTek stop

15   using the Netbula RPC SDK?

16      MR. PULGRAM:  Mischaracterizes the testimony.

17   BY MS. BRILLET:

18      Q   Okay.  I apologize.  It was my understanding

19   that you said that you stopped using it in -- there was

20   LibAttach from mid-2001 to 2006, and you said it was no

21   longer used after 2006.

22      A   It was in 2006 that we discontinued its use.

23      Q   When in 2006?

24      A   It would have been fourth quarter calendar year

25   '06.  I'm sorry.  It was '05.

**MICHAEL ABRAMOVITZ**                          10/23/07

1      MS. BRILLET:  You want to give us some more answers,

2  Counsel?

3      MR. PULGRAM:  If the witness is having a failure of

4  his recollection for some confused reason, I want to

5  clarify it on the record.

6      MS. BRILLET:  No, I understand.

7      MR. PULGRAM:  And I think, as you know from the

8  record here, there's been deposition testimony specifics

9  on this.  And rather than have this go forward with a

10  confused record, I wanted to get it clarified.

11      MS. BRILLET:  Right.

12      Q    So it was fourth quarter 2005?

13      A    Yes.

14      Q    Okay.

15      A    I apologize.

16      MR. PULGRAM:  No problem.

17  BY MS. BRILLET:

18      Q    How many StorageTek developers, and including

19  programmers and test engineers, used the Netbula RPC SDK?

20  And I'm asking for the years of 2000 to 2005.

21      A    How many -- I'm sorry.  Repeat the question.

22      Q    Mm-hmm.  How many StorageTek developers,

23  including the programmers and test engineers, used the

24  Netbula RPC SDK from 2000 to 2005?

25      MR. PULGRAM:  It's a vague question and ambiguous.

MICHAEL ABRAMOVITZ                                    10/23/07

Page 17

1  BY MS. BRILLET:

2      Q    Okay.  There were StorageTek developers --

3      A    Yes.

4      Q    -- and programmers and test engineers who used

5  the Netbula RPC SDK; is that correct?

6      A    There were development engineers.  There were

7  six engineers on the REELs team who used it, and

8  following that there was never more than one engineer

9  using it with LibAttach.  There were never any test

10 engineers using the SDK.

11     Q    Now, you said there was never more than one on

12 the LibAttach.  Was it -- there was never more than one

13 at a time or was there only one person?

14     A    There was never more than one at a time.

15     Q    Okay.  Who were the engineers who used the

16 LibAttach?

17     A    Myself.

18     Q    Mm-hmm.

19     A    And Cliff Henderson and Terry Schmitt.

20     Q    Are Cliff Henderson and Terry Schmitt still

21 employed by StorageTek?

22     A    Yes.

23     Q    And what are their positions?

24     A    Terry is a development software engineer.

25     Q    Mm-hmm.

MICHAEL ABRAMOVITZ                          10/23/07

Page 18

1      A    And Cliff's position and title I'm not sure of.

2      Q    Okay.  And you said there was six engineers on

3   the REELs team who used it?

4      A    Yes.

5      Q    Who were those engineers?

6      A    There was myself, Keith Oliver, Gary Ritzer,

7   Darren Lombardi, Steve Krog, and Dan Shern.

8      Q    Thank you.

9           In the years 2000 to 2003, did StorageTek use

10   the Netbula RPC SDK on computers running the Windows 2000

11   operating system?

12      MR. PULGRAM:  Vague, ambiguous.

13      THE WITNESS:  We did not.

14   BY MS. BRILLET:

15      Q    How was the Netbula SDK copied and distributed

16   within StorageTek?

17      A    There was a CD that we received from Netbula and

18   we loaded it onto our workstations from that CD.

19      Q    So each of the engineers just used that same

20   disk and just copied it onto their system?

21      A    Yes.

22      Q    What kind of -- well, was there any kind of

23   control in terms of the inside copying?  Was there some

24   kind of a list that was maintained at StorageTek of who

25   actually made a copy of the program for their computer?

MICHAEL ABRAMOVITZ                           10/23/07

Page 19

1        A    I don't know.

2        Q    Who would know that?

3        A    I don't know.

4        Q    Okay.  Does StorageTek still have a copy of the

5   software delivered in 2000?

6        A    Yes, we do.

7        Q    And who keeps that?

8        A    I do.

9        Q    Does StorageTek still have a copy of the

10  software delivered by Netbula in 2004?

11       A    Yes, we do.

12       Q    And who has that?

13       A    I do also.

14       Q    Okay.  Scott Painter is an engineer at

15  StorageTek; is that correct?

16       A    Yes.

17       Q    And was he in any of your groups in May of 2000?

18       A    He was not.

19       Q    Was he ever in any of your groups?

20       A    I did work with him on a later project.

21       Q    What's the product that required the port

22  mapper -- I'm sorry -- the Netbula product that required

23  the port mapper?

24       A    That would have been REELs for Windows NT and

25  LibAttach.

Page 20

1          MR. PULGRAM:  Did you mean the StorageTek product?

2          MS. BRILLET:  Yes.  I'm sorry.

3          MR. PULGRAM:  I think that's the way the witness

4     answered the question.

5          MS. BRILLET:  Okay.

6          Q    In May of 2000, in which group were you?

7          A    I was still part of backup and recovery

8     engineering.

9          Q    And who was the head of that department?

10         A    I'm sorry.  What was the date again?

11         Q    May 2000.

12         A    May 2000?

13         Q    Mm-hmm.

14         A    The head of that department would have been a

15    man named Vaughn Howard.

16         Q    In May of 2000, on which product were you

17    working?

18         A    In May of 2000.  I had both REELs and LibAttach

19    at that time.

20         Q    Okay.  What's the functionality of REELs?

21         A    REELs is a network backup application.  We

22    installed a client piece of software on servers

23    throughout the network and then had one machine which had

24    the server software, and the client software would talk

25    to the server to schedule backups and then deliver data

MICHAEL ABRAMOVITZ                    10/23/07

Page 21

1    over the network to the server.  And then the server

2    would write that data out to tape for archival purposes.

3         Q    Would you please look at Exhibit 62, please.

4              I'm showing you an exhibit, an e-mail that was

5    produced by Sun -- well, StorageTek for this litigation.

6         A    Mm-hmm.

7         Q    Do you recognize this document?

8         A    No, I don't.  I do not recall ever seeing this.

9         Q    Would you look at the first page?  It's an

10   e-mail and it says it's from Tracy -- is it Gagnon?

11        A    Gagnon.

12        Q    Okay.  Who is Tracy Gagnon?

13        A    Tracy Gagnon was -- well, we used to call them a

14   project manager, and her task -- well, a project

15   manager's task was to coordinate the various divisions in

16   preparation for getting a product out the door.

17             So she was our go-between between us in

18   engineering and the test organization and the sales

19   organization and the marketing and sourcing and...

20             So it's her job to make sure basically we were

21   on the same page as we went forward.

22        Q    Would you please look at the "to" list.  No, no,

23   it's on the same page.

24        A    Oh, okay.

25        Q    Who the e-mail was sent to.

Page 22

1        A    Mm-hmm.

2        Q    And would you go through those names and tell me
3    who these people are and their positions at the time?

4        A    Okay, Anton Vatcky is a support engineer.  Ben
5    Shern, also a support engineer.  Bridget Schmidt, I don't
6    remember.  Chris Groves, I don't know.  Daniel Spratt was
7    a support engineer.  David Lupo, I don't know.
8    GM Bouricius was a support engineer.  Jack Miller, also a
9    support engineer.  Janet Patching, I don't remember.
10   Jess Gypin, I don't remember.  Ken Kanke was in the test
11   organization.  Lori Richards, also in test.  Louise
12   Richardson, support engineer.  Paul Arnold, I don't
13   remember.  Richard MacCutchan, I don't remember.
14   Salvenmarie Reyes, a support engineer.  Scott Thurston, a
15   support engineer.

16       Q    And the cc line?

17       A    Howard Vaughn was our department head.  B. Shern
18   was one of the architects, and Lannis Fason, also an
19   architect, and Janet Bridges, I do not remember.

20       Q    Of the people on the list that you just named,
21   who is still employed by StorageTek?

22       A    Let's see.  Ben Shern, Salvemarie Reyes, the
23   only two I know for sure.

24       Q    Okay.  Thank you.

25            How many versions of REELs software were

Page 23

1    developed with the Netbula RPC?

2         A    I'm sorry.  The question again?

3         Q    Mm-hmm.  How many versions of the REELs software

4    were developed with the Netbula RPC?

5         A    Just one.

6         Q    Okay.  And what was that version?  Was it 1.0?

7         A    It was 2.5, we called it.

8         Q    Was the original version of the REELs using the

9    MKS nutcracker RPC?

10        A    Yes.

11        Q    When was the REELs version 2.5 developed?

12        A    It would have been the 2000 to 2001 time frame.

13        Q    And when was it released?

14        A    I don't know.

15        Q    Who would know?

16        A    Tracy Gagnon.

17        Q    Did the REELs version 2.5 include the R -- the

18   Netbula RPC runtime files?

19        A    Yes.

20        Q    Which Netbula runtime files did the REELs

21   version 2.5 include?

22        A    The specific file names?

23        Q    Yes.

24        A    There was the PWRPC32.dll, portmap.exe, and I

25   believe that was it.

MICHAEL ABRAMOVITZ                    10/23/07

Page 24

1      Q    Okay.  What groups were working on the REELs

2  version 2.5?

3      A    Groups?

4      MR. PULGRAM:  Objection; vague and ambiguous.

5  BY MS. BRILLET:

6      Q    It sounds like it was just the engineering

7  department and then there were groups within the

8  engineering department.

9      A    Well, there was the backup and recovery

10 engineering division.  Then within that division there

11 were departments working on different projects, and I was

12 on this -- this team that was working on REELs NT.  So it

13 was -- it was my team.

14     Q    Okay.  So then I'll rephrase the question.

15          Who worked on the REELs version 2.5?

16     A    Names?

17     Q    Yes, please.

18     A    Okay.  The engineers would be the same six names

19 I gave you earlier.

20     Q    Okay.  Is that it?

21     A    Yeah.

22     Q    Okay.

23     Q    Now, the developers used the Netbula RPC SDK in

24 developing the REELs 2.5; is that correct?

25     A    I'm sorry.  Repeat the question.

MICHAEL ABRAMOVITZ                    10/23/07

Page 25

1      Q    The developers used the Netbula RPC SDK in

2  developing the REELs version 2.5 --

3         MR. PULGRAM:  Compound.

4  BY MS. BRILLET:

5      Q    -- is that correct?

6      A    I'm sorry.  Repeat it one more time.

7      Q    Did the developers use the Netbula RPC SDK when

8  they were developing the REELs version 2.5?

9      A    Yes.

10     Q    Okay.  And was it the same six individuals?

11     A    Yes.

12     Q    Okay.  From 2000 to 2005 when StorageTek was no

13 longer using the Netbula software, what were the

14 different ways a customer could obtain a copy of REELs?

15        MR. PULGRAM:  I'm going to object as beyond the

16 scope of the 30(b)(6) deposition.

17           If you have personal information about that, you

18 can answer it.

19        THE WITNESS:  I really don't know.

20 BY MS. BRILLET:

21     Q    Was it for sale?

22     A    Yes, it was for sale.

23     Q    Okay.  Could they download it from the Internet?

24     A    No.

25     Q    So how would they get it -- if it was for sale,

MICHAEL ABRAMOVITZ                          10/23/07

Page 26

1    how would they actually get it?

2        MR. PULGRAM:  Same objections.

3    BY MS. BRILLET:

4        Q    Okay.

5        A    It would be on a CD-ROM.

6        Q    Would that be mailed to them?

7        MR. PULGRAM:  Same objections.

8        THE WITNESS:  I don't know.

9    BY MS. BRILLET:

10       Q    Okay.  Who would know?

11       A    People in the sales organization.  I couldn't

12   give you any names.

13       Q    How did StorageTek monitor and account for the

14   number of copies of REELs sold or distributed?

15       MR. PULGRAM:  Same objections.

16       THE WITNESS:  I don't know.

17   BY MS. BRILLET:

18       Q    Did StorageTek or its resellers sell any REELs

19   licensed software after February 1st, 2001?

20       A    I don't know.

21       Q    When was the last time StorageTek sold or

22   licensed a copy of the REELs version 2.5?

23       A    I don't know.

24       Q    Okay.  You mentioned before the LibAttach

25   software, but there was only -- let's see.  On the

MICHAEL ABRAMOVITZ                    10/23/07

Page 27

1   LibAttach it was just Cliff Henderson and Terry Schmitt,

2   and yourself as well, right?

3       A    That's right.

4       Q    Can you describe the functionality of the

5   LibAttach software just in general?

6       A    Yes.  The -- our library control server software

7   has an API that clients have to talk to using that API to

8   control our tape libraries.  And what LibAttach does is

9   it presents that API in a Windows-friendly manner so that

10  Windows applications can then make use of our tape

11  libraries.

12      Q    What were the versions of LibAttach that were

13  developed with the Netbula RPC?

14      A    It would have been 1.1, 1.2, 1.3 and 1.4.

15      Q    Okay.  What is the -- I'm going to give you a

16  model number for LibAttach and I want you to tell me what

17  it is.  It's 1191NLC.  What is that?

18      A    That is the product code for LibAttach.

19      Q    Okay.  Thank you.

20           And then I have future codes.  I have the

21  1191NLC CD-ROM.  I understand that one.  What is the one

22  that has the dash LBST?

