1  LAURENCE F. PULGRAM (CSB NO. 115163)
   *lpulgram@fenwick.com*
2  JEDEDIAH WAKEFIELD (CSB NO. 178058)
   *jwakefield@fenwick.com*
3  ALBERT L. SIEBER (CSB NO. 233482)
   *asieber@fenwick.com*
4  LIWEN A. MAH (CSB NO. 239033)
   *lmah@fenwick.com*
5  FENWICK & WEST LLP
   555 California Street, 12th Floor
6  San Francisco, CA  94104
   Telephone:     (415) 875-2300
7  Facsimile:      (415) 281-1350

8  Attorneys for Defendants
   STORAGE TECHNOLOGY CORPORATION, SUN
9  MICROSYSTEMS, INC., EMC CORPORATION, and
   DARDEN RESTAURANTS, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| NETBULA, LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>STORAGE TECHNOLOGY CORPORATION, a Delaware corporation; SUN MICROSYSTEMS, INC., a Delaware corporation; INTERNATIONAL BUSINESS MACHINES CORPORATION, a New York corporation; EMC CORPORATION, a Massachusetts corporation; VERITAS SOFTWARE CORPORATION, a Delaware corporation; DARDEN RESTAURANTS, INC., a Florida corporation; and DOES 1-100, inclusive,<br><br>Defendants. | Case No. C-06-07391-MJJ<br><br>**DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION AS TO LICENSE ISSUES**<br><br>Date:     December 13, 2007<br>Time:    3:00 P.M.<br>Dept:    Courtroom 11<br>Judge:   The Honorable Martin J. Jenkins |
| AND RELATED COUNTERCLAIMS. | |

/ / /

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ........................................................................................................................ 1

I.   NO DISTRIBUTION OCCURRED OUTSIDE THE SCOPE OF THE
     LICENSES. ..................................................................................................................... 2

     A.   The Distribution Licenses Did Not Require Prepayment ..................................... 2

          1.   The Contracts' Language Does Not Require Prepayment ......................... 2

          2.   The Extrinsic Evidence Is Inadmissible and Does Not Support An
               Obligation To Prepay ................................................................................. 3

     B.   The Grant of Site Licenses Was Not Outside the Scope of the Agreement............ 4

     C.   Plaintiff's Efforts to Import a Platform Restriction Into the Distribution
          Licenses Contradicts the Plain Language of the Agreement ................................. 4

          1.   The Distribution License Terms Impose No Platform Restrictions............ 4

          2.   The Extrinsic Evidence Supports No Different Result .............................. 6

     D.   Because The Allegedly Violated Terms Constitute Covenants, Not
          Conditions, Their Alleged Breach Would Not Constitute Copyright
          Infringement .......................................................................................................... 6

          1.   Even if Admissible, The Extrinsic Evidence Would Fail To Create
               A Question of Fact As To The Covenant/Condition Issue ........................ 8

          2.   The Alleged Payment Obligations Would At Most Constitute
               Covenants, Not Conditions ........................................................................ 9

          3.   The Alleged Platform Restrictions Would At Most Constitute
               Covenants, Not Conditions ...................................................................... 10

II.  PLAINTIFF HAS FAILED TO SHOW A BREACH OF THE SDK LICENSES........... 10

III. PLAINTIFF'S ASSERTION OF FRAUD HAS BEEN WAIVED AND, IN ANY
     EVENT, COULD NOT SUPPORT A CLAIM OF INFRINGEMENT ........................... 11

IV.  THE SUN MERGER DOES NOT ESTABLISH AN INFRINGEMENT CLAIM ......... 12

V.   PLAINTIFF HAS NO BASIS TO DELAY FOR FURTHER DISCOVERY .................. 15

CONCLUSION ........................................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*389 Orange Street Partners v. Arnold*,
 179 F.3d 656 (9th Cir. 1999) ................................................................................................ 13

*Baxter Pharm. Prods., Inc. v. ESI Lederle Inc.*,
 1999 Del. Ch. LEXIS 47 (Del. Ch. 1999) ............................................................................. 14

*Bionghi v. Metropolitan Water Dist.*,
 70 Cal. App. 4th 1358 (Cal. Ct. App. 1999) ........................................................................... 6

*Bourne v. Walt Disney Co.*,
 68 F.3d 621 (2d Cir. 1995) ...................................................................................................... 2

Citicorp Real Estate v. Smith,
 155 F.3d 1097 (9th Cir. 1998) .............................................................................................. 12

*Effects Assoc., Inc. v. Cohen*,
 908 F.2d 555 (9th Cir. 1990) .................................................................................................. 9

*Farmland Irrigation Co., Inc., v. Dopplmaier*,
 48 Cal. 2d 208 (Cal. 1957) .................................................................................................... 14

*Hudson v. Kim Susan, Inc.*,
 2007 U.S. Dist. LEXIS 25895 (E.D. La. 2007) .................................................................... 14

*LGS Architects, Inc. v. Concordia Homes of Nevada*,
 434 F.3d 1150 (9th Cir. 2006) ................................................................................................ 9

*Malinowski v. Playboy Enterprises, Inc.*,
 706 F. Supp. 611 (N.D. Ill. 1989) .......................................................................................... 9

*Martinez v. Bally's La., Inc.*,
 244 F.3d 474 (5th Cir. 2001) ................................................................................................ 11

*Netbula, LLC v. BindView Dev. Corp.*,
 2007 U.S. Dist. LEXIS 74416 (N.D. Cal. 2007) ............................................................... 2, 3

*Rosenthal v. Great W. Fin. Sec. Corp.*,
 14 Cal. 4th 394 (1996) .......................................................................................................... 12

*SQL Solutions v. Oracle*,
 1991 U.S. Dist. LEXIS 21097 (N.D. Cal. 1991) .................................................................. 14

