IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NETBULA, LLC, | No. C06-07391 MJJ |
| Plaintiff, | **ORDER GRANTING MOTION FOR SUMMARY JUDGMENT AS TO COPYRIGHT CLAIM** |
| v. | |
| STORAGE TECHNOLOGY CORPORATION ET AL, | |
| Defendant. | |

## INTRODUCTION

Before the Court is Defendants Storage Technology Corporation ("StorageTek"), Sun Microsystems ("Sun"), International Business Machines Corporation ("IBM"), EMC Corporation ("EMC") and Darden Restaurants' ("Darden") (collectively, "Defendants") Motion for Summary Judgment as to License Defense. (Docket Nos. 63, 95.) Plaintiff Netbula LLC ("Plaintiff" or "Netbula") opposes the Motion. For the following reasons, the Court **GRANTS** the Motion.

## FACTUAL BACKGROUND

The undisputed facts in this matter are as follows.

Netbula, LLC was formed in July 1996. (Joint Statement of Undisputed Facts ("UF") ¶ 1.) Nebula's ONC RPC and Power RPC software facilitates the use of "Remote Procedure Call" ("RPC") technology. (*Id.*) RPC allows a program on a local computer to execute a command on a remote computer over a network. (*Id.*)

StorageTek was founded in 1969. (*Id.* ¶ 2.) StorageTek designed, manufactured and sold

hardware, software and services related to data storage, primarily based on tape-cartridge technology. (*Id.*) Among other products, StorageTek offered LibAttach, a software product that, among other things, allowed Windows computers to communicate with servers running StorageTek's Automated Cartridge System Library Software. (*Id.*) StorageTek also sold a storage management software product called REEL. (*Id.*)

Sun was founded in 1982. (*Id.* ¶ 3.) In the 1980s, it developed and distributed software used in the development of RPC technology. (*Id.*) Sun acquired StorageTek on August 31, 2005. (*Id.* ¶ 4.) Defendants Darden, EMC, and IBM are companies who obtained LibAttach or LibAttach Integrators' Kit software from StorageTek. (*Id.* ¶ 5.)

Plaintiff's ONC RPC and PowerRPC software contains: (1) a software development kit ("SDK") that consists of software tools used by programmers to create applications that use RPC technology, and (2) supporting programs ("Supporting Programs") that consist of software programs and components that can be used by applications developed with ONC RPC or PowerRPC. (*Id.* ¶ 6.) Netbula offers separate licenses for development and distribution of its RPC software: (1) SDL Licenses for computer programmers working at the licensee to use the SDK, and (2) Distribution Licenses (also called "Runtime Licenses") that give the licensee the right to distribute Netbula RPC Supporting Programs externally. (*Id.* ¶ 7.)

Netbula and StorageTek entered into a written agreement dated March 1, 2000 (the "first" or "2000 Agreement"), and another agreement on March 17, 2004 (the "second" or "2004 Agreement"). (*Id.* ¶ 8; Melnick Decl., Exhs. 1, 2.) StorageTek used Netbula's SDK in connection with development of StorageTek's REEL and LibAttach products. (UF ¶ 9.) StorageTek then distributed to its customers Netbula's Supporting Programs within certain versions of REEL and LibAttach. (*Id.*)

Plaintiff contends that it imposes limitations on both the SDK and Distribution licenses, and alleges that Defendants exceeded the scope of the licenses granted to them. Plaintiff's First Amended Complaint ("FAC") alleges: (1) copyright infringement, (2) intentional fraud, (3) breach of contract, (4) statutory unfair competition under California Business & Professions Code Section 17200 *et seq.*; and (5) equitable accounting and imposition of a constructive trust. (Complaint,

1  Docket No. 38.)  Defendants now seek summary judgment on the copyright infringement claim,
2  arguing that the existence and scope of the licenses between Plaintiff and StorageTek sufficiently
3  bars Plaintiff's ability to recover for copyright infringement.

## LEGAL STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of demonstrating the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file that establish the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets this initial burden, the burden then shifts to the non-moving party to present specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). The non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment. *Id.* at 247-48. An issue of fact is material if, under the substantive law of the case, resolution of the factual dispute might affect the case's outcome. *Anderson*, 477 U.S. at 248. Factual disputes are genuine if they "properly can be resolved in favor of either party." *Id.* at 250. Thus, a genuine issue for trial exists if the non-movant presents evidence from which a reasonable jury, viewing the evidence in the light most favorable to that party, could resolve the material issue in his or her favor. *Id.* "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted).