23      A    I don't know.

24      Q    How about ACSLS?

25      A    I know what ASCLS stands for, but I don't know

MICHAEL ABRAMOVITZ                              10/23/07

Page 28

1   what it means as part of the product code.

2       Q    Okay.  What does ACSLS stand for?

3       A    That's automated cartridge system library

4   software.

5       Q    Okay.  And one more:  S500.

6       A    I don't know.

7       Q    What is ACSAPI?

8       A    That is the API that our server software

9   responds to.  The client applications are coded to that

10  API so that they can talk to our tape libraries.

11      Q    And what does it all stand for?

12      A    ACS is automated cartridge system.  API,

13  application programming interface.

14      Q    Thank you.  Okay.

15           At Mr. Melnick's deposition Netbula was provided

16  with a set of documents that appear to be license.text

17  files.  Would you look at Exhibit 63, please.  And I'll

18  give you a moment to look at that.

19           Do you recognize that document?

20      A    Yes.

21      MR. PULGRAM:  I'm going to object to questions about

22  this subject as beyond the scope of the witness's

23  designation.

24           You may go ahead without waiver of that

25  objection.

Page 29

1        MS. BRILLET:  And I do understand that the only

2  issue was that when we wanted -- the first 30(b)(6)

3  witness wasn't able to answer questions, and a lot of the

4  questions, he said the engineering group would be the

5  ones to respond to this.  And so that's why I'm asking

6  the 30(b)(6) witness from the engineering group.  I just

7  wanted to put that on the record, as well.

8        Q    Okay.  Do you see the year that this document is

9  for?

10       MR. PULGRAM:  Objection; no foundation.

11       THE WITNESS:  I don't see any date on here.

12  BY MS. BRILLET:

13       Q    Okay.  Do you see the version of LibAttach that

14  this license is for?  It should be on the first page, the

15  second line.

16       A    It says, "StorageTek Library Attach for

17  Windows NT/2000."

18       Q    Does LibAttach have any kind of control to

19  the -- as to the limit of the number of computers it can

20  be used for?

21       A    Control?

22       Q    Yeah.  Is there any kind of a control that you

23  can say, okay, for the LibAttach, it can only be used for

24  five computers or six computers?  Can you do that with

25  the LibAttach?

MICHAEL ABRAMOVITZ                                    10/23/07

Page 30

1        A    I guess I don't understand your question.

2        Q    With the LibAttach program, can you limit the

3   number of computers it's used for?

4        A    Do you mean like once you load it on one, you're

5   prohibited from loading it onto another?

6        Q    Right.  Or can you say it can only be loaded

7   onto three computers and then no more?  Are you able to

8   do that with the LibAttach?

9        A    Not programmatically.

10       Q    But there was a way to do it?

11       MR. PULGRAM:  Vague.

12  BY MS. BRILLET:

13       Q    Well, you said not programmatically.

14       A    There's -- speaking as the developer, there's no

15  mechanism that I'm aware of.

16       Q    Okay.  Then what did you mean when you said not

17  programmatically?

18       A    Because there are programs that can be locked.

19  Like I said, once you load it on one, you are prevented

20  from loading it on another.  There is no mechanism

21  programmatically to prevent that from happening.

22       Q    Okay.  Although you're in the engineering group,

23  did you deal with any kind of licensing issues with the

24  programs?

25       A    No.

MICHAEL ABRAMOVITZ                          10/23/07

Page 31

1       Q    Okay.  So did you ever see any of the licenses?

2       A    You mean this document.

3       Q    This kind of doc- -- these kinds of documents,

4  yes.

5       A    I saw this document.

6       Q    You've seen this document before today?

7       A    Yes.

8       Q    Okay.  Can you look at the second full paragraph

9  where it says, "Grant of license."

10       A    Mm-hmm.

11       Q    Would you read the first two sentences in there,

12  please.  Out loud, please.

13       A    "Grant of license.  You are hereby granted a

14  personal nonexclusive license to use the StorageTek

15  Library Attach software for Windows NT/2000 and all

16  associated manuals and documentation, 'the software,' on

17  any single computer, provided the software is in use on

18  only one computer at any time.  If you have purchased

19  multiple licenses for the software, then at any time you

20  may have as many copies of the software in use as you

21  have licenses."

22       Q    Okay.  On -- at the end of the first sentence

23  where it says, "provided the software is in use on only

24  one computer at any time," what does that mean?  Was

25  there some kind of a floating license or something?  Does

MICHAEL ABRAMOVITZ                          10/23/07

Page 32

1    that mean you can just use it on this computer and then

2    stop using it on that one and use it on this -- on a

3    second computer?

4         A    Yes.

5         Q    Is that what that means?  Okay.  Thank you.

6              So if a customer used a LibAttach -- had it on

7    two computers but only used it one at a time, that was

8    okay?

9         MR. PULGRAM:  Continuing objection as beyond the

10   scope of the designation of this witness as concerns this

11   exhibit.

12        MS. BRILLET:  Okay.

13        THE WITNESS:  I don't know how that would work.

14   BY MS. BRILLET:

15        Q    Okay.  Exhibit 64, please.

16             Do you recognize this document?

17        A    Yes, I do.

18        Q    What is the document for?

19        A    This document is the -- the current license for

20   LibAttach.

21        Q    Would you look at 65, please.

22             Do you recognize this document?

23        A    Yes, I do.

24        Q    And what version of LibAttach is this for?

25        A    If memory serves, this is for version 1.4.

MICHAEL ABRAMOVITZ                                    10/23/07

Page 33

1       Q   Okay.  On Exhibit 65, do you see under "Grant of

2    license" where it says, "You are hereby granted a

3    noninclusive restricted license to use for internal

4    purposes the StorageTek Library Attach for Windows and

5    all associated manuals and documentation (the software)

6    on any single computer, provided the software is in use

7    on only one computer at any time"?

8       A   Mm-hmm.

9       Q   The same as the previous document?

10      A   Yes.

11      Q   Okay.  66.  Do you recognize this document?

12      A   Yes.

13      Q   Which version of LibAttach is this one for?

14      A   Well, this could be from either 1.1, 1.2 or 1.3.

15      Q   Okay.

16      A   It appears to be the same as Exhibit --

17          MR. PULGRAM:  Objection to the extent that these

18   questions continue to be outside the scope of the

19   designation of the witness.

20          THE WITNESS:  -- 63.

21   BY MS. BRILLET:

22      Q   Besides the license.text files, are there any

23   other forms of agreements or license documents that a

24   customer has to sign or agree to?

25          MR. PULGRAM:  Objection; no foundation, beyond the

MICHAEL ABRAMOVITZ                          10/23/07

Page 34

1   scope of the deposition.

2         THE WITNESS:  I don't know.

3   BY MS. BRILLET:

4         Q    Okay.  67.  Do you recognize this document?

5         A    I've never seen this.

6         Q    Would you take a moment to look through it?  I'm

7   wondering if LibAttach customers need to sign an

8   agreement similar to this, if not this one.

9         MR. PULGRAM:  Objection; no foundation, beyond the

10  scope of the 30(b)(6) designation.

11        THE WITNESS:  Yeah, I wouldn't know.

12  BY MS. BRILLET:

13        Q    Okay.  68.  Okay.  This document is titled,

14  "Customer Purchase Agreement, Business Page."

15             Do you recognize this document?

16        MR. PULGRAM:  Same objection; no foundation, beyond

17  the scope.

18        THE WITNESS:  I have never seen this.

19  BY MS. BRILLET:

20        Q    Okay.  On the second page under number 1,

21  Definitions, the third one down says, "General code, all

22  software other than internal code and maintenance

23  code."

24             Was LibAttach classified as general code?

25        MR. PULGRAM:  Same objections.

Page 35

1          THE WITNESS:  I don't know.

2     BY MS. BRILLET:

3          Q    One moment.

4               Did you ever deal with customers as far as

5     signing license agreements for software?

6          A    Never.

7          Q    Okay.

8          A    Never did.

9          Q    Who is Thomas Murray?

10         A    Tom Murray was an interim manager who took over

11    the open source -- or sorry -- open systems software

12    development organization for a time because the current

13    manager of that organization left the company for

14    personal reasons.  So they had to put us somewhere, so we

15    were under him for a short time.

16         Q    And what was that time period, approximately?

17         A    Approximately 2005.

18         Q    Oh.  Just during that year?

19         A    Yes.

20         Q    Oh, okay.

21              Who did he take over from?

22         A    Janet Rooney.

23         Q    And who replaced him?

24         A    David somebody.  I can't remember his name.  He

25    was -- he was with us a very short time also.

MICHAEL ABRAMOVITZ                                10/23/07

1        Q    Did the LibAttach 1.0 use the RPC technology

2   from Distinct Corporation?

3        A    Yes.

4        Q    What are ISVs?

5        A    ISV is integrated system vendor.

6        Q    What's the significance of an ISV?

7        A    The ISVs are the companies that we partner with

8   so that, you know, we can sell our products in concert,

9   make money together.

10        Q    Was there a LibAttach 1.0?

11        A    Yes, there was a 1.0.

12        Q    But that one did not use the Netbula RPC?

13        A    That's correct.

14        Q    When did -- when did the development of the

15   LibAttach 1.1 start?

16        A    It would have been early 2000 when it was first

17   discussed.

18        Q    And when was it released?

19        A    I don't exactly remember.

20        Q    Okay.  When did the -- you start developing --

21   when did StorageTek start developing 1.2?

22        A    In the 2003 time frame.

23        Q    And when was that released?

24        A    I don't know.

25        Q    Okay.  Do you know the release of any of the --

MICHAEL ABRAMOVITZ                    10/23/07

Page 37

1  the 1.1, 1.2, 1.3 or the 1.4?

2        MR. PULGRAM:  Objection; vague.

3        THE WITNESS:  I don't know the exact release dates.

4  BY MS. BRILLET:

5        Q    To the best of your knowledge, what were they?

6        A    Let's see.  1.4 was -- was mid-2005.  1.3 was

7  mid-2004.  And I don't know 1.2.

8        Q    Okay.  You said you started development for

9  LibAttach 1.1 in early 2000 --

10       A    Mm-hmm.

11       Q    -- 1.2 in 2003.

12            When did you start -- when did StorageTek start

13  development of 1.3 and 1.4?

14       A    1.3 began in February/March -- around February

15  and March of '04.

16       Q    Okay.

17       A    And what was the second version you asked?

18       Q    1.4.

19       A    1.4 would have been in December of '04.

20       Q    Okay.  Were there any minor revisions to the

21  LibAttach 1.1 through 1.4?

22       A    Can you define minor revision?

23       Q    I will.  Like 1.1.1 or 1.2.1, anything like

24  that.

25       A    No, there was nothing like that.

MICHAEL ABRAMOVITZ                                    10/23/07

Page 38

1      Q    Okay.  Did StorageTek use the Netbula RPC

2  gen.exe in developing the LibAttach 1.1 to 1.4?

3      A    No.

4      Q    Did StorageTek use the Netbula RPC header files

5  in developing LibAttach 1.1 through 1.4?

6      A    Header files?

7      Q    Mm-hmm.

8      A    Yes.

9      Q    And which versions?

10     A    1.1, 1.2, 1.3 and 1.4.

11     Q    Oh.  All four.

12     A    Yes.

13     Q    Okay.  Did StorageTek use the Netbula RPC import

14  library, the power RPC32.lib file in developing the

15  LibAttach 1.1 to 1.4?

16     A    Yes.

17     Q    In all four?

18     A    Yes.

19     Q    Did StorageTek use the Netbula RPC port mapper

20  pmapsvc.exe file in developing LibAttach 1.1 through 1.4?

21     A    Yes.

22     Q    Was it in all four?

23     A    Yes.

24     Q    The developers for the LibAttach 1.1 through

25  1.4, where were they located?

MICHAEL ABRAMOVITZ                                10/23/07

Page 39

1        A    1.1 was in Colorado.  1.2 in Australia.  And 1.3

2    and 1.4, back in Colorado.

3        Q    Okay.  Who were the developers or developer in

4    Colorado?

5        A    Myself and Terry Schmitt.

6        Q    There were four engineers who worked on the

7    LibAttach including yourself?

8        A    Four, yes.  Four total throughout all the

9    versions.

10       Q    Okay.

11       A    No.  There were three.

12       Q    You, Mr. Schmitt, and Cliff Henderson?

13       A    Yes.

14       Q    Was Henderson in Australia?

15       A    Yes.

16       Q    Okay.  And did the three of you use the Netbula

17   RPC SDK in developing the LibAttach 1.1 through 1.4?

18       A    Yes.

19       Q    For all four versions?

20       A    Yes.

21       Q    Okay.  Does LibAttach -- do the LibAttach

22   programs 1.1 through 1.4 include the Netbula RPC runtime

23   files?

24       A    Yes.

25       Q    Which runtime file -- which Netbula runtime

Page 40

1    files are included in --

2        A    The PWRPC.dll and the PMAPSVC.exe.

3        Q    Are those two included in all four versions of

4    the LibAttach?

5        A    Yes.

6        Q    Did StorageTek use the Netbula RPC for server

7    usage for the LibAttach 1.1 to 1.4?

8        A    Can you define server?

9        Q    Well, I'm actually going by what someone from

10   StorageTek said, that you have both client and server

11   usage.  Do you know the difference between a client usage

12   and server usage?

13       MR. PULGRAM:  Vague and ambiguous.

14       THE WITNESS:  They're -- there are different types

15   of servers and clients.  I mean, depending on your

16   configuration.

17   BY MS. BRILLET:

18       Q    Okay.  So was StorageTek using Netbula for any

19   kind of server usage as opposed to client usage?