*Star Cellular Tel. Co. v. Baton Rouge CGSA, Inc.*,
 1993 Del. Ch. LEXIS 158 (Del. Ch. 1993),
 *aff'd*, Del. Supr., 647 A.2d 382 (1994) ................................................................................ 14

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*State of California v. Campbell*,
 138 F.3d 772 (9th Cir. 1998) .................................................................................................. 15

*Stitt v. Williams*,
 919 F.2d 516 (9th Cir. 1990) .................................................................................................. 15

*Sun Microsystems, Inc. v. Microsoft Corp.*,
 2000 U.S. Dist. LEXIS 20222 (N.D. Cal. May 8, 2000) ...................................................... 7, 8

*Sun Microsystems, Inc. v. Microsoft Corp.*,
 81 F. Supp. 2d 1026 (N.D. Cal. 2000) .................................................................................. 7, 8

*Trubovitch v. Riverbank Canning Company*,
 30 Cal. 2d 335 (1947) ....................................................................................................... 13, 14

*Wall Data, Inc. v. Los Angeles County Sheriff's Dept.*,
 447 F.3d 769 (9th Cir. 2006) .................................................................................................... 9

*Wasco Prods., Inc. v. Southwall Techs., Inc.*,
 435 F.3d 989 (9th Cir. 2006) .................................................................................................. 13

*Wm. E. Doud & Co. v. Smith*,
 256 Cal. App. 2d 552 (Cal. Ct. App. 1967) .............................................................................. 6

**STATUTES**

Cal. Civ. Code § 1566 ................................................................................................................... 12

Cal. Civ. Code § 1636 ..................................................................................................................... 3

Cal. Civ. Code § 1649 ..................................................................................................................... 3

# INTRODUCTION

Plaintiff's Opposition to Summary Judgment does not revive its efforts to convert this licensing dispute into a claim of copyright infringement. Netbula dedicates much of its Opposition to discussions of extrinsic evidence that, even if admissible, would fail to create a genuine issue of material fact. StorageTek's Distribution Licenses do not require prepayment, prohibit site licenses, or impose platform restrictions. They require that Plaintiff pay the amounts due under the license for copies distributed, but that is all.

Moreover, Plaintiff fails to present any cogent argument for why the prepayment, site license and platform terms it claims exist could be viewed as *conditions* of the license granted. Construction of contracts—and in particular, determinations of whether given terms constitute conditions or covenants—present quintessential issues of law for the Court. There is no role for a jury to play in parsing this legal distinction. Indeed, Judge Whyte recognized exactly that in granting summary judgment in the *Sun v. Microsoft* case, despite the same type of extrinsic evidence Plaintiff presents here. Here, as in *Sun*, it is undisputed that the grant language contains no restricting language, as necessary to make the grants conditional in the manner Plaintiff claims.

Plaintiff also cannot avoid summary judgment through its new claim—improperly raised for the first time in its Opposition—that Sun committed infringement by continuing distribution of Netbula software for three months after its acquisition of StorageTek's stock. To the contrary, the law is settled that, having encouraged and never objected to Sun's continuation of StorageTek's use at the time, Plaintiff cannot now claim a violation of an anti-assignment clause. In any event, Plaintiff's new argument only presents an issue as to the period after the stock acquisition closed—that is, from August 31, 2005 through November 30, 2005, the last date of shipments including Netbula code. Summary adjudication on the license defense would still be warranted for all other periods. And since there is no evidence any customer Defendant received copies of the software during this time, their rights to summary judgment remain unaffected.

## I. NO DISTRIBUTION OCCURRED OUTSIDE THE SCOPE OF THE LICENSES.

### A. The Distribution Licenses Did Not Require Prepayment.

Summary judgment (or adjudication) on the prepayment issue is warranted because the Agreements, by their terms, did not require prepayment. This issue of contract construction presents a question of law for the Court, which should now construe the contracts based on the four corners of the parties' integrated Agreements.[1]

#### 1. The Contracts' Language Does Not Require Prepayment.

Plaintiff's analysis of the actual terms of the Agreements (Opp. at 19) misleadingly commingles the license grant from the *SDK License* with the payment language from the *Distribution License*. Plaintiff ignores (i) the grant language in the Distribution License, (ii) the immediately following terms requiring that the licensee—which has already paid for the first 1000 distributions—maintain reasonable records and pay for each such copy distributed, and (iii) the absurdity of construing this contract as creating copyright liability whenever there is a miscount or audit. *See* Opening Brief at 7:20-8:21, 14:12-16:10.

Having no response to the language in the Distribution License, Plaintiff seizes on language appearing only in the *SDK License* that grants one seat "for each license purchased." Opp. at 20:12-19. But Plaintiff itself asserts the SDK License to be a separate license for different software.[2] Further, in context of the license of eight SDKs, this language merely clarifies that there are eight licensed seats, not one. This language is nowhere to be found in the *Distribution License*, and has nothing to do with payment or prepayment for distributions.

---

[1] Plaintiffs' assertion that it can oppose summary judgment with inadmissible evidence is, of course, mistaken. *See* Defendants' Objections to Evidence at p.3. Likewise, its claim that Defendants bear the burden of proving that the scope of the licenses permitted their uses ignores the authorities cited in Defendants' opening brief (at 11:16-12:24), including *Bourne v. Walt Disney Co.*, 68 F.3d 621, 631 (2d Cir. 1995), as well as this Court's order in *Netbula, LLC v. BindView Dev. Corp.*, 2007 U.S. Dist. LEXIS 74416 (N.D. Cal. 2007), all of which establish that where Plaintiff has alleged the existence of the license, *Plaintiff* must prove that that Defendants exceeded its scope.