## ANALYSIS

Defendants contend that Plaintiff cannot succeed on its copyright infringement claim because StorageTek's use and distribution of the software at issue was licensed. "Generally, a copyright owner who grants a nonexclusive license to use his copyrighted material waives his right to sue the licensee for copyright infringement and can sue only for breach of contract." *Sun Microsystems, Inc. v. Microsoft Corp.*, 188 F.3d 1115, 1121-22 (9th Cir. 1999) ("*Sun I*"). However, the existence of a license to use a copyrighted work does not necessarily preclude a claim for copyright infringement.

3

*See S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1088 (9th Cir. 1989). Instead, when "a license is limited in scope and the licensee acts outside the scope, the licensor can bring an action for copyright infringement." *Sun I*, 188 F.3d at 1121-22. Where, as here, the existence of a license is not in dispute, the critical question is the scope of the license. *See S.O.S.,* 886 F.2d at 1088. "Before [Plaintiff] can gain the benefits of copyright enforcement, it must definitively establish that the rights it claims were violated are copyright, not contractual, rights." *Sun I*, 188 F.3d at 1122. The Court must therefore determine if Plaintiff has established that the disputed terms of the license are limitations on the scope of the license, and thus an issue of copyright, or independent contractual covenants and thus contractual rights. *See id.* If they are the former, then Plaintiff must also show that Defendants have acted outside of the scope of their license to survive this Motion. *See id.* (holding that a licensor can bring an action for copyright infringement if the "license is limited in scope *and* the licensee acts outside the scope") (emphasis added). If they are the latter, Defendants are entitled to summary judgment on the copyright infringement claim.

In determining if the terms of the license are covenants or limitations on the scope of the licenses, the Court looks to California contract law to the extent that it is consistent with federal copyright law and policy. *See id.* The Court therefore reviews relevant provisions of California contract law.

A covenant "is another word for a contractual promise." George W. Kuney & Donna C. Looper, California Law of Contracts § 6.32 (1st ed. 2007). A promise for contract purposes "is a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made." Restatement (Second) of Contracts § 2 (1981). Implied covenants are disfavored and will only be found if they effectuate the intent of the parties, are a legal necessity and "after examining the contract as a whole it is [] obvious that the parties had no reason to state the covenant[.]" *Ben-Zvi v. Edgar Co.*, 40 Cal. App. 4th 468, 473 (1995).

A condition, on the other hand, "is an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due." Restatement (Second) of Contracts § 224 (1981). Under California law a conditional obligation is one "when the

4

rights or duties of any party thereto depend upon the occurrence of an uncertain event." Cal. Civ. Code § 1434. A condition precedent, as is relevant here, "is either an act of a party that must be performed or an uncertain event that must happen before the contractual right accrues or the contractual duty arises." *Platt Pac., Inc. v. Andelson*, 6 Cal. 4th 307, 313 (1993). "Conditions precedent are disfavored and will not be read into a contract unless required by plain, unambiguous language." *Effects Associates, Inc. v. Cohen*, 908 F.2d 555, 559 n.7 (9th Cir. 1990).

It is a well-established rule that "[a] contract must be interpreted to give effect to the mutual, expressed intention of the parties. Where the parties have reduced their agreement to writing, their mutual intention is to be determined, whenever possible, from the language of the writing alone." *Ben-Zvi*, 40 Cal. App. 4th at 473. If, however, the written agreement is uncertain or ambiguous, then extrinsic evidence may be reviewed to determine the intent of the parties. *See Brawthen v. H&R Block, Inc.*, 28 Cal. App. 3d 131, 136 (1972). The California Court of Appeal offers a two-step process for determining whether extrinsic evidence may be considered when a written agreement exists that is allegedly ambiguous: (1) whether the writing was intended to be integrated, or the complete and final expression of their agreement; and (2) whether the agreement is susceptible of the meaning contended for by the party offering the evidence. *Bionghi v. Metropolitan Water District of Southern Cal.*, 70 Cal. App. 4th 1358, 1364 (1999). Even if a contract appears *unambiguous* on its face, there are still two instances in which parol evidence is admissible. *See Brawthen*, 28 Cal. App. 3d at 136. First, extrinsic evidence is admissible to show "the parties' understanding and intended meaning of the words used in their written agreement." *Id.* Second, when the written instrument is not integrated, then "extrinsic or parol evidence will ordinarily be admitted in aid of establishing the *complete* agreement." *Id.* at 137. The court determines, as a matter of law, whether the contract is integrated and allows parol evidence of additional terms or agreements when the additional agreement is one that "might naturally be made as a separate agreement by parties situated as where the parties to the written contract." *Id.* (quotation omitted).