20       MR. PULGRAM:  It's fatally vague and ambiguous.

21       THE WITNESS:  As far as Netbula was concerned, it

22   was never a server.

23   BY MS. BRILLET:

24       Q    Was LibAttach -- well, the versions of LibAttach

25   1.1 through 4, developed on computers running Windows

MICHAEL ABRAMOVITZ                         10/23/07

Page 41

1    2000?

2         A    They were not developed on computers running

3    Windows 2000.

4         Q    What were they developed on?

5         A    Windows NT 4.0.

6         Q    Were the LibAttach 1.1 to 1.4 tested on

7    computers running Windows 2000?

8         A    Yes.

9         Q    Were they tested on computers running Windows

10   2003?

11        MR. PULGRAM:   Compound.

12        THE WITNESS:   Version 1.4 was tested on Windows

13   2003.

14   BY MS. BRILLET:

15        Q    And that's the only version?

16        A    The only version, yes.

17        Q    From 2000 to 2005, what were the different ways

18   a customer could obtain a license for the LibAttach

19   versions 1.1 to 1.4?

20        A    Obtain a license?

21        Q    Mm-hmm.

22        A    I wouldn't know.

23        Q    Okay.   What -- what's the difference between

24   distributing a LibAttach program version 1.1 to 4 to an

25   ISV as opposed to any other customer?

MICHAEL ABRAMOVITZ                          10/23/07

Page 42

1      A    For the ISVs, we provide them with what we call

2   the LibAttach integrators kit or integrators pack.  The

3   terms seemed to be used interchangeably within the

4   company.

5          Now, the integrators pack contains some live

6   files and some header files that allow the integrators to

7   then link into LibAttach and make use of LibAttach

8   services.

9      Q    Did ISVs have the right to further distribute

10  the LibAttachprograms to their customers?

11     A    I don't know.

12     Q    Did you have field test sites -- I'm sorry.

13          Did StorageTek have field test sites?

14     A    I know some were talked about, but I don't know

15  if it ever happened.

16     Q    Okay.  Who were the StorageTek people

17  responsible for monitoring and accounting for LibAttach

18  licenses?

19     A    I don't know.

20     Q    So that was not in your department?

21     A    That was not in my department.

22     Q    Okay.  Did StorageTek create a newer version of

23  the LibAttach software that did not use the Netbula RPC?

24     A    Yes.

25     Q    Okay.  And when was that?

MICHAEL ABRAMOVITZ                          10/23/07

Page 43

1      A    That would have been October, November, December

2  of '05.

3      Q    And what was the name of that product?

4      A    That was LibAttach version 1.4.1.

5      Q    Okay.  And when did StorageTek replace the

6  Netbula RPC in the LibAttach software?

7      A    That would have been in October of '05.

8      Q    Okay.  So that was before it replaced the REELs

9  in November of '05?

10     A    I'm sorry?  What does that have to do with

11  REELs?

12     Q    Well, you said you guys stopped in the fourth

13  quarter of 2005.  And hold on.  Let me pull this out.

14  Where are we?

15          Mark this 72, please.

16              (Plaintiff's Exhibit 72 was marked.)

17  BY MS. BRILLET:

18     Q    Okay.  This Exhibit 72 is a Declaration of

19  Michael Abramovitz in Support of Defendants' Opposition

20  to Application for Temporary Restraining Order and

21  Impoundment.

22     A    Mm-hmm.

23     Q    So on number -- paragraph number 3, on line 8,

24  it says, "On or about November 29th, 2005, Sun replaced

25  the code it had licensed from Netbula."

MICHAEL ABRAMOVITZ                          10/23/07

Page 44

1        A    Yes.

2        Q    So is that referring to the LibAttach software?

3        A    Yes.

4        Q    So it was November of '05, not October?

5        A    I'm speaking on development dates.

6        Q    Okay.  When was the last time that StorageTek or

7    its resellers or ISVs sold a copy of the LibAttach 1.1 to

8    1.4?

9        MR. PULGRAM:  No foundation.

10        THE WITNESS:  I don't know.

11   BY MS. BRILLET:

12        Q    What's the functionality of the LibAttach

13   integrators kit?

14        A    That allows our partners, the ISVs, to

15   programmatically talk to our library control software via

16   the ACSAPI.

17        Q    How does a customer use the LibAttach

18   integrators kit?

19        A    The customer does not.

20        Q    Oh, okay.

21        What's the difference between the LibAttach and

22   the LibAttach integrators kit?

23        A    The integrators kit contains some header files

24   and some library files that when an ISV is writing their

25   application, they need to import those files in order to

MICHAEL ABRAMOVITZ                    10/23/07

Page 45

1    have access to the ACSAPI and have access to LibAttach's

2    services.

3        Q    How many version of the LibAttach integrators

4    kit are there?

5        A    The LibAttach integrators kit is versioned with

6    the same version numbers as the standard LibAttach.

7        Q    Okay.  Go to Exhibit 70.  Sorry.  I'm out of

8    order with the exhibit numbers.

9        MR. PULGRAM:  Okay.

10   BY MS. BRILLET:

11       Q    Do you recognize this document?

12       A    Yes.

13       Q    What is it?

14       A    This was the count of products that were sold --

15       Q    Okay.

16       A    -- using the REELs and LibAttach.

17       Q    The far left-hand column is titled "CEI."  What

18   does that mean?

19       MR. PULGRAM:  No foundation.

20       THE WITNESS:  I don't know.

21   BY MS. BRILLET:

22       Q    Okay.  You said that the LibAttach integrators

23   kit that goes along with the LibAttach program itself --

24   does the LibAttach integrators kit version -- do they

25   include the Netbula software files?

MICHAEL ABRAMOVITZ                          10/23/07

Page 46

 1        A    They --

 2        MR. PULGRAM:  Vague and ambiguous.

 3        THE WITNESS:  They include the runtime files.

 4   BY MS. BRILLET:

 5        Q    Were Netbula header files included in the

 6   LibAttach integrators kit?

 7        A    No.

 8        Q    Did the LibAttach integrators kit use the

 9   Netbula RPC server functionality?

10        A    No.

11        Q    Model number 1191NLI, is that the model number

12   for the integrators kit?

13        A    Yes.

14        Q    Okay.  Do you know which companies purchased the

15   LibAttach integrators kit?

16        A    I don't.

17        Q    Were there trial versions of the LibAttach

18   integrators kit available?

19        A    No.

20        Q    Could you get the integrators kit without

21   getting just the straight LibAttach 1.1 to 1.4?

22        MR. PULGRAM:  Objection; no foundation.

23        THE WITNESS:  I don't know.

24   BY MS. BRILLET:

25        Q    Besides REELs, LibAttach, the LibAttach

MICHAEL ABRAMOVITZ                                    10/23/07

Page 47

1  integrators kit, were there any StorageTek products that

2  used the Netbula software?

3      A    No.

4      Q    Did StorageTek use Netbula software in any other

5  products, including unfinished ones?

6      A    None that I'm aware of.

7      Q    Okay.  When StorageTek stopped using the Netbula

8  software in the fourth quarter of '05, did StorageTek

9  keep cop -- backup copies for the software that was

10 deleted?

11         MR. PULGRAM:  Vague.

12         THE WITNESS:  I'm sorry.  The question again.

13 BY MS. BRILLET:

14     Q    Mm-hmm.  When StorageTek stopped using the

15 Netbula software in the fourth quarter of 2005, did

16 StorageTek keep any backup copies of the Netbula

17 software?

18     A    We kept the original CDs that we received from

19 Netbula.

20     Q    Okay.  But no backups?

21     A    No backups.

22     Q    Okay.  Did StorageTek communicate to its

23 customers that it was replacing the Netbula software in

24 its products?

25         MR. PULGRAM:  Vague and -- I'm sorry.  No

Page 48

1    foundation.

2         THE WITNESS:  I don't know.

3    BY MS. BRILLET:

4         Q    Okay.  Let's see.  What is your Sun employee

5    number?

6         A    189703.

7         Q    What's the name of the free open-source product

8    that Sun downloaded from the Internet to replace the

9    Netbula code?

10        A    ONCRPC.

11        Q    Okay.  Does it require any intellectual labor to

12   create an ONCRPC product for Windows from the Sun RPC

13   code?

14        MR. PULGRAM:  Objection; it's beyond the scope of

15   the 30(b)(6) deposition.

16   BY MS. BRILLET:

17        Q    This --

18        MR. PULGRAM:  It's also beyond the scope of this

19   phase of the proceeding, and therefore it's an

20   inappropriate question.  I'm not going to allow the

21   witness to answer.

22        MS. BRILLET:  And I'll state this once again, it was

23   one of the questions that Mr. Melnick was unable to

24   answer as a 30(b)(6) witness.

25        MR. PULGRAM:  And if you tell me why that is within

Page 49

1    the scope of the licenses defense, then we can consider

2    it, but I can't imagine.

3        MS. BRILLET:  Well, I'll stick with that.  Okay.

4            I am -- I'm finished.  One second.  Let me make

5    sure.  Yeah.

6            Do you have any questions?

7        MR. PULGRAM:  I'm going to have one short word with

8    the witness and then probably a question.

9        MS. BRILLET:  Okay.

10            (Recess taken:  12:15 until 12:19 p.m.)

11        THE REPORTER:  For the record, Counsel, would you

12    like a copy of the transcript?

13        MR. PULGRAM:  Yes, copy.

14        THE REPORTER:  Counsel, for you?

15        MS. MONAHAN:  Yes, please.

16        THE REPORTER:  Counsel, for you?

17        MS. BRILLET:  Yes, please.

18        THE REPORTER:  Are there any time constraints on

19    this transcript?

20        MS. BRILLET:  Just as soon as we can get it.

21        THE REPORTER:  Regular turnaround?

22        MS. BRILLET:  Yes.

23            (Recess taken:  12:24 until 12:29 p.m.)

24        MR. PULGRAM:  Okay.  We're going to put a

25    stipulation on the record here about some housekeeping

MICHAEL ABRAMOVITZ                                    10/23/07

Page 50

1    matters.

2           The defendants are filing summary judgment

3    motions today, and the stipulation is that the two

4    Netbula-StorageTek license agreements from 2000 and 2004

5    that were produced by Netbula stamped "confidential" will

6    nonetheless be filed not under seal, the parties agreeing

7    that the "confidential" designation should be removed

8    from those documents.

9         MR. YUE:  Do they bear NB Bates numbers or NBS Bates

10   numbers?

11        MR. PULGRAM:  I don't know.

12        MR. YUE:  They should be produced with the NBS Bates

13   numbers.  So we should use those documents with the

14   proper Bates numbers.

15        MR. PULGRAM:  Well, we might not have agreement on

16   this part, so let me make sure that we have agreement on

17   the second part.

18           The second item of the stipulation here is that

19   certain pages of Mr. Yue's deposition testimony, which

20   were either advertently or inadvertently identified by

21   the court reporter as "confidential," will be filed not

22   under seal, and those are pages 66 to 67 and 200 to 201

23   of his depositions in the Sun/StorageTek litigation.

24           Are we agreed on that?

25        MR. YUE:  Yes, we'll stipulate to that.

MICHAEL ABRAMOVITZ                              10/23/07

Page 51

1        MR. PULGRAM:  Okay.  Counsel?

2        MS. BRILLET:  Yes.

3        MR. PULGRAM:  And let's go off the record and let me

4    check on this other issue.

5                (Recess taken:  12:31 until 12:38 p.m.)

6        MR. PULGRAM:  So we've reached a clarified agreement

7    here as to the Sun-Netbula license agreements, and the

8    agreement is as follows:  Those agreements were produced

9    marked "confidential" in the Semantec litigation.  They

10   were subject to marking an inquiry in Mr. Yue's

11   deposition in this Sun litigation where they were marked

12   as Exhibits 2 and 3.

13            The parties have agreed that those Sun-Netbula

14   license agreements from 2000 and 2004 will be

15   dedesignated so that they are no longer considered to be

16   confidential, as a result of which they may be filed not

17   under seal.

18            Is that agreeable?

19       MR. YUE:  Exhibits 2 and 3?  Those are the

20   agreements?

21       MR. PULGRAM:  Those are the 2000 and 2004

22   Sun-Netbula agreements.

23       MR. YUE:  Yes, in that case, if those were the two

24   agreements between Netbula and StorageTek, I agree those

25   can be dedesignated as nonconfidential as of today.

Page 52

1          MR. PULGRAM:  Okay.

2              Counsel?

3          MS. BRILLET:  I agree.

4          MR. PULGRAM:  Thank you very much.

5    //

6    //

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MICHAEL ABRAMOVITZ                                    10/23/07

Page 53

1

2

3

4

5

6

7

8

9    I, MICHAEL ABRAMOVITZ, do hereby declare

10   under penalty of perjury that I have read the foregoing

11   transcript of my deposition; that I have made such

12   corrections as noted herein, in ink, initialed by me, or

13   attached hereto; that my testimony as contained herein,

14   as corrected, is true and correct.

15             EXECUTED this _____ day of _____,

16        20___, at _____,
     _____.

17                   (City)                    (State)

18

19

20             _____
               MICHAEL ABRAMOVITZ

21

22

23

24

25

MICHAEL ABRAMOVITZ                              10/23/07

Page 54

1            I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, do hereby certify:

3            That the foregoing proceedings were taken

4    before me at the time and place herein set forth; that

5    any witnesses in the foregoing proceedings, prior to

6    testifying, were duly sworn; that a record of the

7    proceedings was made by me using machine shorthand which

8    was thereafter transcribed under my direction; that the

9    foregoing transcript is a true record of the testimony

10   given.