[2] Plaintiff alleges that its SDK and Distribution licenses are separate in the First Amended Complaint ("FAC"), and most recently in Dongxiao Yue's motion to intervene and for injunctive relief. FAC ¶ 22; Docket No. 68, at p.5:13-26 & n.1 (after buying an SDK license, "[t]o distribute the program based on Netbula RPC, the Netbula customer must buy a separate license . . . . The distributable version of the pwrpc32.dll is different from the developer version."). *See also* Declaration of Dongxiao Yue, ¶ 13.

DEFENDANTS' REPLY ISO MSJ AS TO LICENSE DEFENSE AND COPYRIGHT INFRINGEMENT -2- CASE NO. C-06-07391-MJJ

     The fact that payment is triggered by a purchase order, which in turn triggers an invoice from Netbula due to be paid within 30 days of receipt (Opp. at 20), only confirms that pre-payment is *not* a condition to the license. There is nothing suggesting that the licensee, having 30 days to pay (*see* License Agreements, General Terms ¶ 1), has no license until *after* payment, nor that failing to pay the invoice could justify anything other than a contract claim.[3]

     **2.     The Extrinsic Evidence Is Inadmissible and Does Not Support An Obligation To Prepay.**

     Although Plaintiff rests its argument predominantly on extrinsic evidence, it offers none that is admissible. *See generally,* Defendants' Objections to Evidence. Plaintiff does not dispute that these are integrated agreements. *See* Opening Brief at 6:13-21. Yet it does not even attempt to identify any purportedly ambiguous words or terms—nothing that parol evidence would be necessary to explain. Moreover, the parol evidence offered does not consist of any contemporaneous communications of the parties relating to prepayment. *Compare* Civ. Code § 1636 (considering intentions "at the time of contracting"); § 1649 (intent "at the time of making" the contract)[4].

     Plaintiff's reliance on discussions between the parties during this dispute fails to raise genuine issues of fact. To be sure, StorageTek expressed a preference for payment on an "as we use basis," stating "we were reminded that this was not your model and we must prepay." Yue Decl. Ex. 26. Consistent with Mr. Melnick's deposition, however, this referred to the fact that Netbula required StorageTek to buy blocks of 1000 units—and thus to pay for blocks larger than necessarily needed, a model that caused tracking problems compared to paying quarterly for actual licenses used. Melnick Reply Decl. ¶ 5; Yue Decl. Ex. 43 [Melnick Depo. at 169:16-

---

[3] Similarly, the language "Limited Distribution License" in no way suggests that StorageTek must prepay for units distributed. This term conveys no specific meaning, and even if "Limited Distribution" were tied to any payment provisions, this would mean only that StorageTek does not have unlimited rights to distribute without any further payments; rather it must pay at some point for each unit distributed.

[4] There is no evidence that StorageTek ever saw Plaintiff's online order form or website which, in any event, are not a part of the integrated Agreements that by their terms are the "final, complete and exclusive agreement between the parties" and "supersede all prior or contemporaneous understandings." Melnick Opening Decl. Exs. 1-2, at p.4. *Cf. Netbula v. BindView*, 2007 U.S. Dist. LEXIS 74416 (N.D. Cal. 2007) (Netbula cannot rely on forms absent proof of assent).

DEFENDANTS' REPLY ISO MSJ AS TO LICENSE DEFENSE AND COPYRIGHT INFRINGEMENT    -3-    CASE NO. C-06-07391-MJJ

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  171:8. This does not mean that StorageTek contracted to pay before *any* use, merely that it was
2  paying in 1000-unit batches.
3  The other extrinsic statements—acknowledging that StorageTek needed to pay for
4  additional licenses used—merely show responsible intent to pay for all uses, not any basis to
5  construe the agreement to require *pre*paying. Indeed, Ms. Rady, Mr. Murray and Mr.
6  Abramowitz had never even seen the license Agreements; their statements were based on nothing
7  other than the cover of a CD or on hearsay. Rady Decl. ¶ 2; Murray Decl. ¶¶ 2-3; Abramovitz
8  Reply Decl. ¶ 5.

### B. The Grant of Site Licenses Was Not Outside the Scope of the Agreement.

10  Plaintiff does not dispute that there is nothing in the Agreements that prohibits site
11  licenses. Netbula argues merely that StorageTek "knew" it did not have the right to grant site
12  licenses to individual customers. But it cites only Mr. Melnick's request for a quote for a fixed
13  price for an "unlimited distribution model"— to eliminate all obligations to count distributions
14  and pay future royalties. Melnick Reply Decl. ¶ 6. This is a *non sequitur*. StorageTek's proposal
15  of a model where price would no longer turn on the number of units distributed does not preclude
16  its sale of site licenses and payment of royalties based on the number of units used at each site. In
17  all events, Plaintiff nowhere disputes that grants of site licenses would at most constitute a breach
18  of covenant to keep reasonable records.

### C. Plaintiff's Efforts to Import a Platform Restriction Into the Distribution Licenses Contradicts the Plain Language of the Agreement.

#### 1. The Distribution License Terms Impose No Platform Restrictions.

22  No platform restrictions can be found on the face of the Distribution License. Plaintiff
23  again ignores the distinction between the SDK License and Distribution License, the former
24  specifically limiting platforms, while the latter grants broad right to distribute without such
25  limitations. Plaintiff offers no explanation to overcome its concession that the Licenses are
26  "separate" (*see* n.2, *supra*), a conclusion confirmed by the fact that the Distribution License does
27  not refer to the SDK License; contains an independent license grant; has clauses independently
28  numbered from the SDK licenses; and has independent provisions for payment and warranty.

Plaintiff also ignores the nonsensical result if the two separate agreements are conflated. *See* Opening Brief at 20:2-21:3.