A brief review of some of the cases analyzing the "scope" of licenses in this context is instructive. In *Sun Microsystems v. Microsoft Corporation*, No. C 97-20884, 2000 WL 33223397 (N. D. Cal. May 8, 2000) ("*Sun II*"), the district court confronted a similar question of scope with

regards to a software license agreement. In *Sun II*, the contract between the parties required that the commercially distributed software Defendant developed with Plaintiff's copyrighted software had to be compatible with certain other software. *See Sun II*, 2000 WL 33223397, at *1-2. The court found that this "compatibility" provision was a separate contractual covenant and not a limitation on the scope of the license itself because, inter alia, the contract says "nothing about the license grants being subject to, conditional on, or limited by compliance with the compatibility obligations." *See id.* at 3-4. In *S.O.S.*, the plaintiff argued that the defendant exceeded the scope of a software license by modifying the software when the contract granted the rights to *use* the copyrighted work, but explicitly reserved all ownership rights. *See S.O.S.*, 886 F.2d at 1087-88. The Ninth Circuit agreed with the plaintiff that the literal language of the license limited the licensee to use of the work, but did "not demonstrate[] that [the defendant] acquired any more than the right to possess a copy of the software." *Id.* at 1088. In *LGS Architects v. Concordia Homes of Nevada*, 434 F.2d 1150, 1151-52 (9th Cir. 2006), the license at issue limited the use of architectural plans to one specific development and required written authorization, and payment of a fee, to use the plans for other projects. The court held that this provision was a limitation on the scope of the license and that the scope was exceeded when the defendant used the plans in an unauthorized development and did not pay the fee upon which such construction was conditioned. *See id.* at 1156-57.[1]

With this legal framework in mind, the Court turns to the present case.

**A.    The License**

Plaintiff and StorageTek signed two written agreements, one in 2000 and another in 2004. (*See* Melnick Decl; Exhs 1, 2.) The two agreements are nearly identical. Both agreements contain identical language stating that "[t]his agreement is the final, complete and exclusive agreement between the parties relating to the subject matter hereof, and supercedes all prior or contemporaneous understandings and agreements relating to such subject matter, whether oral or written." (Melinck Decl., Exhs. 1, 2.) Within both agreements there are two distinct sections, one setting forth the terms for the SDK license and one setting forth the terms of the Distribution license.

---

[1] Plaintiff also cites *Wall Data Incorporated v. Los Angeles County Sheriff's Department*, 447 F.3d 769 (9th Cir. 2006). *Wall Data*, however, is inapposite on the specific question before the Court.

6

While Plaintiff appears, at times, to argue that certain limitations apply to both provisions although the language is only included in one of the provisions, the Court views the contract as setting forth two distinct provisions. First, Plaintiff agreed in the undisputed fact submitted to this Court that Netbula offers separate licenses for development and distribution of its RPC software: (1) SDL Licenses for computer programmers working at the licensee to use the SDK; and (2) Distribution Licenses (also called "Runtime Licenses") that give the licensee the right to distribute Netbula RPC Supporting Programs externally. (UF ¶ 7.) In addition, the language and the structure of the contracts require this reading. Each of the two provisions is titled separately, includes language granting a distinct license and contains its own terms and warranties. Finally, the SDK license states that SDK is for development only and a distribution license must be purchased to distribute any of the supporting components. (*See* Melnick Decl., Exhs. 1, 2.) The two provisions are therefore read as separate and distinct licenses within the contract. The Court will take each provision in turn.

### 1. SDK License Provision

The first provision in the 2000 Agreement, tilted "Netbula ONC RPC SDK and POWERRPC SDK Product License" grants to Storagetek:

> a non-exclusive, perpetual, irrevocable license for use by Storagetek's employees, consultants and subsidiaries for up to ONE user(s) for each of the licenses purchased, to use the PowerRPC SDK Product under Windows NT and 95/98 platforms; each user can only use the software on one on computer. You have the right to make additional copies of the SDK Product solely for backup or archival use.