11           Further that if the foregoing pertains to

12   the original transcript of a deposition in a Federal

13   Case, before completion of the proceedings, review of the

14   transcript [  ] was [  ] was not requested.

15           I further certify I am neither financially

16   interested in the action nor a relative or employee of

17   any attorney or party to this action.

18           IN WITNESS WHEREOF, I have this date

19   subscribed my name.

20

21   Dated: _____

22

23

24                     _____
                       TRACY L. PERRY
                       CSR No. 9577
25

# EXHIBIT 45

# EXHIBIT 45



COPY

PAGES 1 - 32

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE BERNARD ZIMMERMAN, MAGISTRATE JUDGE

| | | |
|---|---|---|
| NETBULA, LLC, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| VS. | ) | NO. C 06-7391 BZ |
| | ) | |
| STORAGE TECHNOLOGY | ) | |
| CORPORATION, | ) | |
| | ) | |
| DEFENDANT. | ) | |
| ———————————————— | ) | |

SAN FRANCISCO, CALIFORNIA
TUESDAY, DECEMBER 5, 2006

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

FOR PLAINTIFF:          LAW OFFICE OF
                        VONNAH M. BRILLET
                        2777 ALVARADO STREET
                        SUITE E
                        SAN LEANDRO, CA  94577
                  BY:   **VONNAH BRILLET, ESQ.**


FOR DEFENDANT:          FENWICK & WEST LLP
                        275 BATTERY STREET
                        SUITE 1500
                        SAN FRANCISCO, CA  94111
                  BY:   **JEDEDIAH WAKEFIELD, ESQ.**
                        **LAWRENCE PULGRUM, ESQ.**


REPORTED BY:            JAMES YEOMANS, CSR 4039, RPR
                        OFFICIAL REPORTER

              COMPUTERIZED TRANSCRIPTION BY ECLIPSE

1    TUESDAY, DECEMBER 5, 2006                           3:00 P.M.

2              (THE FOLLOWING PROCEEDINGS WERE HEARD IN OPEN COURT:)

3         **THE CLERK:**  CALLING CIVIL ACTION C 06-7351, NETBULA

4    LLC VERSUS STORAGE TECHNOLOGY CORPORATION, ET AL.

5              COUNSEL, PLEASE STATE YOUR APPEARANCE FOR THE RECORD.

6         **MS. BRILLET:**  VONNAH BRILLET FOR AND ON BEHALF OF

7    NETBULA LLC.

8         **THE COURT:**  NETBULA IS THAT NOT NETBULA?

9         **MS. BRILLET:**  RIGHT.

10        **THE COURT:**  IF I MISPRONOUNCE IT I APOLOGIZE, I'VE

11   BEEN SAYING NETBULA FOR THE LAST DAY OR SO.

12             ALL RIGHT.  NETBULA.

13        **MR. WAKEFIELD:**  JED WAKEFIELD OF FENWICK & WEST ON

14   BEHALF OF DEFENDANTS STORAGE TECHNOLOGY CORPORATION AND SUN

15   MICROSYSTEMS.

16        **THE COURT:**  ANY OTHER FOLKS AT THE TABLE ARE GOING TO

17   MAKE APPEARANCES OR HERE AS OBSERVERS?

18        **MR. PULGRUM:**  LAWRENCE PULGRUM FROM FENWICK & WEST,

19   ALTHOUGH MR. WAKEFIELD WILL HAVE THE FLOOR.

20        **THE COURT:**  WELL, LET ME JUST FIRST SAY, I'VE IN THE

21   LAST HOUR OR SO, I HAVE SEEN -- THIS IS REALLY ADDRESSED TO THE

22   PLAINTIFF -- I HAVE SEEN THE OPPOSITION MEMORANDUM AND THREE

23   SUPPORTING DECLARATIONS, WHICH I REALLY KIND OF READ THEM OVER

24   QUICKLY.  THEY HAVE VOLUMINOUS EXHIBITS AND I WON'T PRETEND

25   THAT I MASTERED THEM.

1    HAVE YOU SEEN ALL THOSE, MS. BRILLET?

2       **MS. BRILLET:** I RECEIVED THEM ABOUT 10 MINUTES AGO,

3    YOUR HONOR.

4       **THE COURT:** I GOT THE DECLARATION, THE MEMO ABOUT AN

5    HOUR AGO AND THE DECLARATIONS PROBABLY ABOUT 10 MINUTES AGO,

6    BUT HAVING READ THEM THROUGH I'M JUST CURIOUS:

7       ARE THE TWO OF YOU TALKING TO ONE ANOTHER IN TERMS OF

8    WHAT IS THE MOST SENSIBLE WAY OF PROCEEDING WITH THIS DISPUTE?

9       I MEAN, AS I WALKED IN HERE I DIDN'T SEE ANYBODY

10   HUDDLING. REALLY WANT TO GO THROUGH TRO, PRELIMINARY

11   INJUNCTION, PERMANENT INJUNCTION AND SO ON AND SO FORTH,

12   ESPECIALLY IN VIEW OF THE SORT OF EVIDENTIARY SHOWING I HAVE IN

13   FRONT OF ME?

14      MAYBE I SHOULD START WITH PLAINTIFF.

15      **MS. BRILLET:** THE KEY PROBLEM HERE IS, ALTHOUGH THE

16   DEFENDANT HAVE SAID THEY'RE NO LONGER USING THE CODE THAT'S IN

17   QUESTION, OUR PROBLEM IS THAT WE WANT TO MAKE SURE THAT,

18   ALTHOUGH THEY VOLUNTARILY STOPPED USING IT, WE WANT TO MAKE

19   SURE WE HAVE ASSURANCES THEY DON'T USE IT AT SOME POINT IN THE

20   FUTURE.

21      **THE COURT:** WELL?

22      **MS. BRILLET:** SO THAT'S WHY WE WANT THE INJUNCTION, SO

23   MAKE SURE BECAUSE OTHERWISE THEY COULD START USING IT AGAIN AND

24   THEN WE'LL BE RIGHT BACK IN COURT.

25      **THE COURT:** WELL, ANYTHING POSSIBLE, BUT YOU'RE THE

1 PLAINTIFF SO, I GUESS, SOME -- I'LL HAVE TO TURN TO YOU FIND

2 OUT WHAT EVIDENCE I HAVE IN FRONT OF ME THEY ARE USING IT.

3 YOU'LL PROBABLY POINT ME TO THAT ONE EXHIBIT FROM MR. YUE'S

4 DECLARATION.

5        **MS. BRILLET:** YES, YOUR HONOR.

6        **THE COURT:** WE'LL TALK ABOUT THAT. BUT LOOK, FOLKS,

7 HERE YOUR POSSIBILITY. HERE'S YOUR OPTIONS. WE CAN DO THIS,

8 WHAT I WOULD CALL THE HARD WAY, A TRO HEARING TODAY, DEPENDING

9 WHAT I DO WE'LL HAVE A PRELIMINARY INJUNCTION HEARING EITHER IN

10 A COUPLE OF WEEKS OR MAYBE A MONTH OR TWO, OR AND THEN WE WOULD

11 HAVE A HEARING ON A PERMANENT INJUNCTION, AND THEN WHATEVER

12 OTHER ISSUES REMAIN TO BE TRIED, PERHAPS, A YEAR FROM NOW.

13        BUT WHAT I'VE SUGGESTED TO FOLKS, THIS IS NOT THE

14 FIRST ONE OF THESE TYPES OF DISPUTES I'VE HAD, IS WHETHER YOU

15 WANT TO CONSIDER -- LET ME ASK YOU ANOTHER QUESTION,

16 MS. BRILLET:

17        WHAT DO YOU ANTICIPATE YOUR DAMAGES TO BE?

18        HOW MUCH MONEY ARE WE TALKING ABOUT?

19        IS THAT MR. YUE SITTING NEXT TO YOU?

20        **MR. YUE:** YES.

21        **THE COURT:** YOU'RE FREE TO TALK OUT, UNLESS MS.

22 BRILLET WANTS YOU TO TALK THROUGH HER. IS THIS, LIKE I

23 UNDERSTAND, 20 SOME THOUSAND DOLLARS HAVE BEEN PAID?

24        LOOKING AT ANOTHER 20,000, A HUNDRED THOUSAND, WHAT

25 ARE WE TALKING ABOUT?

1      **MR. YUE:** AT THIS POINT WE DON'T KNOW THE AMOUNT OF

2    DAMAGES. THE DEFENDANTS HAVE CONCEALED THE SCOPE OF THE

3    INFRINGEMENT, AND THEY HAVE BEEN SELLING UNLIMITED LICENSES

4    WHICH IS GRANTED TO THIRD PARTIES WHO MAKE INFINITE AMOUNT OF

5    COPIES.

6      AT THIS POINT THE DAMAGES UNCERTAIN AND THE PROFITS

7    THAT DERIVE FROM THE INFRINGEMENT IS UNCERTAIN TO US, SO THAT'S

8    WHY WE CANNOT SAY WITH A CERTAINTY.

9      **THE COURT:** I'M NOT ASKING YOU TO SAY ANYTHING WITH

10   CERTAINTY, WHAT I'M SIMPLY TRYING TO FIND OUT IS WHETHER YOU'RE

11   LOOKING AT WHAT'S GOING TO BE FAIRLY EXPENSIVE LITIGATION. I

12   MEAN, PROBABLY SIX FIGURES AND WHO KNOWS WHAT GOES ON FAR

13   ENOUGH.

14     WHAT I'M TRYING TO FIGURE OUT WHETHER IT WOULDN'T MAKE

15   SENSE FOR THE TWO OF YOU TO TRY TO FIGURE OUT A MORE

16   EXPEDITIOUS WAY OF HANDING THIS PROBLEM. I'M WILLING TO WORK

17   WITH YOU, IF YOU'RE WILLING TO DO THAT.

18     **MS. BRILLET:** WELL, YOUR HONOR.

19     **THE COURT:** WHAT I HAD SOME EXPERIENCE WITH DOING IN

20   THE PAST, WHICH HAS SERVED TO CUTDOWN ON THE COST OF THE

21   LITIGATION, IS TO SUGGEST THAT THE PARTIES REACH SOME SORT OF A

22   STANDSTILL AGREEMENT. SINCE THE DEFENDANTS TELL ME THEY'RE NOT

23   SELLING IT, YOU WANT SOME ASSURANCES.

24     **MS. BRILLET:** YES, YOUR HONOR.

25     **THE COURT:** SKIP THE TRO, SKIP THE PRELIMINARY

1   INJUNCTION, SCHEDULE A PERMANENT HEARING ON A PERMANENT

2   INJUNCTION AND I'LL WORK WITH YOU TO GIVE YOU ONE AS SOON AS

3   YOU WANT, BUT USUALLY PEOPLE TELL ME THEY WANT FOUR TO SIX

4   MONTHS TO TAKE DISCOVERY.

5         SO REALLY MY QUESTION IS WHETHER YOU WANT TO SPEND A

6   FEW MINUTES AMONG YOURSELVES TALKING ABOUT A MORE EXPEDITIOUS

7   WAY OF DOING THIS?

8         BECAUSE I'M CONCERNED YOU MAY GET TO THE END OF THIS

9   AND FIND OUT THAT IT'S A $50,000 LAWSUIT, FOR EXAMPLE, BUT YOU

10  ALREADY SPENT $100,000 IN ATTORNEYS' FEES.

11        NOW I TOOK A QUICK LOOK THROUGH LICENSING AGREEMENTS,

12  AND UNLESS I MISSED SOMETHING I DON'T SEE ANY ATTORNEY FEE

13  PROVISIONS.  SO WOULD SEEM TO ME THAT IT -- REALIZE THAT UNDER

14  CERTAIN CIRCUMSTANCES THERE ARE ALLOWANCES FOR ATTORNEY'S FEES

15  UNDER COPYRIGHT LAWS, REALLY WONDERING WHETHER YOU ALL DON'T

16  WANT TO STOP AND THINK BEFORE YOU RUN OFF AND CONDUCT WORLD WAR

17  III, SO TO SPEAK.  WHETHER THERE ISN'T A MORE SENSIBLE WAY OF

18  DOING THIS.

19        **MS. BRILLET:**  OUR PROBLEM IS, AS MR. YUE HAS STATED,

20  THAT THERE'S NO WAY FOR US TO ASCERTAIN WHAT THE DAMAGES WOULD

21  BE AT THIS PARTICULAR POINT BECAUSE OF THERE ARE UNLIMITED

22  LICENSES THAT ARE BEING SOLD OUT THERE.

23        ALTHOUGH, THERE WAS A $22,000 CHECK ISSUED TO MR. YUE

24  IT WAS STATED IT'S A FINAL SETTLEMENT PAYMENT IN FULL, WHICH IS

25  WHY MR. YUE WASN'T ABLE TO CASH THE CHECK, AND SAY THAT HE HAS

1   NO CASE AT THIS POINT.  SO HE WAS UNABLE TO BE PAID FOR ANY OF

2   HIS ROYALTIES FOR THIS.

3        **THE COURT:**  SOUNDS LIKE THE PLAINTIFF WANTS TO GO

4   FORWARD.

5        **MS. BRILLET:**  HE DOES.

6        **MR. YUE:**  YOUR HONOR, MAY I HAVE A WORD?

7        **THE COURT:**  SURE.