Instead, the most Plaintiff can point to is two snippets, out of context, neither of which imposes any platform restriction on the Distribution License grant. Plaintiff first points out that it only guaranteed technical support for specific platforms. Opp. at 12:19-26; Melnick Opening Decl. Exs. 1-2, at p.3. Yet this in no way limited StorageTek's right to distribute for others. Indeed, anyone who has ever used old software on new versions of Windows does so without a guarantee of support, yet this by no means indicates that such use is copyright infringement.[5]

Next, Plaintiff points to a description of a single component, "pmapsvc.exe," buried in a list of Supporting Programs, as purported evidence of a platform restriction. Plaintiff's argument is frivolous. To accept it, the Court must disregard the descriptions of the *other* supporting components. "Portmap.exe" is identified as "the portmapper program for Win32"—which would include all 32 bit Windows operating systems (including Windows 2000 and XP)—and "pwrpc32.dll" is described only as "[t]he runtime library for NETBULA ONC RPC." These inconsistent descriptions obviously were not intended to impose inconsistent limitations on distribution of the Supporting Programs. Moreover, the supposedly restrictive language, "the portmapper service for Windows NT" *also appears in the 2004 Agreement*. Since there is no dispute that the 2004 Agreement granted both development and distribution rights for Windows 2000, reading that description as a limitation to NT only is simply nonsense.

Finally, Plaintiff's contention that a platform limitation in the SDK "automatically" limits the distribution right in the Supporting Programs is wrong as matter of undisputed fact and law. Opp. at 23:11-18. As a matter of fact, it is undisputed that LibAttach Software developed on Windows NT/95/98 worked just fine on Windows 2000. As a matter of law, Plaintiff's assertion that such distribution is an infringing derivative use is pure *ipse dixit*. StorageTek was granted an

---

[5] Plaintiff inaccurately states that Mr. Melnick "specifically requested that no support be provided for Windows 2000." Opp. at 23:23-26. This claim is not supported by any evidence and is false. Mr. Melnick replaced the term "SDK and Supporting Program" for "RPC" simply to make explicit that support would apply not only to the SDK but to the Supporting Programs as well. *See* Yue Decl. Ex. 8 at NBS-007; Melnick Reply Decl. ¶ 8.

DEFENDANTS' REPLY ISO MSJ AS TO LICENSE DEFENSE AND COPYRIGHT INFRINGEMENT -5- CASE NO. C-06-07391-MJJ

unrestricted license to distribute identified Supporting Programs.  The fact that it was also allowed to use the SDK only on certain platforms—which it indisputably did—in no way makes the distribution of the Supporting Programs infringing.

### 2. The Extrinsic Evidence Supports No Different Result.

In light of the complete lack of any platform limitation on distribution in the Agreements, reliance on any parol evidence to create such a limitation would impermissibly add a new and inconsistent term, not explain an existing ambiguous one.  Parol evidence is entirely inadmissible for that purpose. *See Bionghi v. Metropolitan Water Dist.,* 70 Cal. App. 4th 1358, 1369 (Cal. Ct. App. 1999); *Wm. E. Doud & Co. v. Smith,* 256 Cal. App. 2d 552, 558 (Cal. Ct. App. 1967).

In any event, Plaintiff's reliance on extrinsic communications is infected by the erroneous preconception that, wherever any platform restriction is mentioned, it must be intended to refer to restrictions on distribution.  To the contrary, the evidence that refers to platform restrictions merely confirms the uncontested fact that the Agreements contain platform restrictions on the SDK—not that the restriction applies to Distributions. *See, e.g.,* Yue Decl. Ex. 14 (statement that "the agreement" is specific to platform, without reference to distribution), Ex. 27 (statement that "original agreement was for (Windows NT/98/95 only)" again with no reference to distribution).[6]

### D. Because The Allegedly Violated Terms Constitute Covenants, Not Conditions, Their Alleged Breach Would Not Constitute Copyright Infringement.

Even assuming (contrary to fact) that the Agreements had imposed the prepayment and platform terms, their breach could not support any remedy other than breach of contract.  As a matter of law these alleged terms – even if construed exactly as Plaintiff contends – constitute covenants, not conditions.  Plaintiff does not dispute that it has no claim for copyright infringement absent proof of use outside the scope of rights granted in the Agreements.  *See* Opening Brief at 12:19-24.  Nor does it dispute that the operative issue is whether the term

---

[6] The one statement that does discuss distribution does not assist Plaintiff.  First, it is incompetent to demonstrate the meaning of the contract, written by a customer support representative in Australia who had never even seen the contract. Yue Decl. Ex. 12; Vatcky Decl. ¶ 2.  Moreover, all Mr. Vatcky said was that StorageTek had a license for the older, NT version of Netbula's software, and that if StorageTek decided to obtain *new*, Windows 2000 versions, it would enter a new license (which is just what StorageTek did when it obtained new Netbula code in 2004).  *See* Yue Decl. Ex. 12.  This does not support restriction on distribution of the older, NT version.

DEFENDANTS' REPLY ISO MSJ AS TO LICENSE DEFENSE AND COPYRIGHT INFRINGEMENT -6- CASE NO. C-06-07391-MJJ

allegedly breached is a condition of the license grant or merely a covenant; that conditions precedent are disfavored; and that the covenant/condition distinction presents purely legal issues.

Indeed, Plaintiff concedes the applicability of *Sun Microsystems, Inc. v. Microsoft Corp.*, 81 F. Supp. 2d 1026 (N.D. Cal. 2000) ("*Sun*"), in which the court found that the claims lay in contract, not copyright, denied a preliminary injunction, and later – in a nearly identical opinion – granted summary judgment. *Sun Microsystems, Inc. v. Microsoft Corp.*, 2000 U.S. Dist. LEXIS 20222 (N.D. Cal. May 8, 2000) . Hoping to avoid the same fate here, Netbula incorrectly argues that the *Sun* court looked at "whether the [restrictive] term refers back to the license grant" (Opp. at 15:5-7)—a proposition finding no support in the *Sun* decision.[7] In fact, Judge Whyte's analysis zeroed in on the language of the grant clause, noting that the license grants to Microsoft under the Technology License and Distribution Agreement ("TLDA")—like the grants to StorageTek here—simply allowed distribution of the licensed software as part of a product, and "said nothing about the license grants being subject to, conditional on, or limited by compliance with the compatibility obligations." *Sun*, 81 F. Supp. 2d at 1032.