(Melnick Decl., Exh. 1 at 1.) The first provision in the 2004 Agreement is substantively the same, save for the fact that it allows use of SDK product under "Windows Server 2003, NT/SK/XP and 95/98/ME platforms." (Melnick Decl., Exh. 2 at 1.) In 2000, StorageTek purchased eight SDK licenses and in 2004, StorageTek purchased at least one more license. (*See* Yue Decl., ¶¶ 35, 49; Defs.' Mem. of P. & A. at 23.)

Netbula alleges two purported violations of the SDK License. First, Plaintiff contends that StorageTek allowed more than the authorized number of developers to use the SDK. (*See* Plf.'s Opp. at 24-26.) Second, Plaintiff contends that StorageTek developed LibAttach and REEL products on the Windows 2000 operating system before March 2004 (after which it is undisputed that the 2004 SDK License allowed use on Windows 2000 machines). (*See id.*; Wakefield Decl. ¶ 2,

7

1 Exh. 1 ¶ 4.) Defendants argue that StorageTek used the SDK for the correct number of users, did
2 not use SDK on an unauthorized operating system and thus did not exceed the scope of the license.
3 The question here, therefore, is whether the license was limited in scope and whether
4 Defendants acted outside of that scope such that Plaintiff is entitled to bring a copyright claim
5 despite the license agreement.

6 First, turning to the number of users, both the 2000 and 2004 Agreements state that one user
7 may use each of the licenses purchased. This provision does not limit *how* the software may be
8 used, but instead defines what the purchase of one license gives the buyer. The amount charged for
9 each license is set forth separately in Exhibit C to the contract. (Melnick Decl., Exh. 1 at 7.) The
10 parties agree that StorageTek purchased eight licenses with the 2000 agreement and at least one with
11 the 2004 agreement. The agreement, therefore, does not appear to limit the *scope* of the license.
12 Instead, like the compatibility requirements in *Sun II*, the limitation on the number of users is a
13 separate contractual promise, or covenant, that does not limit or condition the use of the license.
14 Therefore, because this provision is not a limitation on the scope of the license, Plaintiff is not
15 entitled to a copyright infringement claim on this issue. Furthermore, the Court need not determine
16 whether Plaintiff can show that Defendants exceeded the allowable "use" under the provision.

17 Second, the SDK provision in the 2000 Agreement includes language that explicitly limits
18 the operating systems that may be used in conjunction with the SDK software. The agreement states
19 that the license is "to use the PowerRPC SDK Product under Windows NT and 95/98 platforms."
20 (Melnick Decl., Exh. 1 at 1.) This language, unlike the number of users per license language
21 discussed above, appears to limit the scope of the license itself and is not a separate contractual
22 covenant. Like the license in *LGS* and *S.O.S.*, this language restricts the way in which the licensed
23 material may be used and is part and parcel of the license grant itself. Unlike the limitation on the
24 number of "users" per license, this restriction limits the breadth of the license and not just the
25 duplication or payment for a license.

26 However, for Plaintiff to sustain a copyright infringement claim based on this limitation on
27 the scope of the license, Plaintiff must show that Defendants' use exceeded the scope of the license.
28 Here, Plaintiff does not set forth sufficient evidence that Defendants used the 2000 SDK on

8

unlicensed operating platforms. In fact, while there is some evidence in the record on this point, Plaintiff does not brief this argument explicitly. Plaintiff's evidence consists of "release notes" regarding StorageTek's LibAttach 1.1 software, which state that this software supports Windows 2000 systems, purportedly showing that it was developed for Windows 2000. (Yue Decl. ¶ 40; Exh. 13) This document, however, does not in and of itself contradict StorageTek's assertion that the SDK was only used on licensed operating platforms for development, rather than for distribution. Plaintiff's other evidence consists of numerous communications between StorageTek employees. Plaintiff offers these communications, however, to show that StorageTek *distributed* software for users on unlicensed platforms. In addition, none of the communications appear to implicate the development of software, using SDK, on incorrect platforms. Instead, Plaintiff's Opposition regarding the SDK licenses focuses on the unauthorized number of users. Furthermore, Defendants offer evidence that the 2000 SDK was only used on Windows NT operating systems, which was a licensed platform. (*See* Abramovitz Decl., ¶¶ 4-7.)

Plaintiff, therefore, may not bring a copyright claim for unauthorized use outside of the scope of the 2000 Agreement because Plaintiff does not produce evidence that Defendants exceeded the scope of the license. Plaintiff, therefore, has not met its burden and is not entitled to a copyright infringement claim on this issue.