8        **MR. YUE:**  WE HAVE EXHAUSTIVELY WITH -- THROUGH

9   NEGOTIATIONS WITH SUN TO SETTLE THE CASE IN ACCORDANCE WITH OUR

10  LICENSE AGREEMENTS, BUT SUN REJECTED.

11       **THE COURT:**  LET ME BE CLEAR.  I'M NOT SUGGESTING THAT

12  YOU NEGOTIATE SETTLEMENT FROM, I'M SIMPLY SAYING THERE ARE TWO

13  WAYS OF HANDLING THIS LITIGATION.

14       NOW, I CAN FORCE YOU DOWN ONE TRACK IF I HAVE TO, NOT

15  PREPARED TO DO THAT TODAY, BECAUSE I CAN COMBINE THE

16  PRELIMINARY AND THE PERMANENT.

17       ALL I'M WONDERING ABOUT IS WHETHER, GIVEN THE

18  MAGNITUDE OF THIS LITIGATION, WHAT I KNOW TO BE THE COST OF

19  BEING INVOLVED IN TRO'S, PRELIMINARY INJUNCTIONS, AND THEN

20  POSSIBLY PREPARING FOR TRIAL, WHETHER IT'S WORTH IT.

21       WHETHER YOU DON'T WANT TO AGREE RIGHT NOW ON A, WHAT I

22  SORT OF CALL A MORE FAST TRACK OR MORE EXPEDITED DISPOSITION,

23  WHICH IS SOME SORT OF STANDSTILL AGREEMENT.

24       SOUNDS TO ME YOU DON'T WANT THEM SELLING THIS PRODUCT

25  IN THE FORESEEABLE FUTURE.

1        **MS. BRILLET:**  THAT'S CORRECT.

2        **THE COURT:**  AND THEN MIGHT BE WILLING, MIGHT BE THEY

3   BE WILLING TO AGREE TO THAT.  THEY REPRESENTED IN COURT UNDER

4   RULE 11 THAT THEY'RE NOT, AND THEN INSTEAD OF, YOU KNOW,

5   PROCEEDING TODAY LET'S STEP BACK AND HAVE A HEARING ON A

6   PERMANENT INJUNCTION, WHICH WOULD BE A TRIAL.

7        IF YOUR WONDERING ABOUT HOW I WOULD DEAL WITH DAMAGES

8   I HAVE SEVERAL OPTIONS.  OBVIOUSLY, THE INJUNCTIVE ISSUES FOR

9   THE COURT, TO THE EXTENT THERE ARE ANY JURY TRIAL ISSUES, I

10  COULD SEVERE THOSE IF THAT WOULD MAKE SENSE.

11       THEY HAVE AN ADVISORY JURY, A NUMBER OF WAYS OF DOING

12  IT.  I'M NOT LOOKING RIGHT NOW TO TALK TO YOU ABOUT SETTLING

13  THE DISPUTE, I'M SIMPLY TRYING TO FIND OUT WHETHER THE TRACK

14  YOU'VE CHOSEN, WHICH IS PRETTY INTENSE LITIGATION, MAKES SENSE

15  FOR THIS KIND OF DISPUTE.

16       **MS. BRILLET:**  RIGHT.  IF WE COULD HAVE SOME KIND OF

17  ASSURANCE FROM THE DEFENDANTS THAT THEY WILL NOT, THEY WILL NO

18  LONGER USE NETBULA'S SOFTWARE OR THE COPYRIGHTED MATERIALS,

19  THEN I THINK THAT WE WOULD BE AMENABLE TO HAVE SOME KIND OF

20  AGREEMENT WITH THEM.

21       **MR. YUE:**  YOUR HONOR, I THINK WE -- TO IMPOUNDMENT OF

22  THE INFRINGING COPIES UNDER THE LAW.

23       **THE COURT:**  IF YOU WIN.  THE DEFENDANTS HAVE BEEN SORT

24  OF SILENT.  DO YOU HAVE ANY VIEWS ON THIS?

25       WHAT I'M SORT OF HEARING FROM THE PLAINTIFFS, MR. YUE

1    ESPECIALLY SEEMS TO WANTS TO PROCEED.  MAYBE SOME BASIS FOR

2    DISCUSSION.  HOW DO THE DEFENDANTS FEEL ABOUT THIS?

3         MR. WAKEFIELD:  WELL, YOUR HONOR, THIS CASE IS AS NEW

4    OR NEWER TO US AS IT IS TO THE COURT AND WE'RE BEEN REVIEWING

5    THE PAPERS AND TRYING TO GET OUR HEADS AROUND ALL THE FACTS.

6         I WANT TO TALK TO MY CLIENT ABOUT A FAST TRACK TOWARD

7    PERMANENT INJUNCTION ON EXPEDITED DISCOVERY SCHEDULE AND TRIAL

8    AND WOULD BE HAPPY TO DISCUSS IT, BUT.

9         THE COURT:  CLIENTS NOT HERE, I ASSUME?

10        MR. PULGRUM:  THEY'RE A PHONE CALL AWAY.

11        MR. WAKEFIELD:  THEY'RE A PHONE CALL AWAY.

12        THE COURT:  PEOPLE, WHY DON'T WE DO THIS.  SOMETIMES

13   WHEN I SAY THIS EVERYBODY SAYS, GREAT, LET'S TALK.  NO ONE

14   SEEMS TO BE REALLY JUMPING, SO LET'S PROCEED.

15        I'LL GIVE YOU EACH A CHANCE TO STATE YOUR POSITION.

16   AS I SAY, I READ YOUR PAPERS, BUT I JUST WANT TO MAKE SURE I

17   UNDERSTAND A FEW THINGS.  LET ME START WITH THE PLAINTIFF.

18        IS IT YOUR POSITION THAT THERE IS NO BUSINESS

19   RELATIONSHIP AT THE MOMENT BETWEEN THE PLAINTIFF AND SUN?

20        MR. YUE:  THAT'S CORRECT.

21        THE COURT:  SO SUN HAS NO CONTRACTUAL RIGHT TO

22   DISTRIBUTE THE SOFTWARE PRODUCT IN QUESTION?

23        MR. YUE:  THAT'S RIGHT.

24        MS. BRILLET:  NO, YOUR HONOR.

25        THE COURT:  SO THIS ISN'T SIMPLY A CASE WHERE YOU

1  WANT, YOUR FIGHTING OVER THE AMOUNT OF SOFTWARE THAT'S BEEN

2  DISTRIBUTED, WHETHER IT'S HUNDREDS OR THOUSANDS, YOUR POSITION

3  IS RIGHT NOW YOU DON'T WANT SUN TO DISTRIBUTE YOUR PRODUCT?

4      **MS. BRILLET:**  YES, YOUR HONOR.

5      **THE COURT:**  WHAT IS SUN'S VIEW?

6      DOES SUN THINK THERE IS AN ONGOING RELATIONSHIP

7  BETWEEN THE PARTIES?

8      **MR. WAKEFIELD:**  SUN THINKS THAT STORAGE TECH, WHICH IT

9  ACQUIRED IN THIS, WHAT WAS A REVERSE TRIANGULAR MERGER, HAS A

10  VALID, IRREVOCABLE AND, WELL, IRREVOCABLE LICENSE TO USE THE

11  NETBULA CODE.  IT BELIEVES THAT AN INJUNCTION BASED ON

12  COPYRIGHT CLAIMS --

13      **THE COURT:**  LET'S NOT GET INTO AN INJUNCTION.  I'M

14  SIMPLY TRYING TO FIND OUT RIGHT NOW, YOU BELIEVE RIGHT NOW, I'M

15  USING SUN, IS THERE STILL A STORAGE TECH?

16      **MR. WAKEFIELD:**  IT IS STILL AN ENTITY, IT'S WHOLLY

17  OWNED.

18      **THE COURT:**  SO, I GUESS, THE REAL DEFENDANT THEN IS

19  STORAGE TECH AND SUN IS SIMPLY HERE BECAUSE IT OWNS CONTROLLING

20  INTEREST OR ALL THE INTEREST?

21      **MR. WAKEFIELD:**  ALL THE INTEREST AND IT HAS BEEN NAMED

22  AND IN THE CASE AND HAS, IN ESSENCE, ADOPTED BUSINESS OF

23  STORAGE TECH INTO ITS OWN.

24      **THE COURT:**  WELL, THE LICENSE AGREEMENT THAT I SEE,

25  MR. MELNICK'S EXHIBIT AS EXHIBIT A, MR. MELNICK'S EXHIBIT A

1    CONTAINS WHAT I'M TOLD THE 1974 LICENSE AGREEMENT.

2         MR. WAKEFIELD:  2004.

3         THE COURT:  2004, WAIT A MINUTE, MAYBE IT'S EXHIBIT B,

4    EXHIBIT B.  MS. -- AND YOUR POSITION, THE DEFENDANT'S POSITION

5    IS THAT THAT AGREEMENT IS STILL IN EFFECT.

6         SAYS IT'S A NON-EXCLUSIVE, PERPETUAL, THAT'S A LONG

7    TIME EVEN FOR THIS COURT, WORLD-WIDE AND IRREVOCABLE LICENSE,

8    AND YOUR POSITION IS THAT STORAGE TECH STILL PROCEED UNDER THIS

9    LICENSE AGREEMENT?

10        MR. WAKEFIELD:  IF IT CHOSE TO.

11        THE COURT:  IF IT CHOSE TO.  MS. BRILLET, WHAT IS THE

12   PLAINTIFF'S POSITION?

13        IS THE PLAINTIFF'S POSITION THIS LICENSE AGREEMENT IS

14   STILL IN EFFECT?

15        MS. BRILLET:  YOUR HONOR, THE PROBLEM HERE IS THAT

16   LICENSE AGREEMENT REFERS TO A PROGRAM CALLED UNDER THE WINDOWS

17   NT PLATFORM AND WHAT WE'RE TALKING ABOUT IS A WINDOWS 2000

18   PLATFORM.

19        THE COURT:  SO YOU'RE SAYING IT ONLY GIVES THEM THE

20   RIGHT TO DISTRIBUTE THE PRODUCT IN CONNECTION OR AS PART OF

21   WINDOWS NT AND YOU BELIEVE THEY'RE DOING IT FOR WINDOWS 2000?

22        MS. BRILLET:  ONE MOMENT.  I'M SORRY, YOUR HONOR, ONE

23   MOMENT.

24        MR. YUE:  MAY I SAY A WORD?

25        THIS 2004 AGREEMENT, ALL THESE AGREEMENTS ARE LIMITED

1  LICENSE AGREEMENTS, PREPAYMENT AGREEMENT.  SO BASICALLY THE

2  DEFENDANTS PURCHASE THE RIGHT TO DISTRIBUTE 1,000 COPIES, THEY

3  ALREADY USED UP 1,000 COPIES.  IN FACT, THEY USED --

4  DISTRIBUTED 7,000 COPIES, SO THEY'RE WELL OVER THE LICENSE

5  LIMIT.

6          **THE COURT:**  DEFENDANTS THAT'S ONE OF THE AREAS THAT

7  UNDER DISPUTE, SO WHAT I HEAR THESE PLAINTIFFS SAYING, IS THAT

8  YOU HAVE A LICENSE BUT IT'S LIMITED TO THE QUANTITY THAT ARE

9  SET FORTH.

10          IN OTHER WORDS, YOU CAN DISTRIBUTE A THOUSAND IN A

11  YEAR OR YOU CAN DISTRIBUTE THEM, YOU KNOW, OVER A HUNDRED

12  YEARS, BUT THERE'S APPARENTLY A DISPUTE OVER HOW MANY YOU

13  BOUGHT AND HOW MANY YOU'RE ENTITLED TO DISTRIBUTE.

14          DO YOU HAVE ANY REACTION TO THAT?

15          HAVE YOU DISTRIBUTED 7,000 AS THEY CLAIM?

16          **MR. WAKEFIELD:**  ACTUALLY YOUR HONOR, I'M NOT CERTAIN

17  AS I SIT HERE TODAY OF THE NUMBER.  I BELIEVE THAT WAS THE

18  COMPANY'S BEST AVAILABLE DATA AS TO THE NUMBER OF COPIES

19  DISTRIBUTED AS OF THE TIME OF THAT REPORT.

20          BUT THE POINT ABOUT THIS BEING A PREPAYMENT AGREEMENT

21  IS NOT CLEAR FROM READING THIS AGREEMENT.  THE AGREEMENT NOT A

22  MODEL OF CLARITY, BUT PROVIDES FOR PAYMENT WITHIN 30 DAYS AFTER

23  RECEIPT OF AN INVOICE.

24          **THE COURT:**  WHO DRAFTED THE AGREEMENT, DO WE KNOW?

25          **MR. WAKEFIELD:**  I BELIEVE, IT WAS A NETBULA AGREEMENT.

1     **THE COURT:** ONE MORE QUESTION, THEN I'LL LET YOU ALL

2     EACH TALK FOR AWHILE.

3     NOW, MS. BRILLET, WHAT IS IT YOU THINK WILL HAPPEN IN

4     THE NEXT 10 TO 20 DAYS, WHICH IS THE TIME FRAME FOR PRELIMINARY

5     INJUNCTION HEARING UNLESS YOU ALL AGREE TO DIFFERENT THINGS,

6     THAT SHOULD CAUSE ME TO USE MY EXTRAORDINARY EQUITABLE POWERS

7     AND ISSUE A RESTRAINING ORDER TODAY, IMPOUNDING AND SO ON AND

8     SO FORTH?

9     **MS. BRILLET:** OUR KEY --

10    **THE COURT:** WHAT IS EMINENT?