Judge Whyte also contrasted that grant clause with Sun's separate *trademark* license grant: "The contrast in language . . . supports the conclusion that the parties regarded the compatibility provisions . . . as separate covenants rather than limitations on the scope of the licenses." *Sun*, 81 F. Supp. 2d at 1032. Similarly, the contrast between the specific limitations in the *SDK Licenses* to StorageTek and their absence from the *Distribution Licenses* "shows that when the parties intended to limit the scope of a license, they expressly did so." *Id.* at 1032 n.9.

The Court in *Sun* also observed that the TLDA—like the Agreements here—made no mention of any right to seek an injunction for breach, nor any suggestion that the parties intended to allow Sun to claim copyright infringement for a compatibility breach. *Id.* at 1032-33. There was no discussion during the negotiation of the TLDA suggesting that Sun would have the option of suing for copyright infringement if Microsoft failed to comply with the compatibility

---

[7] Quite the contrary, the court considered and squarely rejected the notion that a term that restricts a licensee's rights otherwise exclusively conferred to authors under the Copyright Act necessarily conditions or limits the scope of a license. *Id.* at 81 F. Supp. 2d at 1032 n.11.

DEFENDANTS' REPLY ISO MSJ AS TO LICENSE DEFENSE AND COPYRIGHT INFRINGEMENT         -7-         CASE NO. C-06-07391-MJJ

requirements. The same is true here. *See* Melnick Reply Decl. ¶ 3. Indeed, the remedies provisions of the 2000 and 2004 Agreements make no mention of *any* right to seek an injunction, nor any suggestion that the parties intended to allow Netbula to claim infringement for the breaches alleged here. There is simply no support for the notion that the parties intended that a simple error in keeping "reasonable records" or counting copies would permit the drastic infringement claims that Netbula now, opportunistically, pursues.

### 1. Even if Admissible, The Extrinsic Evidence Would Fail To Create A Question of Fact As To The Covenant/Condition Issue.

The various emails and correspondence cited by Netbula—ostensibly to show that StorageTek "understood" that it was bound by platform and quantity terms—is precisely the sort of evidence that the *Sun* court found unpersuasive when it granted summary judgment. Sun had argued that Microsoft had admitted that compliance with the compatibility requirements was a license restriction. *Sun*, 81 F. Supp. 2d at 1033 n.14; 2000 U.S. Dist. LEXIS 20222, at *17 n.13 (noting lead negotiators' admissions that "[i]n order for the technology *to be licensed* under this contract, we need to have run the test suites and passed them" and "we have to have passed the tests, the appropriate tests, *in order to release a product under the license grants* of the TLDA") (emphases added). Nevertheless, Judge Whyte noted that these comments were not made in connection the parties' discussions of the remedies provisions or the consequences of a compliance failure, and accordingly, the extrinsic evidence did not persuade the court that the compatibility restrictions could reasonably be construed as license conditions. *Id.*

The same rationale applies here. None of the purported admissions cited by Netbula were made in connection with discussion of what remedies would be available for breach, or what would happen if StorageTek did not comply with particular contract terms. Thus, even if admissible (which, as discussed above, it is not), at most the extrinsic evidence cited by Netbula would show that contractual terms existed. The mere recognition of the existence of a contract term begs the question of whether it is a condition, a question that remains the province of the Court to decide, based on the four corners of the written Agreements.

### 2. The Alleged Payment Obligations Would At Most Constitute Covenants, Not Conditions

Plaintiff does not attempt to grapple with the substantial case law holding that mere failure to pay under a license does not amount to copyright infringement. *See* Opening Brief at 16:25-18:13 (citing, *inter alia*, *Effects Assoc., Inc. v. Cohen*, 908 F.2d 555, 559 & n.7 (9th Cir. 1990); *see also Malinowski v. Playboy Enterprises, Inc.*, 706 F. Supp. 611, 615 (N.D. Ill. 1989) ("[T]he case law that has developed since adoption of the Copyright Act very specifically states that nonpayment of royalties do not constitute claims arising out of the Copyright Act.").

Plaintiff relies instead on two cases that did not involve a mere failure to pay royalties for otherwise licensed use, but rather involved use of copyrighted materials that was unmistakably outside the scope of the license grants themselves. In *LGS Architects, Inc. v. Concordia Homes of Nevada*, 434 F.3d 1150 (9th Cir. 2006), the issue was not, as Netbula' suggests, a homebuilder's mere failure to pay a "reuse" fee but rather use of copyrighted plans on a second housing project, where the license was limited on its face to a single project *"and no other."* *Id.* at 1151-52 (emphasis added). Similarly, in *Wall Data, Inc. v. Los Angeles County Sheriff's Dept.*, 447 F.3d 769 (9th Cir. 2006), the defendant, the LA County Sherriff's Department, did not simply make licensed copies of software without paying, but rather installed it in prohibited multiple user arrangements:

> The terms of Wall Data's RUMBA license clearly restricted the Sherriff's Department's use to a "single designated computer" and *prohibited* the Sherriff's Department from using "the software in any other multiple computer or multiple user arrangement." Despite this *condition*, the Sherriff's Department loaded an entire suite of software, including RUMBA Office, onto nearly all the computers in the [Facility]."

*Id.* at 779 (emphases added). Thus, far from supporting Netbula's position that failure to pay is infringement, the clear license restrictions in *LGS* and *Wall Data* highlight what a true license condition looks like, and underscore the conspicuous absence of any such conditions in this case.[8]

---

[8] *LGS* and *Wall Data* are relevant here, but for a different reason: both make clear that contract interpretation presents a question of law. *Wall Data,* 447 F.3d at 786; *LGS*, 434 F.3d at 1155.