### 2. Distribution License Provision

The second provision in the 2000 Agreement, titled, "Netbula ONC RPC and POWERRPC Distribution License" grants to StorageTek "a non-exclusive, perpetual, irrevocable license to copy, sublicense, transfer and distribute the NETBULA RPC Supporting Programs and components set forth on Exhibit B (the "Supporting Programs") along with StorageTek's product to StorageTek's resellers and customers." (Abramovitz Decl., Exh. 1 at 1.) The 2004 Agreement is substantially the same.[2] Plaintiff contends that StorageTek distributed more copies of Plaintiff's Supporting Programs than StorageTek initially paid for at the time of the 2000 Agreement and the 2004

---

[2] This provision in the 2004 Agreement grants to StorageTek "a non-exclusive, perpetual, worldwide, irrevocable license to copy, sublicense, transfer, demonstrate and distribute the NETBULA RPC Supporting Programs and components (including, but not limited to, all documentation and supporting materials therefor) set forth on Exhibit B (the "Supporting Programs") along with StorageTek's product to StorageTek's resellers, business partners and customers." (Abramovitz Decl., Exh. 2 at 2.)

9

Agreement, and that this distribution makes out a claim for copyright infringement. (*See* FAC ¶ 56-64.) StorageTek, however, acknowledges that it distributed more copies of Netbula's Supporting Programs than it paid for. (Defs.' Mem. of P. & A. at 14.) StorageTek contends, however, that the failure to pay for the licenses provides Plaintiff with a contractual claim under the licenses, but does not create a claim of copyright infringement. (*Id.*)

Again, the Court begins this analysis by reviewing the contracts to determine if the payment arrangement was a limitation on the scope of the license granted to StorageTek. The payment required under the licenses is set out, in each case, in "Exhibit C" of each license. The 2000 provision states that StorageTek "shall pay Netbula a one-time fee of $895 per license for all right granted under this Agreement with respect to the SDK Product, and one-time fee of $5995 for the right to distribute up to 1000 units of software containing the Supporting Programs." The provision also states that Netbula offered StorageTek additional units of Supporting Program licenses for the limited distribution license at discounted prices. (Abramovitz Decl., Exh. 1 at 7.) The 2004 Agreement provides substantially the same language with different prices. (Abramovitz Decl., Exh. 2 at 8.)

Here, the language reflected in Exhibit C of the 2000 and 2004 Agreements does not, on its face, *require* prepayment, nor does it condition the license grant on prepayment. Instead, the language reflects an agreement to sell licenses in units of 1000. Assuming, however, that the Court could read prepayment into the contract, or the Plaintiff could so prove, the license grant itself is not conditioned on such prepayment. An agreement to prepay, assuming it existed, does not establish that the license rights ran out at the moment the prepaid number of distributions were exhausted. Instead, any notion of prepayment would have to make explicit that the licensing rights ceased upon failure to prepay, thus making the condition precedent to the license explicit. Nowhere in Exhibit C to either of the licenses, or in the entirety of the licenses, is there any notion that StorageTek's failure to pay, or "prepay" as Plaintiff argues, is a limitation on the scope of the license or a condition precedent to the existence of the license. As noted above, conditions precedent are disfavored and courts should not imply them when they are not in the language of the contract. In addition, in a similar case, the Ninth Circuit refused to imply, from a contract that didn't so state,

10

that full payment was a condition precedent to a licensee's use of copyrighted material. *See Effects Associates, Inc. v. Cohen*, 908 F.2d 555, 559 n.7 (9th Cir. 1990). The Court therefore cannot construe the payment agreement, even if it were to require prepayment, as a condition on the license or as implicating the scope of the license itself.

Plaintiff, in response, offers extrinsic evidence that purportedly establishes that Defendants knew that the licenses required pre-payment. There are multiple problems with Plaintiff's argument and evidence. First, as stated above, an agreement to prepay does not convert the agreement into a limitation on the scope of the licenses. In addition, neither party disputes that these license agreements are integrated, the licenses do not appear ambiguous on their faces and Plaintiff does not point to ambiguous language or terms that extrinsic evidence may clarify. Plaintiff also does not argue that there was a collateral agreement of the sort that would reasonably be made and not included in the terms of the contract itself. Instead, Plaintiff offers evidence of communications that occurred one or more years after the time of contracting in which StorageTek employees state their concerns regarding over-distribution of the Netbula Supporting Programs. These communications do not illuminate the meaning of the contract at the time of contracting. Furthermore, the individual employees cited by Plaintiff submit declarations stating that their communications were not intended for this purpose and their use of terms about the payment or impact of distribution were not intended as legal conclusions because they had not reviewed the license, nor had they consulted an attorney as to the meaning of the terms of the agreements. (*See, e.g.*, Murray Decl.; Vatcky Decl.; Wagner Decl.; Rady Decl.) Finally, Defendants raise a number of potentially meritorious evidentiary objections regarding these documents and communications.