11    **MS. BRILLET:** OUR KEY ISSUES WAS IF THEY WERE ACTUALLY

12    USING THE SOFTWARE, THE DEFENDANTS ARE STATING NOW THEY ARE NO

13    LONGER USING THE SOFTWARE.

14    AND AS I SAID, I GOT THESE PAPERS ABOUT 10 MINUTES

15    BEFORE WE STARTED HERE, THEY'RE SAYING THEY'RE NOT USING THE

16    SOFTWARE.

17    THE WHOLE REASON HAVING THE TEMPORARY RESTRAINING

18    ORDER RIGHT NOW WAS WE WANTED TO MAKE SURE, ONE, THEY'RE NOT

19    USING THE SOFTWARE, THEY DON'T CONTINUE TO USE IT AND THEY

20    DON'T START BACK UP LATER ON.

21    WE WANT SOME ASSURANCES THAT THEY WOULD STOP THE

22    COPYRIGHT INFRINGEMENT AND NO LONGER START IT BACK AGAIN.

23    **THE COURT:** SO HERE YOU ARE NOW 3:20, WHAT MORE DO YOU

24    WANT?

25    MR. MELNICK, I THINK, WAS MR. MELNICK WHO SAID IT, LET

1    ME BE CLEAR, I THINK SEVERAL PEOPLE SAID IT.  MR. ABRAMOVITZ

2    SAYS ON PARAGRAPH 3 OF HIS DECLARATION, THAT ON NOVEMBER 29TH

3    2005 SUN REPLACED THE CODE IT LICENSED FROM NETBULA WITH A FREE

4    OPEN SOURCE PRODUCT, AND I GATHER YOUR CLIENT DISAGREES WITH

5    THAT?

6        **MR. YUE:**  OF COURSE, YES, WE WOULD DISAGREE.

7        **THE COURT:**  WE SAY THE NETBULA CODE IS NOT BEING

8    INCLUDED IN ANY STORAGE TECH PRODUCTS DISTRIBUTED TO CUSTOMERS

9    AND HAS NOT BEEN IN THE LAST YEAR.  YOU DISPUTE THAT, TOO?

10        **MS. BRILLET:**  WE ARE NOT SURE -- YOUR HONOR, I WILL

11    SAY, AFTER SPEAKING WITH MY CLIENT JUST NOW WE ARE WILLING TO

12    HAVE THE TEMPORARY RESTRAINING ORDER IN THE NEXT 20 DAYS, AS

13    LONG AS THEY'RE NOT USING THE SOFTWARE.  WE DON'T SEE AN

14    EMINENT HARM WITHIN THE NEXT 20 DAYS.

15        **THE COURT:**  I DON'T THINK I HAVE TO WORRY ABOUT SOME

16    OF THE OTHER ISSUES, THE QUESTION THEN BECOMES, WHAT SHOULD BE

17    THE NEXT STEP?

18        I'M GOING TO DO THIS SINCE I GOT YOU ALL HERE.  I'M

19    GOING TO RECESS FOR FIVE MINUTES.  WHY DON'T YOU ALL TALK TO

20    ONE ANOTHER.  THE OPTIONS ARE AS FOLLOWS:

21        I CAN GIVE YOU A HEARING ON A -- RUNNING INTO THE

22    CHRISTMAS SEASON, SO MINDFUL OF THAT, BUT I CAN GIVE YOU A

23    HEARING ON A PRELIMINARY INJUNCTION TOWARDS THE END OF THE

24    MONTH.

25        NOW, THE BURDEN IS GOING TO BE ON YOU, MS. BRILLET,

1    OBVIOUSLY, TO ESTABLISH THE REQUISITES.  ONE OF THE THINGS

2    CONCERN ME ABOUT YOUR SHOWING HERE, I WASN'T CLEAR WHAT PROOF I

3    HAVE.

4            FOR EXAMPLE, THERE WAS ANY CONDUCT TO ENJOIN.  LET ME

5    PUT ASIDE YOU MAY HAVE PERFECTLY GOOD BREACH OF CONTRACT CLAIMS

6    AND PERFECTLY GOOD COPYRIGHT CLAIMS, I'M NOT OFFERING A VIEW ON

7    THE MERITS, BUT PROCEDURALLY FOR ME TO ISSUE A RESTRAINING

8    ORDER INJUNCTION THERE HAS TO BE SOMETHING TO ENJOIN.

9            NOW, IF IT TURNS OUT YOU'RE SATISFIED, THEY CAN

10   SATISFY YOU THAT THEY'RE NOT USING THIS PRODUCT OR THEY'RE

11   WILLING TO, YOU KNOW, ENTER INTO SOME SORT OF STIPULATION THAT

12   THEY WON'T, YOU MIGHT WANT TO CONSIDER COMING BACK TO WHAT I

13   MENTIONED EARLIER, WHETHER IT MAKES SENSE TO PUT THIS ON SOME

14   SORT OF AN EXPEDITED INJUNCTIVE TRACK OR WHETHER YOU DON'T WANT

15   TO STOP, STEP BACK, THINK ABOUT THE MORE EXPEDITIOUS WAY OF

16   DOING THIS.

17           SO I'M GOING TO RECESS FOR A FEW MOMENTS.  TALK AMONG

18   YOURSELVES AND THEN JUST TELL MS. SCOTT WHEN YOU'RE READY FOR

19   ME.

20           **MS. BRILLET:**  YES, YOUR HONOR.

21           **THE COURT:**  WE'RE IN RECESS.

22                   (RECESS TAKEN.)

23                   (PROCEEDINGS RESUMED.)

24           **THE COURT:**  WE'RE BACK ON THE RECORD IN NETBULA VERSUS

25   STORAGE TECHNOLOGY.

1    IT'S ABOUT FIVE MINUTES BEFORE 4:00.  I DON'T WANT TO

2  PROLONG THIS ANY FURTHER THEN IS NECESSARY.

3    HAVE THE PARTIES COME TO ANY SORT OF UNDERSTANDING

4  THEY WANT TO PUT ON THE RECORD?

5    OTHERWISE I'LL START MAKING SOME DECISIONS FOR YOU.

6    **MS. BRILLET:**  WELL, YOUR HONOR, IT APPEARS THE ONLY

7  THING THAT WE HAVE AGREED UPON WAS THAT DEFENDANTS WOULD NO

8  LONGER USE THE SOFTWARE.

9    **THE COURT:**  ALL RIGHT.  THAT'S -- I UNDERSTOOD THAT

10  MEANT A LOT TO YOUR CLIENT.

11    **MS. BRILLET:**  YES, IT DID.  DEFENDANT ACTUALLY WAS

12  JUST TELLING ME ANOTHER PROVISION THEIR CLIENTS MAY AGREE UPON

13  AS FAR AS LOCATING AND PROVIDING COPIES.

14    **MR. WAKEFIELD:**  YES.  SO WE WERE ATTEMPTING TO ADDRESS

15  THE TWO ISSUES STATED BY NETBULA AS THE GOAL FOR THE TRO HERE,

16  TO GET AN ASSURANCE THESE PRODUCTS AREN'T GOING TO BE SOLD AND

17  TO -- WELL, ESSENTIALLY THAT.

18    THE TWO ISSUES THAT WERE IDENTIFIED IS SOME AGREEMENT

19  THAT THEY WOULDN'T BE DISTRIBUTED AND SECOND THERE WOULD BE AN

20  IDENTIFICATION OR IMPOUNDMENT, WAS THE ORIGINAL REQUEST, OF ALL

21  COPIES.

22    NOW, WE RAISED SOME CONCERN ABOUT AN AGREEMENT WITH

23  RESPECT TO ALL COPIES BECAUSE OF TECHNICAL ISSUES AND

24  EVIDENTIARY ISSUES, BUT WE'RE DISCUSSING AN AGREEMENT THAT

25  WE'RE PREPARED TO RECOMMEND.

1      WE NEED TO TALK TO THE CLIENT ABOUT THE LOGISTICS OF

2  THIS, BUT WE'RE PREPARED TO RECOMMEND AN AGREEMENT WE COULD

3  COLLECT AND PROVIDE COPIES OF ANY PRODUCT, ANY CODE THAT

4  CONTAINS THIS CODE.

5      WHAT WE WERE VERY CLEAR, HOWEVER, IS THAT WE WERE NOT

6  PREPARED TO STIPULATE TO AN INJUNCTION.

7      **THE COURT:**  WELL, LOOK, HERE'S WHAT I'M GOING TO

8  SUGGEST.  MY UNDERSTANDING IS BEFORE WE TOOK THE RECESS THAT

9  THE PLAINTIFF HAVING IN EFFECT BEEN TOLD THAT THE PRODUCT WAS

10  NOT CURRENTLY BEING DISTRIBUTED HAD WITHDRAWN THE APPLICATION

11  FOR RESTRAINING ORDER.

12      MS. BRILLET, THAT ESSENTIALLY CORRECT?

13      **MS. BRILLET:**  WE DON'T SEE THERE'S AN IMMEDIATE HARM

14  WITHIN THE NEXT COUPLE OF DAYS.  OUR ONLY PROBLEM IS AS LONG

15  AS, AND AGAIN, I MEAN, I KNOW THERE'S NO ONE HUNDRED PERCENT

16  GUARANTEES, WE WANT ASSURANCES THAT THE DEFENDANTS WOULD NO

17  LONGER USE THE PLAINTIFF'S SOFTWARE AND CODES.

18      ALSO, SEEM TO BE A QUESTION HERE, YOUR HONOR, OF WHAT,

19  HOW MANY UNLICENSED COPIES ACTUALLY EXIST IN THIS PARTICULAR

20  CASE.  SO THERE SEEMS TO BE SOME QUESTIONS ON THE ACTUAL

21  LANGUAGES.

22      **THE COURT:**  WELL, LET ME JUST MAKE THESE OBSERVATIONS.

23  FIRST OF ALL, YOU CAN CONTINUE TO TALK, I JUST DON'T WANT TO

24  KEEP MY STAFF HERE WHILE YOU ALL ARE TALKING.  IN FACT, YOUR

25  WELCOME TO STAY IN THE COURTROOM.  BUT IT'S NOT FAIR TO THE

1   REPORTER AND TO MY CLERK, SO HERE'S THE WAY I SUGGEST WE

2   PROCEED.

3        FIRST, THE APPLICATION FOR A TEMPORARY RESTRAINING

4   ORDER IS WITHDRAWN.

5        SECOND, THE PLAINTIFF HAS LEAVE TO BRING ON A MOTION

6   FOR PRELIMINARY INJUNCTION IN THE ORDINARY COURSE BY NOTICED

7   MOTION ON THE COURT'S CALENDAR.

8        NOW, IF IT TURNS OUT, REMEMBER YOU COME BACK TO ME FOR

9   ANOTHER TRO, BUT I WOULD EXPECT THAT YOU WOULD HAVE SOME

10  EVIDENCE, THAT THERE'S SOMETHING FOR ME TO RESTRAIN.

11       KEEP IN MIND THE BURDEN IS GOING TO BE ON YOU IN ANY

12  OF THESE EXTRAORDINARY SHOWINGS, TO SHOW THAT YOU'RE ENTITLED

13  TO INJUNCTION RELIEF.

14       AND INJUNCTIONS DO NOT ISSUE FOR PAST CONDUCT, SO IF

15  YOU WANT TO COME BACK HERE FOR RESTRAINING ORDER, FOR

16  PRELIMINARY INJUNCTION OR WHATEVER, YOU'RE GOING TO HAVE TO

17  PRESENT ME WITH SOME EVIDENCE THERE IS SOME CONDUCT THAT'S

18  ANTICIPATED ON BEHALF OF THE DEFENDANTS THAT I NEED TO ENJOIN.

19       ABSENT THAT, IT STRIKES ME THAT, AGAIN, WHAT YOU MAY

20  HAVE IS A BREACH OF CONTRACT OR BREACH OF STATUTORY -- BREACH

21  OF STATUTE, COPYRIGHT LAWS AND SO ON.

22       NOW, THEY'VE RAISED SOME INTERESTING ISSUES, WE

23  HAVEN'T DISCUSSED THEM TODAY, ABOUT THE VALIDITY OF YOUR

24  COPYRIGHT, WHETHER THE PRESUMPTION ATTACHES BECAUSE APPARENTLY

25  NOT REGISTERED MORE THAN FIVE YEARS AFTER CONCEPTION AND SO ON,

1  I DON'T INTEND TO GET TO THOSE, BUT JUST REMIND THE PLAINTIFF

2  THE BURDEN ON LOT OF THOSE ISSUES IS GOING TO BE ON YOU.

3          AND I SUGGEST THAT THE PARTIES DO CONTINUE TO TALK,

4  AND YOU CAN STAY IN THIS COURTROOM AND I'M GOING TO LEAVE MY

5  LAW CLERK HERE FOR, AT LEAST, A LITTLE WHILE IN CASE YOU HAVE

6  ANY NEED TO GET BACK TO ME, BUT I'M GOING TO ADJOURN THESE

7  PROCEEDINGS, UNLESS ANYBODY HAS ANYTHING FURTHER THEY WISH TO

8  ADD?

9          SO THE WAY WE'RE GOING TO LEAVE IT IS TELL -- THE

10  APPLICATION FOR TEMPORARY RESTRAINING ORDER WITHDRAWN BY THE

11  PLAINTIFF.  PLAINTIFF HAS LEAVE TO FILE AN APPLICATION OR A

12  MOTION FOR PRELIMINARY INJUNCTION.

13          YOU CAN NOTICE IT ON MY CALENDAR, MS. BRILLET,

14  WHENEVER YOU THINK YOU'RE READY, IF YOU DECIDE YOU NEED ONE.

15          IF YOU DON'T NEED ONE I COME BACK TO THE VERY FIRST

16  THING I OFFERED YOU.  I'M WILLING TO WORK WITH YOU ON

17  EXPEDITING THE ENTIRE PROCESS, SO WE HAVE A TRIAL ON A

18  PERMANENT INJUNCTION AND THE PARTIES REALLY WORK HARD, WE EVEN

19  HAVE A TRIAL ON ALL ISSUES IN SOMETHING LIKE FOUR TO SIX

20  MONTHS.  AND IF NOTHING ELSE, I THINK, THAT WILL GO A LONG WAY

21  TOWARDS CONTROLLING THE COST OF THIS LITIGATION.

22          ALL RIGHT.  SO WITH THAT, UNLESS ANYBODY, MS. BRILLET,

23  ANYTHING YOU WISH TO ADD BEFORE I ADJOURN THIS HEARING?

24          **MS. BRILLET:**  ONE MOMENT, YOUR HONOR.