DEFENDANTS' REPLY ISO MSJ AS TO LICENSE DEFENSE AND COPYRIGHT INFRINGEMENT   -9-   CASE NO. C-06-07391-MJJ

### 3. The Alleged Platform Restrictions Would At Most Constitute Covenants, Not Conditions.

Defendants' Opening Brief demonstrated that, while the SDK License grant includes restrictions by platform, the Distribution License grant is unconditional. The *Sun* analysis therefore applies: since there is no restriction on compatibility included in the Distribution License grant, any purported compatibility restrictions that could be read into that license, as a matter of law, would constitutes a covenant, not a condition. Plaintiff does not even attempt to take issue with this analysis—other than its mischaracterization of *Sun* (refuted above). The *Sun* court found that compatibility requirements *expressly* and *unambiguously* stated in the TLDA were nevertheless covenants. Plaintiff offers no explanation for why the *unstated, alleged* platform requirement here would be anything more than an implied covenant, and not a condition.

## II. PLAINTIFF HAS FAILED TO SHOW A BREACH OF THE SDK LICENSES

Plaintiff provides no explanation why, even if there were a breach of the SDK License through internal use by too many programmers or on the wrong platforms, this could prevent summary adjudication on the Distribution License. The short answer is that, even if StorageTek exceeded the scope of its internal SDK license, this would do nothing to render the external distribution of the Supporting Programs a breach of anything.

Moreover, although Plaintiff does attempt to muster a number of factual "disputes" about whether a breach of the SDK License occurred, all miss the mark. Plaintiff appears to argue that there is a factual question whether more than eight users used the 2000 SDK at any one time. The issue is not even close. As Mr. Abramowitz testified, no more than six ever used the SDK at once, and thereafter, five of those six left the company, with no more than two simultaneous users thereafter for the eight SDK licenses. Abramowitz Opening Decl. ¶ 4.[9]

---

[9] The fact that a software engineer named Painter requested Netbula's consent to change the name of a file displayed to users raises no inference that he actually used the SDK, and there is zero evidence that he did. *See* Abramovitz Decl. ¶¶ 3-4; Yue Decl. ¶ 37. Similarly, although Mr. Abramowitz did not know of a list maintained of those who made a copy, lack of a list would not suggest more than the eight users of the SDK. Likewise, Plaintiff's assertion that Mr. Abramowitz did not know most of the names in his own team is simply false. In fact he identified the job duties of 12 of 19 persons who happened to be listed on a e-mail he had *never even seen* before his deposition, only two of whom even still work at Sun seven years later. Yue

DEFENDANTS' REPLY ISO MSJ AS TO LICENSE DEFENSE AND COPYRIGHT INFRINGEMENT -10- CASE NO. C-06-07391-MJJ

It is not entirely clear whether Plaintiff claims that the SDK license was limited to eight named users in total, rather than eight seats at any one time. If Plaintiff contends the former, that construction is baseless. The 2000 contract specifies that StorageTek was entitled to "ONE *user* for each license purchased . . . each *user* can only use the software on one computer." (emphasis added). This is simply a seat license—allowing the licensee to have any eight users running eight copies on eight respective computers. Nothing in this license suggests that eight licenses are tethered to eight specific individuals, nor that a new license must be purchased every time an engineer quits, dies, goes on pregnancy leave or is transferred to another assignment.

Plaintiff's assertion that there is an issue of fact as to use of the SDK on platforms other than 95/98/NT before the 2004 Agreement also fails. At his deposition, Mr. Abramowitz testified that there was no such use, and his declaration confirms as much. There is no evidence of any development outside the NT environment before the 2004 Agreement authorized same.[10]

### III. PLAINTIFF'S ASSERTION OF FRAUD HAS BEEN WAIVED AND, IN ANY EVENT, COULD NOT SUPPORT A CLAIM OF INFRINGEMENT.

The Opposition includes a lone paragraph reciting Dr. Yue's testimony that he thinks that fraud might vitiate the 2004 Agreement. Opp. at 24. But to avoid discovery on this topic, Netbula's counsel stipulated in deposition that precisely that argument would *not* be made at this phase in the litigation. *See* Wakefield Reply Decl. ¶ 3 & Ex. B; Defendants' Obj. to Evidence, at 5-7. Plaintiff is bound by its waiver on the record and cannot now seek to duck summary adjudication on that basis. *Martinez v. Bally's La., Inc.*, 244 F.3d 474, 475-76 (5th Cir. 2001).

In any event, even if tenable and unwaived, a purported fraudulent inducement would

---

Decl. Ex. 44 [Abramovitz Depo. at 21:12-23]. Similarly, Plaintiff's objections that Mr. Abramowitz did not have personal knowledge of every fact ignores the that he was deposed as a 30(b)(6) witness on only one issue, and appropriately provided information known to Sun, not just himself. Wakefield Reply Decl. ¶ 4. If Plaintiff claims use outside the scope of the license, it is Plaintiff's burden to produce evidence of the same. Claiming that a 30(b)(6) witness lacks *personal* knowledge is not evidence of anything.

[10] The purported "inconsistency" as to use of development platforms resulted from a bad question at deposition, in which counsel lumped together all versions 1.1 through 1.4. *See* Yue Decl, Ex. 44 [Abramowitz Depo. at 40:24-41:3]. In any event, it would makes no difference: whether version 1.4 was developed in 2004-2005 using NT or Windows 2003, it is undisputed that the 2004 Agreement had granted rights to either platform.