Plaintiff's failure to pay for future distribution of Netbula Supporting Programs does not, therefore, impact the scope of the license itself. Instead, it is a contractual covenant regarding the way payment was to be tendered. Plaintiff's contentions otherwise are unavailing. Plaintiff, therefore, has not met its burden of showing that the Distribution License limited the scope of the license and is not, therefore, entitled to a copyright infringement claim on this issue.

### 3.  Other Defendants are within the scope of StorageTek's Licenses.

Plaintiff sued StorageTek customers IBM, EMC and Darden based on their use of

11

1  StorageTek's LibAttach products. Thus, Netbula's copyright claims against these StorageTek
2  customers fail for the same reasons they fail against StorageTek. Since StorageTek's distribution of
3  the Supporting Programs was within the scope of StorageTek's Distribution Licenses, the
4  customers' use of those products was not infringing. Netbula does not contend otherwise, nor has
5  Netbula presented any evidence of any use by these customers beyond the licenses at issue here

### B.  Plaintiff's Other Arguments

In its Opposition, Plaintiff summarily claims that the 2004 Agreement was induced by fraud. (Plf.'s Opp. at 24). Plaintiff's only evidence is one statement from Dr. Yue that "we believe that but for the fraud, that the license would not be formed under the terms of the 2004 agreement. Therefore, we should be allowed to rescind from that agreement. That would probably render the agreement void." (*Id*.) Even if, with this one statement, Plaintiff could prove fraud in the inducement that would render the contract voidable, Plaintiff's counsel agreed on the record that Plaintiff's fraud claim "has nothing to do with whether there was a contract." (*See* Wakefield Decl., Exh. B. at 171-72.) Defendants' counsel sought clarification, and a stipulation, on this point specifically in order to understand Plaintiff's agreement and avoid discovery on this topic at this phase of the litigation. (Defs.' Mem. of P. & A. at 11.) While the exchange between the parties is less than clear, Plaintiff's counsel, at oral argument, conceded that Plaintiff took fraud off the table with regards to the copyright claim. In addition, Defendants clearly relied on Plaintiff's counsel's representations and it would be prejudicial for Plaintiff to revive this claim after having waived it on the record. Plaintiff's fraud argument is therefore unavailing.

Plaintiff also contends that during the "reverse triangular merger" between StorageTek and Sun, Netbula software code was impermissibly transferred to, and distributed by, Sun. (*See* Plf.'s Opp. at 28.) Defendants contend, however that Plaintiff raises this claim for the first time in its Opposition to this Motion and did not put Defendants on notice of this claim in the FAC or through discovery. (Plf.'s Reply at 12-13.) In addition, Defendants contend that Plaintiff had full knowledge of the Sun/SToragetek acquisition and allowed and encouraged Sun's continued distributions without terminating the 2005 Agreement until November 2006. (*Id*. at 13.)

In asserting this argument, Plaintiff relies on the clause in both the 2000 and 2004 Licenses

12

1  that states "[t]his Agreement may not be assigned by either party or amended without the written
2  consent of both parties, which shall not be unreasonably withheld." (Melnick Decl., Exh. 1 at 4;
3  Exh. 2 at 4.) To state a copyright infringement claim based on a violation of this provision,
4  however, Plaintiff has to show that this provision limits the scope of the license and that Defendants
5  exceeded that scope. Regardless of the untimeliness of Plaintiff's request, the Court finds that this
6  clause does not limit the scope of the license and is instead an independent contractual covenant.
7  Plaintiff, therefore, is not entitled to a copyright infringement claim on this issue.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' Motion for Summary Judgment on the Copyright Infringement Claim.

**IT IS SO ORDERED.**

Dated: January 17, 2008

_____
MARTIN J. JENKINS
UNITED STATES DISTRICT JUDGE