25          **THE COURT:**  SURE.

1              (PAUSE IN PROCEEDINGS.)

2         **MS. BRILLET:**  YOUR HONOR, I'M SORRY THERE'S ONE ISSUE.

3    IN OUR EXHIBITS THERE'S ACTUALLY PROOF THAT SHOWS ON THE WEB

4    SITE THAT THERE ARE UNLIMITED LICENSES ACTUALLY BEING SOLD

5    RIGHT NOW ON THE WEB SITE.

6         IF THEY ARE WILLING TO TAKE THAT OFF OF THE WEB SITE,

7    THIS, AND STOP OFFERING THOSE UNLIMITED LICENSES, THAT'S ONE

8    ISSUE, BUT OTHERWISE WE WILL NEED TO ENJOIN THEM.

9         **THE COURT:**  DO YOU KNOW WHAT SHE'S TALKING ABOUT?

10   THIS WAS AN EXHIBIT TO MR. YUE'S DECLARATION?

11        **MS. BRILLET:**  EXHIBIT I TO MR. --

12        **THE COURT:**  YOU ALL HAVE ANY IDEA WHAT THAT DOCUMENT

13   IS?

14        IT'S DESCRIBED AS BEING A DOCUMENT THAT WAS DOWNLOADED

15   LAST WEEK, TWO WEEKS AGO FROM ONE OF THE -- YOUR WEB SITES, AND

16   THERE'S THOSE 1191 NLC PRODUCTS WHICH, AS I UNDERSTAND IT, THAT

17   IS WHAT YOU CLAIM TO BE THE PRODUCT THAT'S IN DISPUTE.

18        **MS. BRILLET:**  YES, YOUR HONOR, IT SAYS UNLIMITED

19   CLIENT, IT'S UP FOR SALE RIGHT NOW, YOUR HONOR.

20        **THE COURT:**  THE DEFENDANTS HAVE ANY IDEA HOW -- WHAT

21   THIS IS DOING ON THE WEB SITE OR ANYTHING OF THAT SORT?

22        IS IT STILL ON THE WEB SITE TODAY?

23        **MR. YUE:**  I DIDN'T CHECK TODAY.

24        **MS. BRILLET:**  THIS IS AS OF NOVEMBER 22ND, YOUR HONOR.

25        **MR. WAKEFIELD:**  YOUR HONOR, ALL I HAVE BEEN INFORMED,

1    MY UNDERSTANDING IS THAT ANY VERSION OF THE PRODUCT THAT ARE

2    CURRENTLY AVAILABLE MAY BEAR THE SAME NAME AS OTHER PRODUCTS

3    THAT ONCE CONTAINED LICENSE CODE, BUT THAT THESE DO NOT.

4         THAT BEING SAID, THIS IS ALL QUITE NEW TO US.  AND I

5    ACTUALLY DIDN'T FULLY UNDERSTAND OR APPRECIATE WHAT IT WAS THAT

6    EXHIBIT I PURPORTED TO BE LOOKING AT THESE PAPERS.

7         **THE COURT:**  I THOUGHT I UNDERSTOOD IT.  I DON'T KNOW

8    WHAT THE EXPLANATION IS.  I THINK, THAT'S PROBABLY ONE OF THE

9    FIRST ORDERS OF THE BUSINESS THAT YOU NEED TO DISCUSS, NEED TO

10   SATISFY THEM NOTHING HAPPENING BEHIND THEIR BACKS.

11        BUT I COME BACK TO WHAT I WAS TELLING YOU,

12   MS. BRILLET, YOU KNOW, IF YOU CONCLUDE THAT THIS IS BEING

13   DISTRIBUTED AND YOU WANT TO HAVE A HEARING, SIMPLY FILE A NEW

14   NOTICE AND WE'LL HAVE A HEARING ON A RESTRAINING ORDER, AND

15   I'LL GIVE YOU A RULING HAVING IN MIND, AS I'VE SAID, THAT I

16   WILL LOOK TO YOU TO PROVE THE VARIOUS ELEMENTS THAT GO INTO

17   ISSUING THE RESTRAINING ORDER.

18        **MS. BRILLET:**  YOUR HONOR, THE PROBLEM HERE IS THAT

19   THIS PARTICULAR PROGRAM, THE 1191 NLC, SENT -- HAD BEEN -- HAD

20   CONTAINED NETBULA'S PROGRAMS AND NOW THE DEFENDANT IS SAYING

21   THEY DON'T KNOW IF IT'S STILL IN IT.

22        AS OF NOW WITH OUR INFORMATION WE HAVE RIGHT NOW IT'S

23   STILL -- HAS NETBULA'S SOFTWARE INFORMATION AND IF THEY'RE

24   SELLING IT ON THE INTERNET, THEN THAT MEANS IT'S TO MY CLIENT'S

25   DETRIMENT.

1      **THE COURT:** WHAT WOULD YOU LIKE TO HAVE HAPPEN RIGHT

2   NOW?

3      DO YOU WANT TO HAVE -- YOU WANT ME TO FINISH THE

4   HEARING ON THE RESTRAINING ORDER OR DO YOU WANT TO TALK TO

5   COUNSEL WITH TRYING TO RESOLVE IT ALONG THE LINES I'VE

6   SUGGESTED?

7      **MS. BRILLET:** THE BIGGEST THING RIGHT NOW WE NEED, IF

8   LOOKS LIKE THEY'RE USING NETBULA SOFTWARE WE HAVE TO GET --

9      **MR. WAKEFIELD:** I'M SORRY, I DON'T MEAN TO INTERRUPT.

10     **MS. BRILLET:** -- SOME KIND OF RESTRAINING ORDER TO

11  STOP THEM FROM USING HIS SOFTWARE.  IT'S ON THEIR WEB SITE THAT

12  THEY'RE SELLING THIS PROGRAM TO UNLIMITED CLIENTS USING

13  NETBULA'S SOFTWARE.

14     **MR. WAKEFIELD:** YOUR HONOR, THIS SCREEN SHOT SHOWS A

15  RECORD OF A PART NUMBER BEING SOLD TO CLIENTS.  THERE IS NO

16  EVIDENCE BEFORE THIS COURT THAT THIS PRODUCT CONTAINS ANY

17  COPYRIGHTED CODE BELONGING TO NETBULA OR ANYONE OTHER THAN MY

18  CLIENTS.

19     THERE IS NO EVIDENCE THAT NETBULA HAS A COPYRIGHT.

20  THERE'S NO EVIDENCE THAT THIS PRODUCT CONTAINS ANY INFRINGING

21  CODE OR THAT IT WASN'T SOMETHING THAT WAS AUTHORIZED UNDER SOME

22  AGREEMENT OR FOR WHICH MONETARY DAMAGES UNDER THE CONTRACTS

23  HERE WOULD BE ADEQUATE.

24     **MS. BRILLET:**  THE COPYRIGHT EXHIBIT A TO THE

25  COMPLAINT.

1    THE COURT:  ALL RIGHT.  SO IT SOUNDS LIKE WE'RE GOING

2  TO HAVE TO HAVE A HEARING AND I'M GOING TO HAVE TO ISSUE A

3  RULING.

4    ALL RIGHT.  MS. BRILLET, YOU MIGHT AS WELL MAKE YOUR

5  ARGUMENTS THEN.

6    MS. BRILLET:  YOUR HONOR, THERE IS AN INITIAL CONTRACT

7  WITH NETBULA AND STORAGE TECH IN 2000 FOR UP TO 1000 LICENSES

8  FOR DISTRIBUTION AND 2004 THERE WAS AN ADDITIONAL AGREEMENT FOR

9  UP TO 1000 LICENSES EXHIBIT C.

10    THE COURT:  WHERE IS THE EVIDENCE OF ALL THAT IN THE

11  RECORD?

12    MS. BRILLET:  OKAY, YOUR HONOR, IN MR. YUE'S

13  DECLARATION.

14    THE COURT:  MR. YUE'S DECLARATION EXHIBIT A IS THE

15  2000 LICENSE AGREEMENT?

16    MS. BRILLET:  RIGHT, YOUR HONOR.

17    THE COURT:  UH-HUH.

18    MS. BRILLET:  AND IN THAT AGREEMENT --

19    THE COURT:  I'VE READ THAT AGREEMENT.

20    MS. BRILLET:  SO IN HERE, YOUR HONOR, THEY HAVE UP TO

21  ONE --

22    THE COURT:  WHERE IS THE OTHER AGREEMENT?

23    MS. BRILLET:  PARDON?

24    THE COURT:  THE SECOND AGREEMENT?

25    MS. BRILLET:  OKAY.

1          THE COURT:  YOU SAID THERE WERE TWO.  IT'S NOT PART OF

2    YOUR CASE?

3          MS. BRILLET:  RIGHT.

4          THE COURT:  GO AHEAD.

5          MS. BRILLET:  IN THIS AGREEMENT, ACTUALLY, ON NUMBER

6    TWO, IT SAYS COPYRIGHT, YOU MUST TREAT THE SOFTWARE AS

7    COPYRIGHTED MATERIAL, AND IT TELLS THEM EXACTLY WHAT THE TERMS

8    ARE.

9          THE COURT:  OKAY.

10         MS. BRILLET:  AND IT GIVES THEM A PRICE FOR -- FOR UP

11   TO 1000 COPIES FOR $5,995 ON EXHIBIT C.

12         THE COURT:  NOW, THIS IS EXHIBIT C TO EXHIBIT A, THIS

13   IS NOT YOUR EXHIBIT C?

14         MS. BRILLET:  YES, EXHIBIT C IS ACTUALLY PART OF THE

15   AGREEMENT BETWEEN NETBULA AND STORAGE TECH.

16         THE COURT:  SO THE FIRST THOUSAND COPIES ARE FIFTY

17   NINE NINETY FIVE, SECOND NOW COPIES ARE LITTLE BIT LESS AND SO

18   ON?

19         MS. BRILLET:  WHAT HAPPENS, YOUR HONOR, HERE SAYS ONE

20   TIME FEE 5,595 FOR DISTRIBUTION, RIGHT TO DISTRIBUTE UP TO 1000

21   UNITS.

22         THE COURT:  CORRECT.

23         MS. BRILLET:  WE'RE SAYING THERE WAS NO ACTUAL

24   SUBSEQUENT AGREEMENT OTHER THAN THE 2004 WHERE THEY ACTUALLY

25   PURCHASED ANOTHER THOUSAND COPIES.

1          THE COURT:  WHERE IS THE EVIDENCE OF THAT?  WHERE IS

2    THAT INFORMATION IN THE RECORD?

3          MS. BRILLET:  THEY DON'T -- HERE'S THE THING.  WE ONLY

4    HAVE THE TWO AGREEMENTS.  THERE TWO AGREEMENTS FOR 1000 COPIES

5    EACH, SO WE'RE SAYING THEY ONLY HAVE LICENSES FOR 2000 COPIES.

6          THE COURT:  I DON'T QUITE UNDERSTAND YOU.  THIS

7    AGREEMENT SAYS THAT THEY CAN GO UP TO ANY NUMBER OF COPIES AS

8    LONG AS THEY'RE WILLING TO PAY.  YOU THINK -- YOUR CONSTRUING

9    THIS AS BEING AN AGREEMENT THAT'S LIMITED TO 1000 COPIES?

10          MS. BRILLET:  IN THE CONTRACT SAYS ONE TIME THE 5,595.

11          THE COURT:  WHERE ARE YOU READING FROM?

12          MS. BRILLET:  THIRD LINE DOWN ON --

13          THE COURT:  FROM WHICH DOCUMENT?

14          MS. BRILLET:  EXHIBIT C TO EXHIBIT A.

15          THE COURT:  ALL RIGHT.

16          MS. BRILLET:  WHICH IS THE AGREEMENT BETWEEN STORAGE

17    TECH, WHERE IT SAYS THE FIRST SENTENCE, THE THIRD LINE DOWN

18    SAYS, OF THE 5,995 FOR THE RIGHT TO DISTRIBUTE UP TO ONE

19    THOUSAND UNITS OF SOFTWARE CONTAINING THE SUPPORTING PROGRAMS

20    30 DAYS AFTER RECEIPT OF INVOICE VALID PURCHASE ORDER NUMBER.