DEFENDANTS' REPLY ISO MSJ AS TO LICENSE DEFENSE AND COPYRIGHT INFRINGEMENT    -11-    CASE NO. C-06-07391-MJJ

1  render the 2004 Agreement voidable, not void.  The license would remain valid and in effect until
2  such time as Plaintiff acted affirmatively to rescind it.  *Rosenthal v. Great W. Fin. Sec. Corp.*, 14
3  Cal. 4th 394, 415 (1996) (contract allegedly induced by fraud is voidable, not void, and remains
4  in effect absent effective rescission); *Citicorp Real Estate v. Smith*, 155 F.3d 1097 (9th Cir. 1998)
5  (affirming summary judgment enforcing contract, where defendants' fraud counterclaim never
6  timely sought rescission); Cal. Civ. Code § 1566.  Plaintiff has never rescinded the 2004
7  Agreement.  Moreover, even its November 2006 "Notice of Termination"—which did not purport
8  to rescind and did not invoke fraud—came *a year after all distribution of Plaintiff's code had*
9  *ceased*.  *See* DeCecco Reply Decl. ¶ 5 & Ex. D.  Thus, any purported fraud gives rise to no
10 possible infringement claim.

**IV.     THE SUN MERGER DOES NOT ESTABLISH AN INFRINGEMENT CLAIM.**

12        On August 31, 2005, Sun acquired the stock of StorageTek.  StorageTek then continued to
13 exist as a separate, wholly owned corporation until December 31, 2006, when StorageTek was
14 "rolled up" through merger into Sun.  *Id.* ¶ 6 & Ex. E.  In the interim, on November 29, 2005,
15 StorageTek released its new version 1.4.1, which did not include Netbula code.  Abramovitz
16 Opening Decl. ¶ 9.

17        In its Opposition, *for the first time in any pleading or other communication with*
18 *Defendants in the two years since the merger occurred*, Netbula now asserts that Sun's
19 acquisition of StorageTek's stock constituted an impermissible assignment giving rise to a claim
20 for copyright infringement against Sun for the period from August 31, 2005, until the last sale of
21 version 1.4 in November 2005.  Plaintiff relies on Paragraph 8 of the General Terms of the 2004
22 License Agreement, which precludes assignment of the license absent consent, "not to be
23 unreasonably withheld."  *See* Melnick Opening Decl. Ex. 2 at 2.  This newly minted claim fails
24 for multiple reasons.

25        *First*, **Plaintiff has never included this claim of infringement in the pleadings**.  *See* FAC
26 ¶¶ 73-77 (describing alleged infringing acts, omitting any reference to use after merger).
27 Defendants' Interrogatory No. 4 required Plaintiff to "describe each use by each DEFENDANT
28 you contend was outside the scope of the license agreement, and the basis for such contention."

DEFENDANTS' REPLY ISO MSJ AS TO LICENSE
DEFENSE AND COPYRIGHT INFRINGEMENT     -12-                      CASE NO. C-06-07391-MJJ

In response, Plaintiff made no reference to use after the Sun merger, even though Plaintiff answered the Interrogatory without objection, identifying only the platform, prepayment, and site license issues. Wakefield Reply Decl. ¶ 2 & Ex. A. To prevail on summary judgment, Defendants have no obligation to defeat issues never previously presented, they need merely negate the issues raised by the complaint and Plaintiffs' discovery.[11]

*Second,* it is undisputed that, with full knowledge of the Sun/StorageTek acquisition, Plaintiff deliberately allowed and encouraged Sun's continued distributions (which stood to net Plaintiff more royalties), never terminating the 2004 Agreement until November 2006.

- On June 15, 2005, during negotiations, "John Young" (actually, Don Yue) at Netbula requested to be "kept informed about the effects of the Sun/StorageTek Merger." Mr. Melnick responded that "the only thing that you and I may have to do is for you to allow assignment of the agreement to Sun. The agreements calls [sic] for your approval. *I assume you would sallow [sic] this as if you did not the agreement would be terminated."* Netbula never suggested otherwise*. Melnick Reply Decl.¶ 9 & Ex. A. Netbula gave no indication of any intention to terminate the license due to the merger.

- In July 2005, knowing that Sun's acquisition of StorageTek was imminent, Netbula offered to enter long term licenses. *Id. ¶* 10.

- On August 31, 2005, rather than terminating, "John Young" wrote: "We just noticed that Sun Microsystems has completed acquisition of StorageTek, how does this affect the License agreement and related issues? Will you [Melnick] still be the contact on such matters?" *Id.* ¶ 11 & Ex. B. When advised by Melnick that "[t]he Sun acquisition should not make a difference in resolving this," Netbula did not advise that Sun must cease use, but "thank you for the information regarding the Sun acquisition." *Id.*

- On October 10, 2005, Netbula still was affirmatively encouraging Sun to continue as licensee, writing to Sun: "***We look forward to a continuing relationship with Sun/StorageTek*** and hope we can resolve the differences shortly." DeCecco Decl. ¶ 2 & Ex. A (emphasis added).

Having induced Sun to rely on the continuation of the StorageTek relationship after the merger, Melnick Reply Decl. ¶¶ 9-11, Plaintiff has waived and is estopped from asserting the anti-assignment clause two years later. *See Trubovitch v. Riverbank Canning Company*, 30 Cal. 2d 335, 342 (1947) (it is "well settled in this state that a party benefited by a clause against assignment may waive his right thereunder by dealing with an assignee with regard to the contract . . . with knowledge of its assignment"). In *SQL Solutions v. Oracle*, 1991 U.S. Dist.

---

[11] *See, e.g.*, *389 Orange Street Partners v. Arnold*, 179 F.3d 656, 665 (9th Cir. 1999) ("[a] Plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment."); *Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) ("summary judgment is not a procedural second chance to flesh out inadequate pleadings").