21    THERE WERE ONLY TWO VALID PURCHASE ORDER NUMBERS.

22          THE COURT:  WHERE IS THAT INFORMATION?

23          MS. BRILLET:  THAT CAME WITH EXHIBIT B TO DON YUE'S

24    DECLARATION.

25          THE COURT:  THAT'S ONE.

1          **MS. BRILLET:** THAT'S ONE.  THE SECOND ONE IS ATTACHED

2    TO DEFENDANTS 2004 LICENSE AGREEMENT THAT HAS ANOTHER PURCHASE

3    ORDER FOR ANOTHER 1000 COPIES.  THERE WERE ONLY TWO PURCHASE

4    ORDERS.

5          **THE COURT:** WHERE IS THE EVIDENCE THERE WERE ONLY TWO,

6    THOUGH?

7          **MS. BRILLET:** THE FACT THERE WERE NO OTHER AGREEMENTS

8    BETWEEN THE TWO PARTIES.

9          **THE COURT:** WHERE IS THAT EVIDENCE?

10          **MS. BRILLET:** I HAVE NO EVIDENCE TO SHOW THAT THERE

11    WAS NO EVIDENCE, THERE ONLY TWO AGREEMENTS.

12          **THE COURT:** BUT NOBODY SAYS THAT, THAT'S MY PROBLEM.

13          **MS. BRILLET:** OKAY.

14          **THE COURT:** YOU SAY IT, BUT I CAN'T BASE A RESTRAINING

15    ORDER ON WHAT YOU SAY.

16          **MS. BRILLET:** THAT THERE WAS NO SUBSEQUENT AGREEMENT

17    BETWEEN THE DEFENDANTS AND THE PLAINTIFFS?

18          **THE COURT:** CORRECT.

19          **MS. BRILLET:** THE PURCHASE ORDER, UNLESS DEFENDANTS

20    HAVE THERE IS NO PURCHASE ORDER BECAUSE THERE WAS NO AGREEMENT

21    HERE.

22          **THE COURT:** SO YOU'RE ASKING ME TO INFER FROM THE FACT

23    THAT YOU HAVE NOT INCLUDED ANY FURTHER PURCHASE ORDERS THAT

24    THERE WERE NO FURTHER PURCHASE ORDERS?

25          WHAT IF YOUR JUST KEEPING THEM FROM ME?

1    **MS. BRILLET:** I'M SORRY?

2    **THE COURT:** WHAT IF YOUR JUST KEEPING THEM FROM ME?

3    **MS. BRILLET:** YOUR HONOR, DEFENDANTS CAN --

4    **THE COURT:** YOU HAVE THE BURDEN OF PERSUADING ME THAT

5    YOUR ENTITLED TO AN INJUNCTION, AND I WAS HAVING A HARD TIME

6    BECAUSE YOU HAVE VERY LITTLE EVIDENCE IN THE RECORD.

7    YOU HAVE MR. YUE'S DECLARATION WHICH CONTAINS A NUMBER

8    OF DOCUMENTS, YOU HAVE A VERY LENGTHY COMPLAINT WHICH CONTAINS

9    A LOT OF INFORMATION BUT, OF COURSE, NONE OF THAT SUPPORTED BY

10   ANY EVIDENCE.

11   SO PART OF WHAT I'M HAVING TROUBLE WITH IS JUST

12   DEALING FROM AN EVIDENTIARY PROSPECTIVE WHAT HAPPENED.

13   REMEMBER THIS IS YOUR MOTION, SO YOU'VE HAD WEEKS, OR MONTHS,

14   OR ACCORDING TO THEM A YEAR TO PREPARE THIS.

15   SO ONE OF THE GREAT DIFFICULTIES I'M HAVING IS YOU

16   HAVE TO PROVE A NUMBER OF THINGS TO ME AND I HAVE VERY LITTLE

17   EVIDENCE OF IT, I HAVE A LOT OF ARGUMENT OVER WHAT HAPPENED.

18   SO BACK TO YOU.

19   **MS. BRILLET:** RIGHT. THE ONLY THING I CAN SAY, THE

20   ONLY WAY I CAN PROVE THERE WAS NO OTHER AGREEMENT IS TO SEND A

21   LETTER TO THEM STATING WE HAD TWO AGREEMENTS.

22   **THE COURT:** NO, MR. YUE, FOR EXAMPLE, COULD TESTIFY IF

23   HE'S A PERSON WITH KNOWLEDGE, I THINK, HE SAYS HE'S THE

24   MARKETING MANAGER.

25   **MS. BRILLET:** HE IS.

1          **THE COURT:**  HE CAN TESTIFY THAT HE KNOWS THERE ARE NO

2    OTHER AGREEMENTS, BUT HE DIDN'T.

3          **MS. BRILLET:**  BUT DO THAT RIGHT NOW.

4          **THE COURT:**  I DON'T TAKE TESTIMONY ON RESTRAINING

5    ORDERS.  I COME BACK TO THE FACT THAT YOU FILED RESTRAINING

6    ORDER WHEN YOU THINK YOUR IN A POSITION TO OBTAIN ONE AND YOU

7    HAD, DEPENDING WHO I BELIEVE, DAYS, WEEKS OR MONTHS TO PREPARE

8    THESE PAPERS.

9          SO WHEN YOU TALK ABOUT THE EVIDENCE, LIMIT YOURSELF TO

10   THE EVIDENCE THAT I HAVE IN FRONT OF ME.

11         **MS. BRILLET:**  YES, YOUR HONOR.

12         **THE COURT:**  WHICH BASICALLY CONSISTS OF MR. YUE'S

13   DECLARATION, HIS EXHIBITS, MAYBE SOME OBJECTIONS TO SOME OF

14   THOSE, I DON'T KNOW, AND THE EVIDENCE WHICH THE DEFENDANTS HAVE

15   PUT IN THE RECORD, WHICH AT THIS STAGE I'M WILLING TO CONSIDER,

16   OKAY, BUT DON'T ARGUE OFF THE EVIDENCE.

17         **MS. BRILLET:**  I UNDERSTAND, YOUR HONOR.

18         **THE COURT:**  CONTINUE.

19         **MS. BRILLET:**  YOUR HONOR, THERE IS ONE THING ON

20   EXHIBIT C OF DON YUE'S DECLARATION WHICH IS E-MAIL FROM ANTON

21   VATCKY.

22         **THE COURT:**  WELL, I HAVE A LOT OF STUFF IN EXHIBIT B,

23   BUT I THOUGHT IT WAS FROM KEITH OLIVER.  EXHIBIT C WE'RE

24   TALKING ABOUT?

25         **MS. BRILLET:**  EXHIBIT C THE THIRD E-MAIL.  ACTUALLY,

1    THE LAST PAGE OF EXHIBIT C.

2            **THE COURT:**  MY NAME IS KEITH OLIVER?

3            **MS. BRILLET:**  NO.  SAYS, WE STORAGE TECH CURRENTLY USE

4    THE NT VERSION OF POWER RTC IN OUR PRODUCT.

5            **THE COURT:**  MY EXHIBIT C HAS PAGE ONE WHICH SAYS

6    RECEIVE FROM VINCENT AT THE TOP LEFT.  PAGE TWO SAYS, BEGINS

7    WITH PLEASE CONTACT ME AS SOON AS POSSIBLE.  PAGE THREE SAYS

8    RECEIVED FROM VINCENT ATM6 TOP LEFT, THAT'S THE PAGE THAT

9    SHOULD BE ON?

10           **MS. BRILLET:**  ONE SAYS RECEIVED FROM SWAIN DOT STORAGE

11   TECH DOT COM AT THE VERY TOP.

12           **THE COURT:**  I DON'T SEEM TO HAVE THAT.

13           **MS. BRILLET:**  ANTON VATCKY.

14           **THE COURT:**  YES, I SEE IT.  OKAY.

15           **MS. BRILLET:**  AND EVEN HERE HE SAYS HOW THEY ONLY HAVE

16   A LICENSE TO USE WINDOWS NT AND NOT THE WINDOWS 2000 PROGRAM.

17           **THE COURT:**  WHO IS MR. VATCKY?

18           **MS. BRILLET:**  ACCORDING TO HIS E-MAIL INTERNATIONAL

19   SOFTWARE SUPPORT FOR STORAGE TECH.  SO THIS SHOWS AS OF EVEN IN

20   2001 THIS IS DATED MONDAY JUNE 11TH 2001.

21           **THE COURT:**  LET ME -- REALLY BEGINNING TO -- WE'RE NOT

22   REALLY MAKE MUCH -- LET'S FOCUS ON TODAY.

23           YOU WANT A RESTRAINING ORDER, WHAT EXACTLY IS IT YOU

24   WANT ME TO RESTRAIN?

25           LET'S FOCUS ON THAT, WHAT EVIDENCE DO I HAVE OF THAT,

1    OKAY?

2              **MS. BRILLET:**  YES, YOUR HONOR.

3              **THE COURT:**  I'M NOW WINDING UP BACK IN 2001.

4              **MS. BRILLET:**  RIGHT.

5              **THE COURT:**  SO LET'S FOCUS ON THE DECEMBER 5TH 2006.

6    WHAT DO YOU THINK GOING TO HAPPEN TOMORROW IF I DON'T ISSUE A

7    RESTRAINING ORDER?

8              **MS. BRILLET:**  POSSIBLY THAT THEY ACTUALLY CONTINUE

9    SELLING THIS PROGRAM ON STORAGE TECH'S WEB SITE.

10             **THE COURT:**  THE EVIDENCE YOU HAVE OF THIS IS THAT

11   MR. YUE, DO YOU HAVE ANY EVIDENCE THAT THEY'RE DOING THIS OTHER

12   THAN MR. YUE'S DECLARATION AND HIS EXHIBIT?

13             **MS. BRILLET:**  FROM THE STORAGE TECH WEB SITE.

14             **THE COURT:**  RIGHT.  AND THERE I'M SIMPLY BEING ASKED

15   TO INFER THAT 1191 MLC DASH 0000 WI IN THE ATTACHED CLIENT,

16   THAT THAT HAS THE SO -- THE -- PRODUCT AT ISSUE, THE SOFTWARE

17   AT ISSUE AS PART OF IT.

18             **MS. BRILLET:**  YOUR HONOR --

19             **THE COURT:**  DO YOU HAVE ANY PROOF OF THAT?

20             **MS. BRILLET:**  I UNDERSTAND WHERE YOU'RE GOING AND I

21   ACTUALLY WOULD LIKE TO GO ALONG WITH YOUR RECOMMENDATION.

22             **THE COURT:**  WHICH ONE ARE WE NOW GOING ALONG WITH?

23             **MS. BRILLET:**  TO GO ALONG -- TO HAVE LEAVE TO ACTUALLY

24   BRING A PRELIMINARY INJUNCTION AT LATER DATE.

25             **THE COURT:**  YOU'RE GOING TO WITHDRAW THE APPLICATION

1  FOR RESTRAINING ORDER?

2        **MS. BRILLET:**  YES.

3        **THE COURT:**  THE APPLICATION FOR RESTRAINING ORDER

4  WITHDRAWN.  I'M NOT GOING TO MAKE ANY FINDINGS ONE WAY OR THE

5  OTHER.

6        THE PLAINTIFF, AS I SAID, CAN BRING ON A MOTION FOR

7  PRELIMINARY INJUNCTION DULY NOTICED AT ANY TIME IF YOU BELIEVE

8  SOMETHING EMINENT IS ABOUT TO HAPPEN.

9        IF YOU HAVE EVIDENCE OF SOMETHING EMINENT THAT

10  REQUIRES RESTRAINING ORDER YOU CAN SIMPLY RENOTICE THE

11  RESTRAINING ORDER, BUT RIGHT NOW I'M NOT GOING TO RULE ON THE

12  RESTRAINING ORDER AND I'LL RULE ON THE INJUNCTION WHENEVER THE

13  PLAINTIFF THINKS IT'S IN A POSITION TO DO SO.

14        AND I WILL ONCE AGAIN SUGGEST THAT THE PARTIES SEE IF

15  THEY CAN'T -- NOT TALKING ABOUT RESOLVING THE MERITS, THAT'S

16  NOT A BAD IDEA, AT LEAST COME TO SOME AGREEMENT ON HOW TO

17  EFFECTIVELY HANDLE THIS MATTER.

18        ALL RIGHT.  DEFENDANTS WISH TO ADD ANYTHING?  NO.

19        WE'RE ADJOURNED.  GOOD DAY, FOLKS.

20        **MR. WAKEFIELD:**  THANK YOU, YOUR HONOR.

21        **MS. BRILLET:**  THANK YOU.

22              (PROCEEDINGS ADJOURNED.)

23

24

25

CERTIFICATE OF REPORTER

I, THE UNDERSIGNED, HEREBY CERTIFY THAT THE FOREGOING PROCEEDINGS WERE REPORTED BY ME, A CERTIFIED SHORTHAND REPORTER, AND WERE THEREAFTER TRANSCRIBED UNDER MY DIRECTION INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND TRUE RECORD OF SAID PROCEEDINGS.

I FURTHER CERTIFY THAT I AM NOT OF COUNSEL OR ATTORNEY FOR EITHER OR ANY OF THE PARTIES IN THE FOREGOING PROCEEDINGS AND CAPTION NAMED, OR IN ANY WAY INTERESTED IN THE OUTCOME OF THE CAUSE NAMED IN SAID CAPTION.

THE FEE CHARGED AND THE PAGE FORMAT FOR THE TRANSCRIPT CONFORM TO THE REGULATIONS OF THE JUDICIAL CONFERENCE.

FURTHERMORE, I CERTIFY THE INVOICE DOES NOT CONTAIN CHARGES FOR THE SALARIED COURT REPORTER'S CERTIFICATION PAGE.

IN WITNESS WHEREOF, I HAVE HEREUNTO SET MY HAND THIS 13TH DAY OF DECEMBER, 2006.


JAMES YEOMANS, CSR, RPR