LEXIS 21097, at *17 (N.D. Cal. 1991), Judge Patel found no waiver. There, "ongoing correspondence" from the licensor "unequivocally stated that the Agreement had been terminated" due to the merger, rendering any contrary belief by the licensee objectively unreasonable. *Id.* By contrast, Netbula encouraged Sun to continue with the relationship, *never* asserting that the license had been terminated by the merger. *See also* DeCecco Decl. Ex. D (Netbula's termination came a year after the merger, and even then did not even mention merger or anti-assignment clause). Indeed, Plaintiff still seeks the contractual benefit of Sun's use after the merger, seeking to recover for a claim *breach of contract* as to each copy *Sun* sold but did not pay for. FAC ¶ 107. Nothing in this record would support a reasonable belief that Netbula had any intention to terminate the license based on the merger. Moreover, unlike the agreement in *SQL*, the 2004 Agreement extends distribution rights to third-party "resellers" and "business partners." Melnick Opening Decl. Ex. 2 at 2. Thus, StorageTek was free to transfer distribution rights to Sun even before the acquisition.[12]

*Finally*, even if Plaintiff were correct that the merger undermined the license defense after August 31, 2005, this argument has no possible impact on summary adjudication for earlier

---

[12] If *SQL* is not distinguished on the facts, Defendants respectfully submit that it is wrongly decided and should not be followed. *SQL* defies the prevailing rule that "Where an acquiror purchases the stock of a corporation, that purchase does not, in and of itself, constitute an 'assignment' to the acquiror of any contractual rights or obligations of the corporation whose stock is sold." *See Baxter Pharm. Prods., Inc. v. ESI Lederle Inc.*, 1999 Del. Ch. LEXIS 47, at *16 (Del. Ch. 1999); *see also Hudson v. Kim Susan, Inc.*, 2007 U.S. Dist. LEXIS 25895, at *19 (E.D. La. 2007) (no harm from a stock purchase because third parties retain any bargain they previously had with the acquired company); *Farmland Irrigation Co., Inc., v. Dopplmaier*, 48 Cal. 2d 208, 223 (Cal. 1957) (stock sale does not terminate a license unless the license agreement specifically so provides).

*SQL* erroneously failed to follow *Trubowitch v. Riverbank Canning Co.*, 30 Cal. 2d 335 (1947), which found that, notwithstanding an anti-assignment clause "a transfer is permissible if it does not adversely impact the party benefited by the prohibition against assignment." *SQL* also failed to analyze whether performance by the original party was a material condition, and whether the change in ownership created unreasonable risks for the other contracting parties. *Star Cellular Tel. Co. v. Baton Rouge CGSA, Inc.*, 1993 Del. Ch. LEXIS 158, at *25, 26, 33 (Del. Ch. 1993), *aff'd*, Del. Supr., 647 A.2d 382 (1994), (surveying opinions). Here, Netbula obviously was not harmed by Sun's purchase of StorageTek's stock, as Netbula affirmatively sought to continue Sun's ongoing distribution, earned more royalties as Sun continued to use its product, and never objected to the merger until this motion.

Finally, *SQL* erred by assuming that copyright law necessarily imposes a bright line prohibition on all succession by stock ownership, even those causing no harm. Nonetheless, if the Court is inclined to follow *SQL*, we would respectfully request supplemental briefing, given both Plaintiff's late addition of this issue, and the page limit constraints.

1   periods. Nor could the merger preclude summary judgment for the customer Defendants, as to
2   whom Plaintiff has presented no evidence of distributions after August 31, 2005.

## V.   PLAINTIFF HAS NO BASIS TO DELAY FOR FURTHER DISCOVERY.

Plaintiff suggests that it should have received more information in discovery, pointing to discovery responses served *five months* ago. Plaintiff had ample time to raise the issue. In its May 10, 2005 scheduling order, the Court set aside six months to handle the first phase of this proceeding, including unambiguous discovery cutoffs and a hearing date for this motion. Plaintiff has no right to sit on its hands and argue, when the hearing date arrives, that it needs more time. *See Stitt v. Williams*, 919 F.2d 516 (9th Cir. 1990) (affirming denial of Rule 56(f) motion where Court's scheduling order gave party 30 days to take depositions). Nor has plaintiff followed the requisite procedures for invoking Rule 56(f). *State of California v. Campbell*, 138 F.3d 772, 779 (9th Cir. 1998) (to obtain postponement, party must submit affidavit showing specific facts it hopes to elicit from further discovery, that the facts sought exist, and that these sought-after facts are "essential" to resist the summary judgment motion).[13] Plaintiff has presented no lawful basis to delay these dispositive motions.

## CONCLUSION

For the foregoing reasons, summary judgment, or in the alternative, summary adjudication on each issue presented, should be granted as to Plaintiff's copyright claims.

Dated: November 20, 2007                FENWICK & WEST LLP

                                        By:        /s/ JEDEDIAH WAKEFIELD
                                                Jedediah Wakefield
                                        Attorneys for Defendants STORAGE TECHNOLOGY
                                        CORPORATION, SUN MICROSYSTEMS, INC., EMC
                                        CORPORATION, and DARDEN RESTAURANTS, INC.

---

[13] Plaintiff also misstates the facts in arguing that it was not provided with the identity of the software engineers who used the SDK (Opp. at 29:2-5). Mr. Abramovitz testified to exactly that. *See* Yue Decl. Ex. 44 [Abramovitz Depo. at 17:12-18:8]. Plaintiff complains that Mr. Abramovitz did not know certain information about his employer's licensing practices, while failing to mention that Mr. Abramovitz was not the designated 30(b)(6) witness on these topics. Wakefield Reply Decl. ¶ 4. Plaintiff also mischaracterizes Defendants' objections to Interrogatory No. 7 (Opp. at 28:25-29:2), which objected on the grounds of mischaracterization of Mr. Melnick's statement. Netbula never took up Defendants' invitation to meet and confer on this Interrogatory, but Melnick answered all questions on the subject at deposition. Yue Decl. Ex. 43 [Melnick Depo. at 169:16-174:1].